IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JOHN LOWN d/b/a LOWN RETIREMENT PLANNING; DAVID MESSING; MILES FINANCIAL SERVICES, INC.; JON BELLMAN d/b/a BELLMAN FINANCIAL; GOLDEN AGE INSURANCE GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 3:22-cv-00243-K-BN |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and MARTIN J. WALSH, SECRETARY OF LABOR, | § § § § | |
| *Defendants.* | § § | |

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Andrew G. Jubinsky
Texas Bar No. 11043000
andy.jubinsky@figdav.com
Don Colleluori
Texas Bar No. 04581950
don.colleluori@figdav.com

**FIGARI + DAVENPORT, LLP**
901 Main Street, Suite 3400
Dallas, Texas 75202
T: (214) 939-2000
F: (214) 939-2090

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   ARGUMENT AND AUTHORITIES .................................................. 3

    A. The Statutory and Regulatory History ................................................ 3

        1.  The ERISA Statute ................................................................. 3

        2.  The Five-Part Test ................................................................. 4

        3.  The 2016 Fiduciary Rule ........................................................ 5

        4.  The Chamber of Commerce Decision ....................................... 6

        5.  The Revised Exemption and New Interpretation ......................... 6

    B. The New Interpretation is a Final Agency Action Subject
       to Review Under the APA ................................................................ 7

    C. The DOL Exceeded its Authority in Promulgating the New Interpretation ..... 10

        1.  The New Interpretation Once Again Contravenes the
           Common Law Presumptive Meaning of Fiduciary ..................... 10

        2.  The New Interpretation Renders the Requirements
           of the Five-Part Test Meaningless ......................................... 13

           a.  The DOL has once again virtually
              eliminated the regular basis prong. ................................ 14

           b.  The New Interpretation neuters the mutual agreement prong. .............. 21

           c.  The New Interpretation also fails to properly address
               the remaining elements of the five-part test. ..................... 25

        3.  The New Interpretation Impermissibly Equates Sales
           Commissions with a Fees for the Provision of Investment Advice ........... 26

        4.  The New Interpretation Improperly Conflates ERISA Plans and IRAs
           and Attempts to Expand the Scope of the DOL's Regulatory Authority .... 29

    D. The New Interpretation is an Unreasonable Construction of ERISA ............... 34

        1.  The Major Questions Doctrine Applies and the
           DOL Lacks a Clear Congressional Authorization
           for the Vast New Regulatory Authority it Asserts ..................... 35

        2.  The New Interpretation is Unreasonable Under Any Standard ................. 36

III.  CONCLUSION ............................................................................... 42

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                 **PAGE(S)**

*Am. Fed'n of Unions Local 102 Health & Welfare Plan v.*
*Equitable Life Assurance Soc'y of the U.S.*,
841 F.2d 658 (5th Cir. 1988) ................................................................... 15, 38

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) ......................................................................... 9

*Bank One, Texas, N.A. v. Stewart*,
967 S.W.2d 419 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) .................... 23

*Beeson v. Fireman's Fund Ins. Co.*,
No. C-09-2776 SC, 2009 WL 2761469 (N.D. Cal. Aug. 31, 2009) ........................... 31

*Chamber of Commerce of United States of Am.*
*v. United States Dep't of Labor*,
885 F.3d 360 (5th Cir. 2018) .............................................................*passim*

*Chevron, USA, Inc. v. Nat. Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ................................................................................. 2, 36

*City of Arlington v. F.C.C.*,
133 S.Ct. 1863 (2013) ................................................................................. 34

*Cotton v. Mass. Mut. Life Ins. Co.*,
402 F.3d 1267 (11th Cir. 2005) .................................................................. 15

*Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*,
823 S.W.2d 591 (Tex. 1992) ....................................................................... 22

*Env't Procs., Inc. v. Guidry*,
282 S.W.3d 602 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ................... 22

*Meyer v. Cathey*,
167 S.W.3d 327 (Tex. 2005) ...................................................................... 21

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
702 F.3d 755 (4th Cir. 2012) ..................................................................... 39

*Nat'l Council for Adoption v. Blinken*,
4 F.4th 106 (D.C. Cir. 2021) ......................................................................... 8

*Qureshi v. Holder,*
    663 F.3d 778 (5th Cir. 2011) ................................................................ 7

*Sabre, Inc. v. Dep't of Transp.,*
    429 F.3d 1113 (D.C. Cir. 2005) ........................................................... 9

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.,*
    No. 6:21-CV-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022) ........................ 9

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ........................................................... 7, 8

*Util. Air Regulatory Grp. v. E.P.A.,*
    573 U.S. 302 (2014) .................................................................... 41

*W. Virginia v. Env't Prot. Agency,*
    142 S.Ct. 2587 (2022) (Gorsuch, J., concurring) ................................. 13, 35

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
    5 F.4th 997 (9th Cir.), *cert. denied*, 142 S.Ct. 713 (2021) ........................ 7

**STATUTES**

5 U.S.C. § 702 ........................................................................... 7

5 U.S.C. § 704 ........................................................................... 7

5 U.S.C. § 706(2)(A) .................................................................... 42

5 U.S.C. § 706(2)(C) .................................................................... 42

26 U.S.C. § 4975(c)(2) §1108(a) ......................................................... 4

26 U.S.C. § 4975(e)(1)(B) ............................................................... 3

26 U.S.C. § 4975(e)(3)(B) .............................................................. 11

29 U.S.C. § 1002(21)(A) .............................................................. 3, 27

29 U.S.C. § 1002(21)(A)(ii) ........................................................ 11, 28

29 U.S.C. §§1108(a) and (b) ............................................................. 3

29 U.S.C. § 1135 ...................................................................... 3, 4

## OTHER AUTHORITIES

26 C.F.R. § 54.4975-9(c) ................................................................. 5

29 C.F.R. 2510-3.21 ...................................................................... 7

29 C.F.R. § 2510.3-21(c)(1) ............................................................ 5

29 CFR § 2510.3-21(c)(1)(ii)(B) ...................................................... 31

29 CFR § 2510.3-21(c)(ii)(B) .......................................................... 25

49 Fed. Reg. 13208 (April 3, 1984) .................................................. 38

81 Fed. Reg. 20946 (April 8, 2016) ................................... 2, 24, 36, 37

85 Fed. Reg. 40589 (July 7, 2020) ................................................... 7

85 Fed. Reg. 40834 (July 7, 2020) ................................................... 6

85 Fed. Reg. 82798 (December 18, 2020) .......................................... 7

DOL Advisory Opinion 2005-23A .................................................... 30

J. Metzler, *Cleaning Up Quotations*,
    18 Journal of Appellate Practice and Process (2017) ...................... 1

DOL Advisory Opinion 83-60A (Nov. 21, 1983) ................................ 28

Plaintiffs[1] file this brief in support of their motion for summary judgment [Doc. 19], and state:

## I.   **INTRODUCTION**

This lawsuit presents the question of whether the DOL will be permitted to make an end run around a judgment rendered by the United States Court of Appeals for the Fifth Circuit. Through a strained reinterpretation of a long-standing regulation, the DOL has reinstated substantive elements of the 2016 Fiduciary Rule, which was emphatically struck down in its entirety by the Fifth Circuit in 2018. The question presented in this lawsuit is, at its core, whether the DOL may circumvent that ruling to the detriment of financial services providers across the nation and the clients they serve.

The express purpose of the 2016 Fiduciary Rule was "to regulate in an entirely new way hundreds of thousands of financial service providers and insurance companies in the trillion dollar markets for ERISA plans and individual retirement accounts (IRAs)." *Chamber of Commerce of United States of Am. v. United States Dep't of Labor*, 885 F.3d 360, 363 (5th Cir. 2018). According to the DOL, the market for retirement advice had changed dramatically since ERISA was enacted and the rule it had promulgated in 1975, which set out a five-part test defining who is an investment advice fiduciary under ERISA and the Code, was outdated. *Id*. at 365. Specifically, the DOL believed that numerous advisers, brokers, and insurance agents who worked with retirement savers were excluded

---

[1] Defined terms used herein shall have the same meaning as in Plaintiffs' motion for summary judgment. This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process (2017). Unless otherwise stated, all emphases are supplied by counsel.

from the definition of a fiduciary under the five-part test, and the 2016 Fiduciary Rule was therefore necessary to correct this perceived deficiency. *See* 81 Fed. Reg. 20946. 20954-56 (April 8, 2016).

The Fifth Circuit thought otherwise and vacated the 2016 Fiduciary Rule *in toto*. *Chamber of Commerce*, 885 F.3d at 388. The Fifth Circuit held that the 2016 Fiduciary Rule significantly expanded and conflicted with the statutory definition of fiduciary in ERISA and the Code, and the DOL therefore lacked the authority to promulgate it. *Id*. at 379. The court likewise held that the 2016 Fiduciary Rule was an unreasonable interpretation of the statutory text under *Chevron, USA, Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chamber of Commerce*, 885 F.3d at 379-88.

Notably, the DOL did not seek review of the Fifth Circuit's decision by the United States Supreme Court. Instead, the DOL has now resurrected and repackaged the substance of the vacated 2016 Fiduciary Rule through adoption of the Revised Exemption and accompanying New Interpretation of the five-part test. Although the DOL purports to leave the five-part test unchanged, the New Interpretation carries forward the root problem the Fifth Circuit identified in vacating the 2016 Fiduciary Rule: DOL's impermissible effort to rewrite and expand the definition of a fiduciary under ERISA and the Code. It should be manifestly apparent, however, that DOL cannot do indirectly what the Fifth Circuit has prohibited it from doing directly. Accordingly, like the 2016 Fiduciary Rule before it, the Court should vacate the New Interpretation under the APA.

## II.    ARGUMENT AND AUTHORITIES

### A.    THE STATUTORY AND REGULATORY HISTORY

#### 1.   *The ERISA Statute*

Congress enacted ERISA in 1974 to regulate employee benefit plans. *Id*. at 363-64. Title I of ERISA gives the DOL regulatory authority over union and employer sponsored retirement and welfare benefit plans. *See* 29 U.S.C. §§1108(a) and (b), 1135. The statute provides that a party is a fiduciary with respect to an ERISA plan to the extent that party: (a) exercises discretionary authority or control over the management of the plan or its assets; (b) renders investment advice for a fee or other compensation with respect to the assets of the plan or has the authority or responsibility to do so; or (c) has discretionary authority or control of the plan administration. *Id*. § 1002(21)(A). The second of these three subparts describes what is often referred to as an "investment advice fiduciary," and is at issue here.

Title II of ERISA amended the Code and, among other things, created individual retirement accounts and similar tax advantaged accounts (collectively, "IRAs"). 26 U.S.C. § 4975(e)(1)(B). Notably, the DOL does not have supervisory or regulatory authority with respect to IRAs comparable to its authority over ERISA Title I plans, and the Code does not impose statutory duties of loyalty and prudence on fiduciaries. *Chamber of Commerce*, 885 F.3d at 364. Instead, the Code allows the Internal Revenue Service to impose an excise tax on prohibited transactions involving either ERISA or IRA fiduciaries. *Id*. (citing 26

U.S.C. § 4975).[2] The only role granted to the DOL with respect to IRAs is to define "accounting, technical and trade terms," 29 U.S.C. § 1135 and to grant exemptions from the Code's prohibited transaction provisions (*i.e.*, PTEs). *Id.* §1108(a), 26 U.S.C. § 4975(c)(2).[3]

### 2.   The Five-Part Test

In 1975, shortly after ERISA was enacted, the DOL promulgated a regulation that established the five-part test for determining who is deemed to be rendering investment advice under ERISA and the Code. The 1975 rule provided that a person rendering investment advice is one who (1) "renders advice...or makes recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property" (2) "on a regular basis" (3) "pursuant to a mutual agreement...between such person and the plan" that (4) "will serve as a primary basis for investment decisions with respect to plan assets," and that (5) "such person will render individualized advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment

---

[2] Absent an exemption created by statute or regulation, the prohibited transaction provisions of ERISA and the Code generally prohibit fiduciaries with respect to a plan or IRA from, among other things, receiving compensation from third parties, such as commissions, in connection with transactions involving the plan or IRA.

[3] The DOL's lack of authority over IRAs is understandable given the historical context and reasons ERISA was enacted. ERISA has always been concerned with the integrity of employee benefit plans and enabling participating employees to monitor such plans to prevent mismanagement and abuse of plan funds. ERISA established standards for those individuals who manage plans, which are derived from common law of trusts, and enforcement provisions aimed at assuring plan funds are protected and participants who qualify receive their earned benefits. *See* www.dol.gov/agencies/ebsa/about-us/history-of-ebsa-and-erisa. By contrast, IRAs are purchased directly by and controlled by individual IRA owners with virtually unrestricted portability and thus are not subject to similar concerns relating to control and transparency.

---

policies or strategy, overall portfolio composition, or diversification of plan investments." 29 C.F.R. § 2510.3-21(c)(1).[4]

### 3. The 2016 Fiduciary Rule

Beginning in 2010, the DOL set out to change the five-part test, culminating in adoption of the 2016 Fiduciary Rule. The 2016 Fiduciary Rule was a "package of seven different rules that broadly reinterpret[ed] the term 'investment advice fiduciary' and redefine[d] exemptions to provisions concerning fiduciaries" for purposes of ERISA and the Code. *Chamber of Commerce*, 885 F.3d at 363. Specifically, the DOL replaced the 1975 rule and effectively sought to redefine who was an investment advice fiduciary to include anyone who renders investment advice and receives a fee or other compensation, direct or indirect. *Id*. at 373.

Recognizing its new definition of an investment advice fiduciary would encompass "virtually all financial and insurance professionals who do business with ERISA plans and IRA holders," the DOL also promulgated as part of the 2016 Fiduciary Rule a new PTE, known as the Best Interest Contract Exemption (the "BIC Exemption"). *Id.* at 366-67. To qualify for the BIC Exemption, providers of financial services were required to "enter into contracts with clients that, *inter alia,* affirm[ed] their fiduciary status; incorporate[d] 'Impartial Conduct Standards' that include[d] the duties of loyalty and prudence; 'avoid[ed] misleading statements;' and charge[d] no more than 'reasonable compensation.'" *Id*. at 367.

---

[4] The same definition is contained in the regulations under the Code. 26 C.F.R. § 54.4975-9(c).

### 4.   The Chamber of Commerce Decision

The Fifth Circuit vacated the 2016 Fiduciary Rule *in toto* in *Chamber of Commerce*. The court held that the 2016 Fiduciary Rule significantly expanded and conflicted with the statutory definition of fiduciary in ERISA and the Code, and the DOL therefore lacked the authority to promulgate it. *Id*. at 379. The Court likewise held that the 2016 Fiduciary Rule was an unreasonable interpretation of the statutory text and thus arbitrary and capricious within the meaning of the APA. *Id*. at 387-88. The Fifth Circuit's analysis of the defects in the 2016 Fiduciary Rule are discussed in detail below, along with Plaintiffs' explanation of how those same defects have been carried forward in the New Interpretation. In short, however, the Court categorically rejected the DOL's effort to "fundamentally transform[ ] over fifty years of settled and hitherto legal practices in a large swath of the financial services and insurance industries" by its expansion of the definition of investment advice fiduciary. *Id*. at 363.

### 5.   The Revised Exemption and New Interpretation

On July 7, 2020, the DOL proposed a new PTE to be made available to "registered investment advisers, broker-dealers, banks, and insurance companies (Financial Institutions) and their individual employees, agents, and representatives (Investment Professionals) that provide fiduciary investment advice to Retirement Investors."[5] 85 Fed. Reg., 40834, 40836 (July 7, 2020), AR 70, 72. The same day, the DOL issued a technical

---

[5] Consistent with the DOL's terminology, this brief will sometimes use the term "Retirement Investors" to refer to Title I ERISA plan participants and IRA owners, and the term "Investment Professionals" to refer generally to financial advisors, securities brokers, and insurance agents (such as the Plaintiffs herein).

amendment to 29 C.F.R. 2510-3.21 to remove the amendments to the 1975 rule that it had made in the 2016 Fiduciary Rule and to reinstate the text of the five-part test. 85 Fed. Reg. 40589 (July 7, 2020), AR 102-07.

On December 18, 2020, the DOL promulgated the Revised Exemption. 85 Fed. Reg. 82798, *et seq.*, AR 65-69. The Revised Exemption was accompanied by a lengthy preamble setting forth the DOL's New Interpretation of how the five-part test for investment advice fiduciaries is to be applied, as well as reversing a longstanding position of the DOL that recommendations pertaining to rollovers from Title I plans to IRAs were not considered fiduciary investment advice under ERISA. AR 1-64.

## B.   THE NEW INTERPRETATION IS A FINAL AGENCY ACTION SUBJECT TO REVIEW UNDER THE APA

A party seeking judicial review under the APA must have suffered a "legal wrong" or been "adversely affected or aggrieved" by a "final agency action." 5 U.S.C. §§ 702, 704. *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1006–07 (9th Cir.), *cert. denied*, 142 S.Ct. 713 (2021). A final agency action is one "that (1) 'mark[s] the consummation of the agency's decision-making process' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up). The courts apply a "flexible" and "pragmatic" interpretation of this finality requirement. *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

The text and context of the New Interpretation leave no doubt that it constitutes a final agency action subject to review by this Court under the APA. *See, e.g., EEOC*, 933

F.3d at 446 (EEOC guidance on employers' use of criminal records in hiring was final agency action because it had the effect of committing the agency to a view of that law that, in turn, forces a regulated party to alter its conduct or expose itself to potential liability); *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) (agency guidance that prohibited certain "soft" adoption referrals constituted a legislative rule where guidance was not mere clarification of existing rules and effect to was expose adoption agencies to enforcement action if they did not comply). Indeed, the DOL itself declares the New Interpretation as final. AR 2 ("This document also sets forth the [DOL's] *final interpretation of the five-part test* of investment advice fiduciary status for purposes of this exemption, and provides the [DOL's] views on when advice to roll over Title I Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code.") And in another lawsuit challenging DOL's promulgation of "Frequently Asked Questions" (or FAQs) about the Revised Exemption and New Interpretation, the DOL argues that the plaintiff "does not seek relief from the [Revised] Exemption or preamble" (*i.e.*, the New Interpretation), and that the FAQs "merely restate and synthesize for interested parties the contours of *the agency's policy as set forth in the preamble and the [Revised] Exemption*." APP 43, 46-47.

Plaintiffs have been adversely affected by the New Interpretation. As state-regulated insurance agents selling annuities to clients who may be rolling over funds from an ERISA plan or an IRA, Plaintiffs will for the first time be subject to regulation, and potential liability, as fiduciaries in connection with such transactions based on the standards set forth in the New Interpretation. Moreover, in cases of rollovers from Title I ERISA plans, the

New Interpretation will now deem them ERISA fiduciaries with respect to plans they have had no prior relationship with at all. Plaintiffs have been forced to adopt new procedures and documentation for these types of annuity sales or, in some cases, stop assisting clients altogether with respect to their investment of tax-qualified funds. APP 3-20. Accordingly, Plaintiffs have standing to bring this action to challenge the New Interpretation under the APA. *See*, *e.g.*, *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1117-18 (D.C. Cir. 2005) (computerized reservation agency had standing under APA to challenge Department of Transportation's assertion of jurisdiction over business by enactment of rule that impacted its operations); *see also Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:21-CV-425-JDK, 2022 WL 542879, at *5 (E.D. Tex. Feb. 23, 2022) (standing "is usually self-evident when the plaintiff is a regulated party or an organization representing regulated parties").

In addition, FACC has associational standing to bring this suit on behalf of its members. FACC is a trade organization whose members are independent marketing organizations, insurance agents, and agencies that market fixed insurance products including traditional fixed rate annuities and fixed indexed annuities. APP 18. The interests FACC seeks to protect are germane to its corporate purposes, and neither the claims asserted, nor the relief requested herein, require an individual member to participate in this suit. *See, e.g., Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

C.   **THE DOL EXCEEDED ITS AUTHORITY IN
     PROMULGATING THE NEW INTERPRETATION**

When the DOL attempted in 2016 to significantly expand the scope of its regulatory authority by jettisoning the five-part test and broadly redefining who would be deemed an investment advice fiduciary, it did so openly and forthrightly. That effort having been rebuffed by the Fifth Circuit, the DOL has now tried again with the promulgation of its New Interpretation. This time, however, it has attempted to proceed stealthily by professing adherence to the five-part test but radically reinterpreting and effectively eviscerating it. As detailed below, the New Interpretation carries forward many of the fundamental problems the Fifth Circuit identified in the 2016 Fiduciary Rule. The DOL's nominal concessions to what Congress intended in enacting ERISA, as explained in *Chamber of Commerce*, amount to nothing more than window dressing. Like the 2016 Fiduciary Rule, therefore, the New Interpretation should be struck down.

1.   *The New Interpretation Once Again Contravenes the
     Common Law Presumptive Meaning of Fiduciary*

In *Chamber of Commerce*, the Fifth Circuit catalogued numerous ways in which the 2016 Fiduciary Rule ran afoul of DOL's statutory authority under ERISA. The first and most important of these – the failure to adhere to the presumptive common-law meaning of fiduciary – is one the DOL barely acknowledges as it tries to steer around that decision in the New Interpretation. In this regard, the Fifth Circuit began its analysis with the recognition that "Congress's use of the word 'fiduciary' triggers the settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Chamber of Commerce*, 885 F.3d at 369-70

(cleaned up). The court went on to observe that fiduciary status at common law turns on the existence of a special relationship of trust and confidence between the parties, which "is the *sine qua non*" of a fiduciary relationship. Id. at 370-71.

The Fifth Circuit summarily rejected the DOL's argument that this common law presumptive meaning of fiduciary had been displaced by the statutory text or structure of ERISA. *Id*. at 371-72. To the contrary, the court concluded that the language of the statute undermined the broad reach of the 2016 Fiduciary Rule. *Id*. at 372. In this regard, ERISA provides that a person is a plan fiduciary if "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii).[6] The Fifth Circuit interpreted this provision as follows:

> Properly considered, the statutory text equating the "rendering" of "investment advice for a fee" with fiduciary status comports with common law and the structure of the financial services industry. When enacting ERISA, Congress was well aware of the distinction, explained further below, between investment advisers, who were considered fiduciaries, and stockbrokers and insurance agents, who generally assumed no such status in selling products to their clients. The [2016] Fiduciary Rule improperly dispenses with this distinction.

*Chamber of Commerce*, 885 F.3d at 372-73.

Contrary to the plain intent of the statute, the 2016 Fiduciary Rule provided that an investment advice fiduciary included anyone who was compensated in connection with a recommendation as to the advisability of a specific investment. *Id*. at 366. The failure to

---

[6] The Code includes the same definition for purposes of a fiduciary to an IRA. 26 U.S.C. § 4975(e)(3)(B).

honor the distinction between fiduciary investment advisers and financial salespeople was the fundamental flaw of the 2016 Fiduciary Rule:

> Congress does not "hide elephants in mouseholes." Had Congress intended to abrogate both the cornerstone of fiduciary status—the relationship of trust and confidence—and the widely shared understanding that financial salespeople are not fiduciaries absent that special relationship, one would reasonably expect Congress to say so. This is particularly true where such abrogation portends consequences that "are undeniably significant." Accordingly, the [2016] Fiduciary Rule's interpretation of "investment advice fiduciary" **fatally conflicts with the statutory text and contemporary understandings**.

*Id*. at 376 (cleaned up).

The DOL's New Interpretation of who is an investment advice fiduciary is nothing but a variation on the same misguided theme. It perpetuates the original sin of the 2016 Fiduciary Rule by completely ignoring the historically recognized distinction between fiduciary investment advisers and financial salespeople and failing to distinguish between those financial professionals who undertake a "special relationship of trust and confidence" with clients and those who do not. Indeed, the July 2020 notice of proposed rulemaking, which unveiled DOL's ideas for reinterpreting the five-part test, failed to even mention what the Fifth Circuit had called the *sine qua non* of the test, *i.e.*, the existence of a special relationship of trust and confidence between adviser and client.

As will be detailed below, the New Interpretation still operates to sweep within its reach financial salespeople, such as insurance agents and stockbrokers, who inarguably are *not* fiduciaries at common law. The DOL hopes to conceal this attempted circumvention of *Chamber of Commerce* by asserting that it has reinstated the five-part test and merely reinterpreted how that test applies "to current marketplace conduct and harmonizes with

the current regulatory environment." AR 12. This fig leaf provides insufficient cover, however, for what is once again a thinly veiled effort by the DOL to radically transform "over fifty years of settled and hitherto legal practices in a large swath of the financial services and insurance industries." *Chamber of Commerce*, 885 F.3d at 363.

In its briefing in the other lawsuit relating to the New Interpretation, the DOL candidly acknowledges it disagrees with the Fifth Circuit's decision, which it says was "in error." APP 40, 54. It is the province of the courts, however, to say what the law is, and the Fifth Circuit has clearly and authoritatively spoken on the issue of Congress' intent when it used the term fiduciary in ERISA. If the DOL disagrees, it should turn to Congress. As Justice Gorsuch recently explained:

> When Congress seems slow to solve problems, it may be only natural that those in the Executive Branch might seek to take matters into their own hands. But the Constitution does not authorize agencies to use pen-and-phone regulations as substitutes for laws passed by the people's representatives. In our Republic, "[i]t is the peculiar province of the legislature to prescribe general rules for the government of society." *Fletcher v. Peck*, 6 Cranch 87, 136, 3 L.Ed. 162 (1810).

*W. Virginia v. Env't Prot. Agency*, 142 S.Ct. 2587, 2626 (2022) (Gorsuch, J., concurring). Here, the DOL has attempted not only to usurp the role of Congress, but to overrule the judicial branch as well. This, it may not do.

### 2. The New Interpretation Renders the Requirements of the Five-Part Test Meaningless

In *Chamber of Commerce*, the Fifth Circuit explained that the five-part test captured the essence of the common-law definition of a fiduciary that Congress intended to incorporate when enacting ERISA. *Id.* at 365. By establishing a multi-prong, conjunctive

test, the 1975 regulation "echoed the then thirty-five-year old distinction drawn between an 'investment adviser,' who is a fiduciary regulated under the Investment Advisers Act, and a 'broker or dealer' whose advice is 'solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor.'" *Id*. at 364-65 (quoting 15 U.S.C. § 80b-2(a)(11)(C) (specifically excluding from the definition of investment adviser a broker or dealer whose advice regarding purchase or sale of securities "is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation" for such advice)). While the 2016 Fiduciary Rule simply eliminated several of the critical elements of the five-part test, the New Interpretation attempts to redefine them out of existence. The result is the same: the DOL has strayed from Congress' intent in a fundamental way, and the New Interpretation therefore cannot be allowed to stand.

### a.  The DOL has once again virtually eliminated the regular basis prong.

One of the principal problems with the 2016 Fiduciary rule was that it eliminated from the definition of investment advice fiduciary the criterion that such advice had to be provided on a regular basis. *Chamber of Commerce*. 885 F.3d at 369. The Fifth Circuit explained that the DOL had long considered this element of the five-part test to be one of the "hallmarks" of an advisor's fiduciary status. *Id*. The requirement that advice be given to the customer on a "regular basis" and be the "primary basis" for the customer's investment decision necessarily excluded one-time transactions, such as a customer's rollover of assets from a 401k plan to an IRA. *Id*. at 365. Under the 2016 Fiduciary Rule, however, such a one-time transaction in which an Investment Professional recommended

the purchase of a stock or annuity to a Retirement Investor, even in the absence of *any* prior relationship, would subject the Investment Professional to fiduciary status. *Id*. at 369.

The elimination of the regular basis requirement thus resulted in a definition of fiduciary that was untethered to the common law meaning Congress intended. While the five-part test "contemplated an intimate relationship between adviser and client beyond ordinary buyer-seller interactions," the 2016 Fiduciary Rule was at odds with the settled understanding of what was meant by "investment advice for a fee." *Id*. at 374. That understanding was reflected not just in the 1975 rule, but also in the "[s]ubstantial case law" that recognized the same "dichotomy between mere sales conduct, which does not usually create a fiduciary relationship under ERISA, and investment advice for a fee, which does." *Id. See*, *e.g.*, *Am. Fed'n of Unions Local 102 Health & Welfare Plan v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988) ("Simply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products."); *Cotton v. Mass. Mut. Life Ins. Co.,* 402 F.3d 1267, 1278-79 (11th Cir. 2005) (insurance company's sale of life policies to an ERISA plan, without more, was insufficient to create fiduciary duty to the plan). Similarly, the Fifth Circuit noted that federal and state legislation, as well as SEC regulations, sharply differentiated between investment advisers covered by, for example, the Investment Advisers Act, and brokers or dealers who provide advisory services only as incidental to their sales activities and receive no special compensation for same. *Chamber of Commerce*, 885 F.3d at 375.

With the 2016 Fiduciary Rule rejected, the DOL has now returned to this issue with the New Interpretation, trumpeting that the five-part test has been restored and professing

adherence to the Fifth Circuit's opinion. An examination of the substance of the New Interpretation, however, quickly reveals the DOL's supposed retreat is illusory. In this regard, the New Interpretation begins with the DOL's acknowledgement that "a single instance of advice to take a distribution from a Title I Plan and roll over the assets would fail to meet the regular basis prong" of the five-part test, as would "sporadic interaction" between an Investment Professional and a Retirement Investor. AR 8. This promising start is immediately and thoroughly subverted, however, by the DOL's further explanations, which serve only to sabotage the longstanding and plain meaning of the elements of the five-part test and thereby find a path back to the 2016 Fiduciary Rule's impermissibly over-inclusive definition of fiduciary.

It is immediately clear the New Interpretation does not require the type of substantial, ongoing relationship of trust and confidence between adviser and client that the Fifth Circuit held was the hallmark of a fiduciary relationship. Instead, the DOL now states that the regular basis prong will be satisfied in situations where an Investment Professional with no prior relationship to a Retirement Investor provides a recommendation if there is any ***expectation*** of an ongoing relationship between the parties. AR 9-10. According to the New Interpretation, this expectation can be demonstrated by, for example, "the parties agreeing to check-in [sic] periodically on the performance of the customer's post-rollover financial products." AR 9. Indeed, the DOL suggests that merely by holding themselves out as providing such ongoing services, Investment Professionals would satisfy the regular basis prong with respect to a brand-new customer. *Id*. In short, under the New Interpretation:

A financial services provider that recommends that Retirement Investors roll potential life savings out of a Title I Plan with the expectation of offering ongoing advice to the same Retirement Investor whose assets will now be held in an IRA should reasonably understand that the provider will be held to fiduciary standards.

AR 10.

This attempt to reinterpret the critical regular basis prong of the five-part test is unworkable, inconsistent with ERISA, and wholly incompatible with the holding in *Chamber of Commerce*. In promulgating the New Interpretation, the DOL brushed aside the concerns expressed by numerous commenters that it had effectively eliminated the regular basis prong because every financial professional seeks to develop or nurture a relationship with his or her customers, and whether in time a special relationship of trust and confidence will actually develop is usually unknowable. AR 9. These concerns were valid, however, and the superficial analysis offered by the DOL to dismiss them makes no meaningful effort to reconcile its expansive reinterpretation with the Fifth Circuit's clear holding.

To begin with, the Fifth Circuit's criticism regarding elimination of the regular basis element in the 2016 Fiduciary Rule was not limited to the fact that it would impose a fiduciary duty in the case of a one-time encounter between an Investment Professional and a Retirement Investor. That was merely the most obvious, and extreme, example provided by the court to illustrate the fundamental problem—*i.e.*, that eliminating the regular basis prong meant that the regulatory test was no longer grounded in the concept of a fiduciary relationship as it was known at common law and incorporated in ERISA. *Chamber of Commerce*, 885 F.3d at 369.

Reinterpreting the regular basis prong to encompass a one-time sales recommendation if it is accompanied by any expectation of a future relationship merely reverts to, rather than cures, the very problem the Fifth Circuit identified with the 2016 Fiduciary Rule. As the Fifth Circuit observed, in a one-time rollover transaction "it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id*. at 380. This same anomaly persists under the New Interpretation. Notably, the DOL could have complied with the Fifth Circuit's ruling by simply reinstating the five-part test, which has an extensive history and well-established meaning. Instead, the DOL seeks to obfuscate by putting forward its New Interpretation, which demonstrates it is still attempting to turn ordinary brokers and insurance agents involved in sales activities into fiduciaries based not on the existence of an ongoing special relationship of trust and confidence, but on the fact that they are directing those sales efforts at ERISA plan members and IRA owners.

The following hypothetical cited by the Fifth Circuit to demonstrate that even a broker's "cold call" would fall within the extraordinary scope of the 2016 Fiduciary Rule is, with the minor modification highlighted, equally applicable to the New Interpretation.

> [A] broker-dealer otherwise unrelated to an IRA owner tells the IRA owner, "You'll love the return on X stock in your retirement plan, let me tell you about it" (the "investment advice")"; ***the broker-dealer adds "I'll follow up with you and if you like X stock I can recommend other stocks" and the IRA owner says "sure"***; the IRA owner purchases X stock; and the broker-dealer is paid a commission (the "fee or other compensation").

*Id*. at 369. Based on this single sales transaction ***and the broker-dealer's expectation of a continuing relationship***, the broker-dealer would be deemed an investment advice

fiduciary under the New Interpretation. And an insurance agent who recommended an annuity product to a Retirement Investor would meet the same fate.

It is difficult to conceive how any stockbroker or insurance agent could avoid satisfying the DOL's "just checking in" standard for the regular basis element. As noted, all financial salespeople attempt to cultivate relationships with their customers. To avoid being labeled fiduciaries under the New Interpretation, however, salespeople would have to take the extraordinary step of advising clients up front that they will not follow up at all with the client regarding the investment and will not do any future business with the client. Obviously, that is not how the real world works. Indeed, even then, these salespeople could still be deemed fiduciaries under the New Interpretation if they or their firms hold themselves out to the public as providing such continuing services generally, regardless of whether they are offered to, or accepted by, the client. All of this represents defiance of, not compliance with, the Fifth Circuit's decision.

The DOL asserts that the New Interpretation is appropriate because even a relationship of trust and confidence must have a starting point, and a financial adviser does not get a free pass for the first instance of fiduciary investment advice. AR 10. If the New Interpretation were limited to situations involving a formal agreement between a financial professional and client for the provision of investment advice for a fee, this argument might have merit. That, however, is not DOL's position.[7] Instead, the New Interpretation, like the 2016 Fiduciary Rule before it, indiscriminately brings securities salespeople and insurance

---

[7] To the contrary, as discussed *infra*, the New Interpretation also effectively eliminates the "mutual agreement" element of the five-part test.

agents under the investment advice fiduciary umbrella based on nothing more than their hopes of being able to continue doing business with a customer. *Chamber of Commerce* teaches, however, that those professionals may only be categorized as such if they have the type of special relationship of trust and confidence with a client that has historically been recognized as fiduciary in nature. As a matter of law, such a relationship cannot exist where there is no prior relationship and there is nothing more than hope or expectation, on the part of either or both parties, that such a relationship may take root in the future.[8] The New Interpretation is therefore at odds with common law and inconsistent with *Chamber of Commerce.*

When commenters pointed out that the notion of a relationship of trust and confidence existing in the first encounter between an Investment Professional and a Retirement Investor was irreconcilable with *Chamber of Commerce*, the DOL's paltry response was to note that the Fifth Circuit agreed an investment adviser registered under the Investment Advisers Act could appropriately be considered a fiduciary without indicating that such status would only apply after a period of time. AR 12.[9] But that proves

---

[8] The DOL does not explain, because it cannot, how its expectations-based model of fiduciary status makes any sense when, even it must concede, such a relationship of trust and confidence may never come to pass. According to the New Interpretation, the disappointed agent or broker was nevertheless a fiduciary to that Retirement Investor from the outset based merely on his or her unfulfilled hope for future business. Conversely, the DOL provides no meaningful answer to how an agent or broker who has no expectation of a future relationship with a customer would be able to retrospectively demonstrate that fact if one nonetheless develops later.

[9] In responding to these commenters, the New Interpretation also noted that the Fifth Circuit spoke approvingly of the SEC having repeatedly held that in furnishing investment advice for a fee, the gathering of personal and intimate information about a client itself cultivates a confidential relationship. AR 12-13 (citing *Chamber of Commerce*, 885 F.3d at 374). However, DOL inverts the very point being made by the court by conspicuously omitting the immediately following sentences, which are far more pertinent: "The SEC cautioned that fiduciary status does not follow

---

nothing because investment advisers are required by law and the nature of their work to be fiduciaries. Registered investment advisers are not the intended target of the New Interpretation. It is aimed instead at Investment Professionals who are not formal fiduciaries and who do not have an existing special relationship of trust and confidence, as that term has long been understood at common law. *See*, *e.g.*, *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) ("To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit.") (cleaned up). According to the Fifth Circuit, without such an existing relationship those financial salespeople cannot be investment advice fiduciaries. Under the New Interpretation, they will be.

### b. The New Interpretation neuters the mutual agreement prong.

The New Interpretation also reimagines the mutual agreement prong of the five-part test in a way that is loosed from its moorings in the common law concept of a fiduciary. In this regard, the New Interpretation simply assumes that ***any*** type of ongoing relationship with an Investment Professional must be fiduciary in nature, without any meaningful consideration of whether the marketplace or the parties themselves would expect that to be the case. As noted above, the DOL's position is that anyone who recommends that Retirement Investors roll "potential life savings" out of a 401k into an IRA with the

---

'merely from the fact that [the broker-dealer] renders investment advice.' Indeed, broker-dealers "who render investment advice merely as an incident to their broker-dealer activities" are not fiduciaries '***unless they have by a course of conduct placed themselves in a position of trust and confidence as to their customers***.'" *Id.* (cleaned up).

expectation of offering any ongoing advice "should reasonably understand that [he or she] will be held to fiduciary standards." AR 10. Conspicuously absent from this framing is any mention of a special relationship of trust and confidence or any facts that would evidence the same. Instead, in the DOL's paternalistic view it is enough that a potential rollover from a Title I plan to an IRA is a significant transaction for the Retirement Investor. In other words, as with the primary basis prong, the mutual agreement requirement is reduced to nothing more than a vague expectation of ongoing advice.

Of course, the DOL has the default presumption exactly backwards. It has long been recognized at common law that most business relationships are ***not*** fiduciary in nature. Apart from historically recognized, "formal" fiduciary relationships (*e.g.*, trustee-beneficiary), it is the rare case in which one party in a commercial setting binds itself to act for the benefit of the other party as a fiduciary. *See Chamber of Commerce*, 885 F.3d at 370-71 (development of common law concept of fiduciary reflected "a situation wherein a person assumed the character of a trustee, or an analogous relationship," where a party has accepted "an obligation to act in a position of trust or confidence for the benefit of another"). The fact that parties have had prior dealings over a period time does not, in itself, evidence the special relationship of trust and confidence that must exist to be labeled fiduciary. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex. 1992). Many individuals have longstanding and financially significant relationships with financial professionals such as stockbrokers, banks, or insurance agents that are not fiduciary in nature. *See*, *e.g.*, *Env't Procs., Inc. v. Guidry*, 282 S.W.3d 602, 627-28 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (insurance broker was not a fiduciary of

client); *Bank One, Texas, N.A. v. Stewart,* 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (relationship between a bank and its customer is generally not a fiduciary one).

The mutual agreement prong of the five-part test ensures that parties enter into a fiduciary investment advice relationship knowingly and voluntarily. But the New Interpretation diminishes this crucial element, paying little more than lip service to its importance, while enshrouding it in a cloud of doubt. The New Interpretation is replete with equivocations on this point, stating on one hand that "parties can make clear in their communications that they do not intend to enter into an ongoing relationship to provide investment advice" (AR 8), but also that the DOL "intends to consider the reasonable understanding of each of the parties" and "written statements disclaiming a mutual understanding . . . will not be determinative." AR 9. All of this is designed to obscure the question of whether the parties are intentionally and voluntarily entering into a special relationship of trust and confidence, thus leaving this key element of the five-part test in tatters.

Indeed, the DOL metaphorically thumbs its nose at the Fifth Circuit's extensive reliance on common law, established market practices and understanding, and other federal and state statutory authorities to determine Congress' intent when it used the term fiduciary in ERISA. *Chamber of Commerce*, 885 F.3d at 369-71, 372-76. According to the DOL: "The fact that a financial services professional is not considered a fiduciary under other laws, such as securities law or insurance law, is not a determinative factor under the five-part test." AR 11. Having thus dispensed with established marketplace norms regarding the

nature of a stockbroker's or insurance agent's role, the DOL proceeds to take the position that the parties themselves cannot define the nature of the relationship either by agreeing to an explicit disclaimer that an Investment Professional is not a fiduciary. AR 9.[10]

Notably, when the DOL promulgated the 2016 Fiduciary Rule, one of its justifications for scrapping the five-part test entirely was that it was supposedly too easy for an Investment Professional to defeat fiduciary status by asserting the mutual agreement prong was not met due to such a disclaimer, even though the Investment Professional was in fact providing individualized investment advice. *See* 81 Fed. Reg. 20946, 20955. Even then, this concern on the DOL's part missed the mark, as the mutual agreement prong is more properly concerned with whether the parties intend to undertake the kind of special relationship of trust and confidence that is deemed fiduciary. More importantly for present purposes, however, the fact that the DOL now emphasizes that such contractual disclaimers may readily be disregarded in applying the five-part test demonstrates that DOL is not engaged in interpretation at all, but rather is attempting to rewrite the five-part test *sub silentio*.

---

[10] The New Interpretation does acknowledge that such a disclaimer could be considered, although it would not be binding. *Id*. Paradoxically, however, one of the requirements of the Revised Exemption, which is discussed *infra* at 40-41, is a statement by the Investment Professional that he or she is a fiduciary. According to the DOL, such a statement is required because it "ensures clarity as to the nature of the relationship between the parties." AR 9. Evidently, the DOL wants clarity only in the direction of its pre-selected outcome.

### c. The New Interpretation also fails to properly address the remaining elements of the five-part test.

The other equally important elements of the five-part test require that the Investment Professional provides individualized advice that will be a primary basis for the investment decision with respect to assets of an ERISA plan or IRA. 29 CFR § 2510.3-21(c)(ii)(B). These elements also describe hallmarks of a fee-based Investment Professional, such as a registered investment adviser, who has an intimate knowledge and understanding of a client's entire financial picture and whose specific job is to provide tailored investment advice "based on the needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification." *Id*. That is not, however, the normal function of stockbrokers and insurance agents engaged in sales to individual customers.

To the extent the New Interpretation addresses these elements at all, it once again does so in a way that fails to recognize the foregoing distinctions between salespeople and fiduciary investment advisers. For example, the New Interpretation recognizes that a Retirement Investor may engage multiple financial professionals (e.g., stockbroker, accountant, insurance agent) and may even consult with all of them about a particular investment. AR 11. Undoubtedly, the investor consults with multiple professionals because each may play a different role with respect to the investor's overall financial situation, such as a stockbroker who is focused on asset growth or income, while an insurance agent is focused on asset protection and mitigation of risk. In the DOL's view, however, each would satisfy the primary basis prong of the five-part test as to any investment advice – even as

to the same investment – if "the parties reasonably understand that the advice is important to the Retirement Investor and could determine the outcome of the investor's decision." *Id*. According to the DOL, any "advice based on the individual needs of the Retirement Investor will typically involve a reasonable understanding by both parties that the advice will serve as at least a primary basis for the decision." *Id*.

Once again, the DOL's conflation of the elements of the five-part test and counterfactual assumptions turn virtually every financial sales transaction into fiduciary investment advice. That is the antithesis of the meaning of fiduciary as the term was used by Congress in ERISA and explained by the Fifth Circuit in *Chamber of Commerce*. The fact that DOL blithely assumes every such consultation satisfies the requirements of individualized advice that serves as the primary basis for an investment decision is telling. Combined with its gutting of the other prongs of the five-part test, there can be no doubt as to the DOL's intent in the New Interpretation. The DOL has not laid out understandable, objective criteria for application of the five-part test in compliance with the Fifth Circuit's direction. Instead, it has again cast an unacceptably wide net in an attempt to deem as a fiduciary anyone who provides any type of investment advice to a Retirement Investor, while ostensibly abiding by the Fifth Circuit's ruling. The Court should reject this subterfuge and vacate the New Interpretation.

3.   *The New Interpretation Impermissibly Equates Sales Commissions with a Fees for the Provision of Investment Advice*

In *Chamber of Commerce*, the Fifth Circuit also roundly rejected another aspect of DOL's approach to redefining a fiduciary, namely its failure to recognize the significance

of how the purported fiduciary is compensated. As part of its analysis tying the five-part test to the definition of fiduciary at common law (as Congress intended), the Fifth Circuit emphasized that the distinction between sales agents and fiduciary advisers is customarily reflected in how each is compensated. *Chamber of Commerce*, 885 F.3d at 373. The New Interpretation defies this aspect of the court's ruling as well.

To be an investment advice fiduciary under ERISA a person must provide such advice "for a fee." 29 U.S.C. § 1002(21)(A). As was the case with the 2016 Fiduciary Rule, the New Interpretation ignores that, unlike registered investment advisers, stockbrokers and insurance agents generally receive their compensation in the form of commissions for completed sales, not for advice they may provide in making those sales. The Fifth Circuit broadly condemned the failure to recognize the important distinctions between these two models of compensation in rejecting the 2016 Fiduciary Rule:

> Had Congress intended to include as a fiduciary any financial services provider to investment plans, it could have written ERISA to cover any person who renders "*any* investment advice for a fee...." The word "any" would have embodied DOL's expansive interpretation, and it is a word used five times in ERISA's tripartite fiduciary definition, *e.g.*, "*any* authority or responsibility." Further, DOL's interpretation conjoins "advice" with a "fee or other compensation, direct or indirect," but it ignores the preposition "for," which indicates that the purpose of the fee is not "sales" but "advice." Therefore, taken at face value, the provision rejects "*any* advice" in favor of the activity of "render[ing] investment advice for a fee." Stockbrokers and insurance agents are compensated only for completed sales ("directly or indirectly"), not on the basis of their pitch to the client. Investment advisers, on the other hand, are paid fees because they "render advice." The statutory language preserves this important distinction.

*Chamber of Commerce*, 885 F.3d at 372-73 (cleaned up).

The Fifth Circuit went on to explain that the DOL's attempt to equate individual sales transactions with stand-alone furnishing of investment advice was also inconsistent with the last clause of the ERISA provision defining investment advice fiduciaries. Specifically, § 1002(21)(A)(ii) describes as fiduciaries not only a person who renders investment advice for a fee, but also a person who "has any authority or responsibility to [render investment advice]." Construing these provisions in context, the court criticized the DOL's attempted rewriting of the statute, observing that "[o]nly in DOL's semantically created world do salespeople and insurance brokers have 'authority' or 'responsibility to 'render investment advice.'" *Chamber of Commerce*, 885 F.3d at 373.

The New Interpretation carries forward the same misguided approach to compensation found within the 2016 Fiduciary Rule. Once again commenters surfaced this concern, pointing out that DOL's reading of what constitutes the rendition of "investment advice for a fee" is inconsistent with ERISA, the long-standing interpretation of the five-part test, and the *Chamber of Commerce* opinion. AR 13. DOL refused to bend, responding only with the vague assertion that the Fifth Circuit had not specifically criticized the DOL's longstanding position that the required fee for investment advice "may include" a brokerage commission if the broker satisfied all of the elements of the five-part test. *Id*. While that is true, it is also misleading given the full context of the Court's comments, which merely acknowledged the DOL's position that the receipt of a commission was not necessarily "dispositive" of whether a broker was receiving a portion of that commission as compensation for rendering "investment advice." *Chamber of Commerce*, 885 F.3d at 373-74 (quoting DOL Advisory Opinion 83-60A (Nov. 21, 1983)). Even that advisory

opinion, however, presupposed that was not the norm, but merely allowed for the possibility that "if, under the particular facts and circumstances," the broker otherwise provided "individualized advice on a regular basis pursuant to a mutual agreement with the client," it was possible that, "even in the absence of a distinct and identifiable fee for such advice, a portion of the commissions paid to the broker-dealer would represent compensation for the provision of such investment advice." *Id*. at 374. In other words, in a particular case, a broker and client could agree that is how the broker would be paid for investment advice.

Merely acknowledging the possibility that there may be rare cases where a broker agrees to provide investment advice to a client on a regular basis and be paid for that advice only if and when the broker earns a commission on a completed sale is obviously a far cry from endorsing the DOL's attempted obliteration of the historical divide between commissioned salespeople and fee-based advisers. The Fifth Circuit strongly condemned the latter, holding that "investment advice for a fee" contemplates "an intimate relationship between adviser and client beyond ordinary buyer-seller interactions" and rejecting the 2016 Fiduciary Rule because it was "at odds with that understanding." *Id*. Because the New Interpretation embodies that same approach, it too cannot be squared with the text of ERISA and the Fifth Circuit's ruling.

### 4. *The New Interpretation Improperly Conflates ERISA Plans and IRAs and Attempts to Expand the Scope of the DOL's Regulatory Authority*

Under Title I of ERISA, the DOL possesses "far-reaching regulatory authority" over ERISA benefit plans. *Id*. at 364. Title II does not, however, grant the DOL similar authority

with respect to IRAs. *Id*. Instead, the DOL's role is limited to granting exemptions from prohibited transaction and defining "accounting, technical and trade terms" for purposes of the Code. IRA fiduciaries are not subject to the statutory duties of loyalty and prudence imposed on ERISA plan fiduciaries, and Title II did not create any federal cause of action for IRA owners like those available under ERISA. *Id*.

In addition to its other defects, the New Interpretation also significantly erodes this clear line of demarcation. Along with radically reinterpreting what the five-part test means, the New Interpretation also states that the DOL has withdrawn its Advisory Opinion 2005-23A, dated December 7, 2005 (copy at APP 64-66), commonly referred to as the "Deseret Letter." AR 6. The Deseret Letter provided a straightforward answer to the question whether a recommendation to an ERISA plan participant to withdraw his or her account balance from the plan would constitute investment advice with respect to the plan:

> It is the view of the Department that merely advising a plan participant to take an otherwise permissible plan distribution, even when that advice is combined with a recommendation as to how the distribution should be invested, does not constitute "investment advice" within the meaning of the regulation (29 CFR § 2510-3.21(c)). The investment advice regulation defines when a person is a fiduciary by virtue of providing investment advice with respect to the assets of an employee benefit plan. The Department does not view a recommendation to take a distribution as advice or a recommendation concerning a particular investment (*i.e.*, purchasing or selling securities or other property) as contemplated by regulation § 2510.3-21(c)(1)(i). Any investment recommendation regarding the proceeds of a distribution would be advice with respect to funds that are no longer assets of the plan.

APP 65 (footnotes omitted).

The Deseret Letter, which remained in place for the next 15 years, is consistent with the structural dichotomy between Titles I and II, as well as the text of ERISA, which defines

a fiduciary as one who renders investment advice for a fee with respect to money or other property **of the plan** or has the authority to do so. Merely advising an employee to withdraw funds from a 401k plan is not, in the usual meaning of such words, advice regarding the investment of plan assets. *See Beeson v. Fireman's Fund Ins. Co.*, No. C-09-2776 SC, 2009 WL 2761469, at *7 (N.D. Cal. Aug. 31, 2009) (financial advisers' provision of investment advice to employees to withdraw funds from employer plan to invest in entities promoted by advisers did not constitute investment advice regarding plan assets or implicate duties owed under ERISA). And investment advice with respect to funds in an IRA that have been rolled over from an ERISA Title I plan are obviously no longer assets of the plan either.

The New Interpretation summarily withdrew the Deseret Letter, deeming it "incorrect." AR 6. Now, says DOL, "the better view is that a recommendation to roll assets out of a Title I Plan is advice with respect to moneys or other property of the plan." *Id*. This abrupt disavowal of its longstanding advisory is of a piece with the effort by the DOL to reinterpret the five-part test beyond recognition. In this regard, the five-part test speaks in terms of investment advice involving recommendations as to the advisability of investing in, purchasing, or selling securities or other property, not whether retirement funds should be held in a Title I plan or an IRA. Moreover, it specifically requires that such investment advice be rendered "on a regular basis **to the plan**." 29 CFR § 2510.3-21(c)(1)(ii)(B). Rollover recommendations from a financial professional who has had no prior involvement with a Title I plan, or an individual participant's plan account, cannot possibly be said to have been rendering investment advice to the Title I plan on a regular basis.

It is important to recognize the full import of the DOL's decision to reverse the longstanding position articulated in the Deseret Letter, which had never been controversial and always regarded as consistent with the text of ERISA. For not only has the DOL withdrawn the Deseret Letter, it also simultaneously announced that Title I plan assets and non-plan assets will be treated as indistinguishable for purposes of applying the five-part test to determine whether an adviser is a fiduciary to a Title I plan. The DOL explains:

> Given that the identical five-part test definition appears in the regulatory definition under both Title I and the Code, the advice is rendered to the exact same Retirement Investor (first as a Plan participant and then as IRA owner), and the IRA assets are derived, in the first place, from that Retirement Investor's Title I Plan account, it is appropriate to conclude that an ongoing advisory relationship spanning both the Title I Plan and the IRA satisfies the regular basis prong. It is enough, in the scenarios outlined above, that the same financial services provider is giving advice to the same person with respect to the same assets (or proceeds of those assets), pursuant to identical five-part tests. A different outcome could all too easily defeat legitimate investor expectations of trust and confidence by arbitrarily dividing an ongoing relationship of ongoing advice and uniquely carving out rollover advice from fiduciary protection.

AR 10. With surface logic, the DOL attempts to create the impression it is articulating nothing more than an incremental progression in regulatory analysis, but in reality, it is taking a radically new position that is inconsistent with the five-part test and ERISA and which promises to have enormous ramifications.

Under the true five-part test, without straining its natural meaning, a person is a fiduciary only if such person renders advice on a regular basis "***to the plan***." Even if a recommendation to roll over assets from a 401k plan could be regarded as a recommendation "as to the advisability of investing in, purchasing, or selling securities or other property" (which, as discussed above, is itself a strained interpretation), such a one-

time recommendation cannot reasonably be considered advice given "on a regular basis *to the plan*". The DOL's inconsistency is underscored by the fact that it takes the opposite position with regard to non-qualified taxable investments. Specifically, the New Interpretation states that even regular advice to a plan participant regarding non-qualified account investments would not meet the five-part test "based solely on an additional one-time advice with respect to the Plan or IRA." AR 10. None of this make any sense; the truth is that the DOL's explanation is all over the map, driven not by logic and the text of ERISA but by a desired outcome.

Under the DOL's new position, individual retail advisers, such as insurance agents discussing the purchase of an annuity with clients sitting across the kitchen table, have suddenly become not only fiduciaries, but *Title I plan fiduciaries*, subject to ERISA duties of prudence and loyalty, ERISA causes of action, and DOL's jurisdiction and enforcement authority. For example, if an insurance agent meets with a longstanding client who separated from employment years earlier and is interested in cashing out of an older 401k account to purchase an annuity product in an IRA, the agent - who had no pre-existing relationship whatsoever with the employer plan - will be a fiduciary to that plan under the New Interpretation. Similarly, were an agent to meet with a client to provide personal financial advice covering the client's entire portfolio, that situation alone could render the agent an ERISA fiduciary if any of the advice incidentally touched on any 401k assets the client has.

In its zeal to reinterpret the five-part test in a way that will replicate the essence of the vacated 2016 Fiduciary Rule, the DOL has twisted the plain language of ERISA and

its own regulation beyond recognition. In the brave new regulatory world concocted by the DOL, not only has the DOL vastly expanded the scope of who is a fiduciary but has also turned most of those fiduciaries into ***ERISA plan fiduciaries***. None of this could have been imagined by Congress when it enacted ERISA in 1974. The Court should reject this regulatory about-face and vacate the New Interpretation, including the withdrawal of the Deseret Letter, in its entirety.

**D.    THE NEW INTERPRETATION IS AN UNREASONABLE CONSTRUCTION OF ERISA**

In reviewing an agency's construction of a statute, the Court must first decide whether Congress has directly spoken to the issue and, if Congress' intent is clear, nothing further is required: the Court must give effect to the statute as written. *City of Arlington v. F.C.C.*, 133 S.Ct. 1863, 1868 (2013). If the statute is silent or ambiguous, however, the Court must decide if the agency's interpretation is reasonable. *Id.* For the reasons described above, Plaintiffs submit that Congress' intent, as confirmed by the Fifth Circuit in *Chamber of Commerce*, is clear and promulgation of the New Interpretation in an attempt to vary it was beyond the authority of the DOL. For this reason alone, it should be vacated. Moreover, even if there were any remaining gaps in the relevant statutory language that could be filled by DOL interpretative guidelines, the New Interpretation would still constitute an arbitrary and capricious exercise of the DOL's power in violation of the APA.

1.  *The Major Questions Doctrine Applies and the DOL Lacks a Clear Congressional Authorization for the Vast New Regulatory Authority it Asserts*

As an initial matter, the United States Supreme Court has recently clarified and reaffirmed the "major questions doctrine," which is applicable here. *See W. Virginia v. Env't Prot. Agency*, 142 S.Ct. at 2609. Under that doctrine, the Court explained:

> [I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us "reluctant to read into ambiguous statutory text" the delegation claimed to be lurking there. To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to "clear congressional authorization" for the power it claims.

*Id*. (cleaned up). Among the factors that identify a major questions case are where an agency asserts a power to (1) substantially restructure a significant portion of the economy, (2) which it claims to have discovered "in a long-extant statute" and which (3) represents a "transformative expansion" of its own regulatory authority. *Id*.

Each of these factors is plainly present in this case. The DOL estimates that the rollovers from Title I ERISA plans to IRAs would approach $2.4 trillion cumulatively from 2016 through 2020 alone. AR 6. The DOL's assertion of broad regulatory authority over that market, and the Investment Professionals who operate in it with no other connection to Title I plans, is both transformative and inconsistent with its own longstanding understanding of its mandate. Turning virtually all these Investment Professionals into fiduciaries in the employer plan and IRA marketplaces clearly entails a substantial restructuring of a significant portion of the economy. Under the major questions doctrine, therefore, the DOL should be required to show a clear Congressional authorization for the

power it now wishes to assert. It plainly cannot; indeed, it has already been told that directly by the Fifth Circuit. Accordingly, the New Interpretation cannot stand.

### 2. *The New Interpretation is Unreasonable Under Any Standard*

Even without the obstacle presented by the major questions doctrine, the New Interpretation cannot pass the far more deferential *Chevron* standard of review either. As the Fifth Circuit explained in *Chamber of Commerce*, the DOL's effort to rewrite the meaning of "investment advice fiduciary" without reference to the common law trust and confidence standard not only exceeds its statutory authority but is unreasonable in the context of the other prongs of ERISA's fiduciary definition. *Chamber of Commerce*, 885 F.3d at 380. And the fact that the DOL only "discovered" this New Interpretation after 45 years highlights its unreasonableness. *Id*. at 380-81. Indeed, the DOL's newly discovered understanding of the five-part test is an even more brazen usurpation of authority than the 2016 Fiduciary Rule. When it promulgated the 2016 Fiduciary Rule, the DOL was candid about its belief that the five-part test should be discarded, and a new standard established, due to the significant changes in the marketplace for employer retirement plans and IRAs. According to the DOL at the time, the five-part test excluded from the realm of investment advice fiduciaries too many players—including brokers and insurance agents—that DOL believed should be subject to a fiduciary standard in their dealings with Retirement Investors. *See* 81 Fed. Reg. at 20946 ("Today, as a result of the five-part test, many investment professionals, consultants, and advisers have no obligations to adhere to ERISA's fiduciary standards or to the prohibited transaction rules, despite the critical role they play in guiding plan and IRA investments.").

Having been rebuked by the Fifth Circuit, the DOL has now promulgated the New Interpretation, which overreaches virtually as far as the 2016 Fiduciary Rule, and disingenuously asserts that was what the five-part test meant all along. The Court need only review the DOL's own 2016 description of the high bar established by the five-part test, which the Fifth Circuit endorsed as consistent with the text of ERISA, to understand how insincere it is in now professing adherence to that test in the New Interpretation.

> As the marketplace for financial services has developed in the years since 1975, the five-part test now undermines, rather than promotes, the statute's text and purposes. The narrowness of the 1975 regulation allows advisers, brokers, consultants, and valuation firms to play a central role in shaping plan and IRA investments, without ensuring the accountability that Congress intended for persons having such influence and responsibility. Even when plan sponsors, participants, beneficiaries, and IRA owners clearly rely on paid advisers for impartial guidance, the regulation allows many advisers to avoid fiduciary status and disregard ERISA's fiduciary obligations of care and prohibitions on disloyal and conflicted transactions. . . . Instead of ensuring that trusted advisers give prudent and unbiased advice in accordance with fiduciary norms, the 1975 regulation erects a multi-part series of technical impediments to fiduciary responsibility. The Department is concerned that the specific elements of the five-part test--which are not found in the text of the Act or Code--work to frustrate statutory goals and defeat advice recipients' legitimate expectations.

81 Fed. Reg. at 20955.

The New Interpretation is also unreasonable for a separate reason discussed in *Chamber of Commerce*. Specifically, it fails to recognize and respect the line Congress has drawn between the DOL's authority to regulate and supervise Title I plans versus its role with respect to IRAs, which is limited to defining technical and accounting terms and granting exemptions from the prohibited transactions provisions of the Code. *Chamber of Commerce*, 885 F.3d at 381. Like the 2016 Fiduciary Rule before it, the New Interpretation

is largely focused on (and motivated by) the perceived need to regulate rollover transactions from ERISA Title I plans to individual IRAs. AR 5-6 (noting that IRA rollovers can involve a lifetime of savings, represent a very consequential financial decision for retirement investors, and are expected to approach $2.4 trillion cumulatively from 2016 through 2020). And when it adopted the 2016 Fiduciary Rule the DOL acknowledged that this expanded scope of its authority "encompassed actors and transactions that the Department 'does not believe Congress intended to cover as fiduciary.'" *Chamber of Commerce*, 885 F.3d at 381. The same is true of the New Interpretation.

In the New Interpretation, DOL grudgingly concedes, based on *Chamber of Commerce*, that a purely one-time recommendation as to an IRA rollover cannot meet the five-part test. However, while the New Interpretation may appear slightly less overreaching than the 2016 Fiduciary Rule in this respect, the DOL's repudiation of the Deseret Letter leaves no doubt that it still seeks to arrogate to itself significant regulatory power over the IRA marketplace that Congress has not granted it. According to the DOL, an insurance agent who recommends an IRA rollover of a first-time client's funds from an ERISA plan to an annuity will, if the agent has any expectation of a continuing relationship with the client, be considered not just a fiduciary but a fiduciary *of the ERISA plan*. The agent would therefore be subject to the full regulatory authority the DOL possesses over ERISA fiduciaries and must now comply with the Revised Exemption or another existing exemption, such as PTE 84-24, 49 Fed. Reg. 13208, *et seq*. As with the 2016 Fiduciary Rule, the DOL, "lacking direct regulatory authority over IRA 'fiduciaries,'" is attempting

to impermissibly bootstrap its definitional authority into "backdoor regulation" of the IRA marketplace. *Id*. at 387-88. This newly asserted power, contrary to Congress' clear intent, is yet another reason to conclude the New Interpretation is unreasonable, arbitrary, and capricious.

The DOL's continued conflation of salespeople with fiduciary investment advisers is another unreasonable aspect of the New Interpretation. The New Interpretation is targeted at brokers and insurance agents who, in connection with their sales activity, make recommendations regarding particular investments to IRA clients. *Id*. at 382. The Fifth Circuit explained the perversity of this approach as follows:

> Under ERISA, however, fiduciaries are generally prohibited from selling financial products to plans. As the Chamber of Commerce puts it, the Rule "treats the fact that a person has done something that a fiduciary generally may *not* [do], as dispositive evidence that the person is a fiduciary." Transforming sales pitches into the recommendations of a trusted adviser mixes apples and oranges.

*Id*. (cleaned up). As discussed in the preceding sections of this brief, the New Interpretation unquestionably carries forward this fundamental flaw of the 2016 Fiduciary Rule—*i.e.*, the DOL's attempt to regulate sales activities of brokers and insurance agents simply because they are directed to ERISA plan participants and IRA owners.

The DOL's announcement of the New Interpretation, coinciding with its abrupt withdrawal of the Deseret Letter, effectively achieves the same regulatory framework as the 2016 Fiduciary Rule. But that framing has taken place entirely outside of rulemaking processes prescribed by the APA. The DOL's decision to proceed outside of the APA merely highlights the arbitrary and capricious nature of its conduct. *See, e.g., N. Carolina*

*Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (holding that "because the Department did not provide a meaningful opportunity for comment … the Department's reinstatement of the 1987 regulations was arbitrary and capricious"). Rather than issuing a notice of intent to change its longstanding regulation that had been restored by the Fifth Circuit's *vacatur* of the 2016 Fiduciary Rule, the DOL has embedded those changes in its preamble commentary to the grant of a PTE without the benefit of focused notice and comment, cost-benefit analysis, and other procedural steps that are required for new regulations.

Finally, as with the 2016 Fiduciary Rule, the unreasonableness of the New Interpretation is not salvaged by the protection offered in the Revised Exemption. Although the Revised Exemption purportedly eliminates several of the objectionable provisions previously found in the BIC Exemption, many of the same issues remain. In this regard, like the BIC Exemption, the Revised Exemption requires financial services professionals to acknowledge they are fiduciaries upfront in order to avail themselves of the exemption. AR 66. This requirement, as explained in the New Interpretation, makes clear that the Revised Exemption is not intended merely as a safe harbor that an agent or broker can fall back on if, based on the facts and circumstances, it is later determined that he or she is in fact a fiduciary. AR31. Thus, as with the BIC Exemption, the Revised Exemption protects Investment Professionals' ability to receive commissions in sales transaction only if they

declare themselves fiduciaries and expose themselves to whatever other regulation and liabilities that may entail. *Chamber of Commerce*, 886 F.3d at 382.[11]

More fundamentally, however, as the Fifth Circuit observed, the fact that the Revised Exemption is necessary "to blunt the overinclusiveness" of the DOL's New Interpretation of the five-part test merely reinforces its overreach in seeking to regulate actors and transactions in the IRA market that Congress never intended to cover as fiduciaries in the first place. *Chamber of Commerce*, 885 F.3d at 381-82. The DOL is "not free to adopt unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014) (cleaned up).

"[T]here is no doubt that the Supreme Court has been skeptical of federal regulations crafted from long-extant statutes that exert novel and extensive power over the American economy." *Chamber of Commerce*, 885 F.3d at 387. Like the 2016 Fiduciary Rule before it, the New Interpretation attempts to do just that. Window dressing aside, the most

---

[11] While most insurance agents will likely avail themselves of PTE 84-24 rather than the Revised Exemption under current circumstances, that is irrelevant for purposes of this lawsuit. The point here is that the Revised Exemption does not save the DOL's overinclusive definition of fiduciary under the New Interpretation any more than the BIC Exemption saved the 2016 Fiduciary Rule. Moreover, the current circumstances may soon change for the worse, such that the unreasonable aspects of the Revised Exemption may have even greater significance to Plaintiffs. In this regard, the DOL has made clear that PTE 84-24 may be modified or eliminated altogether as part of additional new rulemaking that is already on the DOL's agenda. *See* AR 1350; https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202204&RIN=1210-AC02; https://www.irionline.org/wp-content/uploads/legacy/advocacy-files/summary-of-dol-comments-to-iri-advocacy-committee-(6-29-21).pdf?sfvrsn=e03d4064_2.

significant difference between the two is the DOL's degree of candor about what it is doing. For all of the foregoing reasons, therefore, the New Interpretation cannot stand either.

## III.   <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court grant its motion for summary judgment and enter judgment: (1) declaring that the New Interpretation was promulgated by the DOL in excess of its statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C) and is arbitrary, capricious, or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A); (2) vacating and setting aside the New Interpretation in its entirety; and (3) permanently enjoining the DOL and all of its officers, employees and agents from implementing, applying, or taking any action of any type under the New Interpretation anywhere within the DOL's jurisdiction.

Dated:  July 15, 2022                           Respectfully submitted,

By: _/s/ Don Colleluori_
    Andrew G. Jubinsky
    Texas Bar No. 11043000
    andy.jubinsky@figdav.com
    Don Colleluori
    Texas Bar No. 04581950
    don.colleluori@figdav.com

**FIGARI + DAVENPORT, LLP**
901 Main Street, Suite 3400
Dallas, Texas 75202
T: (214) 939-2000
F: (214) 939-2090

**ATTORNEYS FOR PLAINTIFFS**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 15, 2022, this document was served by email on all parties and/or attorneys of record in this matter through the Court's CM/ECF filing system.

*/s/ Don Colleluori*
Don Colleluori