# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JOHN LOWN d/b/a LOWN RETIREMENT PLANNING; DAVID MESSING; MILES FINANCIAL SERVICES, INC.; JON BELLMAN d/b/a BELLMAN FINANCIAL; GOLDEN AGE INSURANCE GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | ) ) ) ) ) ) ) ) ) | Civil Action No. 3:22-cv-00243-K |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| UNITED STATES DEPARTMENT OF LABOR, and MARTIN J. WALSH, SECRETARY OF LABOR, | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**DEFENDANTS' BRIEF IN SUPPORT OF CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES..........................................................................iii

INTRODUCTION........................................................................................1

LEGAL AND PROCEDURAL BACKGROUND ........................................5

    A.    ERISA Statutory Framework................................................5

    B.    ERISA Regulations...............................................................7

    C.    The 2016 Fiduciary Rulemaking and the *Chamber of Commerce* Decision..........9

    D.    Subsequent Regulatory Developments .............................12

    E.    The Department's 2020 Interpretation and Exemption.....................13

ARGUMENT..............................................................................................18

I.    THIS COURT LACKS JURISDICTION TO ADJUDICATE PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS LACK STANDING..........................................18

    A.    Plaintiffs Have Not Established That They Have Suffered a Cognizable Injury in Fact. ...............................................19

    B.    Plaintiffs Do Not Challenge PTE 84-24, Which They Acknowledge Would Provide Alternative Exemptive Relief and Remains Available to Plaintiffs...............................................23

II.    THE EXEMPTION IS CONSISTENT WITH THE FIFTH CIRCUIT'S *CHAMBER OF COMMERCE* DECISION..........................................25

    A.    The 2016 Rule Amended and Changed the Five-Part Test, While the Current Interpretation Narrowly Applies That Test to Discrete Market Events. .............................................27

    B.    The Exemption Does Not Impose Any Contractual Requirements.....................31

    C.    No Private Right of Action Has Been Created. .................................32

    D.    The Exemption Contains No Limitation on Arbitration.....................33

    E.    PTE 84-24 Was Not Amended and Remains Available to Insurance Professionals...............................................33

III.    THE EXEMPTION IS A REASONABLE INTERPRETATION OF ERISA AND THE DEPARTMENT'S PRIOR REGULATIONS. ........................................34

    A.    The Department's Interpretation is Consistent With The Fifth Circuit's Reading of ERISA's Text and With The Plain Meaning Of The 1975 Regulation...............................................35

        1.    The Major Questions Doctrine is Inapplicable.......................................40

        2.    The Department Has Reasonably Interpreted the "Regular Basis" Prong of the 1975 Regulation...............................................42

| | 3. | The Department Has Reasonably Interpreted the "Mutual Agreement" Prong of the 1975 Regulation. | 47 |
| | 4. | The Department Has Reasonably Interpreted Other Elements of the 1975 Regulation. | 49 |
| | 5. | Commissions Have Long Been Treated as Investment Advice Fiduciary "Fees" Provided the Other Elements of the Test Are Satisfied. | 50 |
| | 6. | The Department's Interpretation Does Not Conflate ERISA Plans With IRAs. | 51 |
| B. | | The Interpretation is Not Arbitrary and Capricious. | 54 |
| C. | | To The Extent That The 1975 Regulation Is Ambiguous, The Department's Interpretation Of Its Own Regulation Is Entitled To Deference, And Its Interpretation Was Reasonable. | 59 |
| IV. | | **ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS BEFORE THE COURT.** | **61** |
| | | **CONCLUSION** | **62** |

# TABLE OF AUTHORITIES

## CASES

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004)...........................................................................................5

*AFL-CIO v. Donovan*,
  757 F.2d 330 (D.C. Cir. 1985)..........................................................................54

*Am. Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable Life Assur. Soc. of the U.S.*,
  841 F.2d 658 (5th Cir. 1988)............................................................................42

*ARA Auto. Grp. v. Cent. Garage, Inc.*,
  124 F.3d 720 (5th Cir. 1997).....................................................................28, 50

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022).............................................................................62

*Auer v. Robbins*,
  519 U.S. 452 (1997)...............................................................................4, 59, 60

*Baker v. Carr*,
  369 U.S. 186 (1962).........................................................................................18

*Beeson v. Fireman's Fund Ins. Co.*,
  No. C-09-2776 SC, 2009 WL 2761469 (N.D. Cal. Aug. 31, 2009)......................53

*Chamber of Com. of the United States of Am. v. Hugler*,
  231 F. Supp. 3d 152 (N.D. Tex. 2017)..........................................................9, 11

*Chamber of Com. of the United States of Am. v. United States Dep't of Labor*,
  885 F.3d 360 (5th Cir. 2018).....................................................................*passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)...........................................................................26, 55, 56

*Cibolo Waste, Inc. v. City of San Antonio*,
  718 F.3d 469 (5th Cir. 2013)............................................................................18

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).........................................................................................24

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
  No. 20-11179, 2022 WL 3440652 (5th Cir. Aug. 17, 2022)..............................61

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020)................................................................................. 61

*Dornberger v. Metro. Life Ins. Co.*,
961 F. Supp. 506 (S.D.N.Y. 1997)............................................................ 46

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)............................................................................... 56

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021)............................................................................... 54

*Georgia v. President of the United States*,
No. 21-14269, 2022 WL 3703822 (11th Cir. Aug. 26, 2022)............................. 61

*Gill v. Whitford*,
138 S. Ct. 1916 (2018)............................................................................... 18

*Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*,
10 F.3d 700 (10th Cir. 1993)..................................................................... 40

*Guzman v. Allstate Assurance Co.*,
18 F.4th 157 (5th Cir. 2021)...................................................................... 21

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).................................................................................. 22

*Janvey for Stanford Int'l Bank, Ltd. v. Alvarado*,
No. 3:10-CV-2584-N, 2015 WL 13739416 (N.D. Tex. June 24, 2015).................. 28

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86 (1993).................................................................39, 40, 55, 57

*Johnson v. Buckley*,
356 F.3d 1067 (9th Cir. 2004) .................................................................. 40

*Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*,
88 F.3d 1191 (D.C. Cir. 1996)................................................................... 60

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)............................................................37, 59, 60

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*,
892 F.2d 1238 (5th Cir. 1990) .................................................................. 39, 57

*LaRue v. DeWolff, Boberg & Associates, Inc.*,
   552 U.S. 248 (2008)........................................................................ 52, 53

*Lester v. Lester*,
   No. 3:06-CV-1357-BH, 2009 WL 3573530 (N.D. Tex. Oct. 29, 2009)................................ 19

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020)........................................................................ 41

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996)........................................................................ 6

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021)........................................................................ 61

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)........................................................................ 4, 19

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990)........................................................................ 21

*Mancini v. City of Providence by & through Lombardi*,
   282 F. Supp. 3d 459 (D.R.I. 2017)........................................................................ 22

*Market Synergy Grp, Inc. v. Dep't of Labor*,
   885 F.3d 676 (10th Cir. 2018)........................................................................ 11

*Market Synergy Grp, Inc. v. Dep't of Labor*,
   No. 16-CV-4083, 2017 WL 661592 (D. Kan. Feb. 17, 2017)................................ 11

*McConnell v. FEC*,
   540 U.S. 93 (2003)........................................................................ 24

*Meyer v. Cathey*,
   167 S.W.3d 327 (Tex. 2005)........................................................................ 45

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................ 54

*National Ass'n of Mfrs. v. Dep't of Defense*,
   138 S. Ct. 617 (2018)........................................................................ 41

*Nat'l Assoc. for Fixed Annuities v Perez*,
   217 F. Supp. 3d 1 (D.D.C. 2016)........................................................................ 11

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ......................................................................... 55, 56

*Ninilchik Traditional Council v. United States*,
  227 F.3d 1186 (9th Cir. 2000) ................................................................ 41

*North Carolina Growers Association v. United Farm Workers*,
  702 F.3d 755 (4th Cir. 2012) ................................................................... 35

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) .................................................................................. 55

*Pharm. Research & Manufacturers of Am. v. Fed. Trade Comm'n*,
  44 F. Supp. 3d 95 (D.D.C. 2014) ............................................................ 41

*POET Biorefining, LLC v. Env't Prot. Agency*,
  970 F.3d 392 (D.C. Cir. 2020) ......................................................26, 51, 55

*R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*,
  205 F.3d 165 (5th Cir. 2000) .............................................................. 39, 57

*Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*,
  422 F. Supp. 2d 75 (D.D.C. 2006) .......................................................... 23

*Sabre, Inc. v. Dep't of Transp.*,
  429 F.3d 1113 (D.C. Cir. 2005) ............................................................... 20

*San Antonio Garment Finishers, Inc. v. Levi Strauss & Co.*,
  18 F. Supp. 2d 669 (W.D. Tex. 1998) ..................................................... 45

*SCF Arizona v. Wachovia Bank, N.A.*,
  No. 09-CIV-9513, 2010 WL 5422505 (S.D.N.Y. Dec. 14, 2010) .......................... 45

*Sec'y of Labor v. Fitzsimmons*,
  805 F.2d 682 (7th Cir. 1986) .............................................................. 5, 39

*Serna v. L. Off. of Joseph Onwuteaka, P.C.*,
  614 F. App'x 146 (5th Cir. 2015) ............................................................ 21

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ................................................................ 20

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ................................................................................ 19

*Simon v. E. Kentucky Welfare Rts. Org.*,
   426 U.S. 26 (1976)......................................................................................... 25

*Skrzypczak v. Roman Cath. Diocese Of Tulsa*,
   611 F.3d 1238 (10th Cir. 2010) .................................................................... 22

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)....................................................................................... 21

*St. Paul Reinsurance Co., Ltd. v. Greenberg*,
   134 F.3d 1250 (1998)....................................................................................... 4

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................................. 23, 25

*Swanson Grp. Mfg. LLC v. Jewell*,
   790 F.3d 235 (D.C. Cir. 2015) ..................................................................... 21

*Taylor v. FDIC*,
   132 F.3d 753 (D.C. Cir.1997)....................................................................... 24

*Texas Clinical Labs, Inc. v. Sebelius*,
   612 F.3d 771 (5th Cir. 2010) ....................................................................... 31

*Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
   No. 6:21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022)................... 19

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021)......................................................................... 54

*Texas v. EEOC*,
   993 F.3d 433 (5th Cir. 2019)........................................................................ 25

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994)...................................................................................... 59

*Tolbert v. RBC Capital Markets Corp.*,
   758 F.3d 619 (5th Cir. 2014) ......................................................................... 5

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018).................................................................................. 61

*U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*,
   446 F. Supp. 2d 651 (N.D. W. Va. 2006) ................................................... 60

*United States v. Fafalios*,
  817 F.3d 155 (5th Cir. 2016) ................................................................. 37

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ............................................................ 61

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) ................................................................. 54

*Verizon v. F.C.C.*,
  740 F.3d 623 (D.C. Cir. 2014) ............................................................... 55

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ...................................................................... 40, 41

*Williams v. Parker*,
  843 F.3d 617 (5th Cir. 2016) ................................................................. 18

*Woodfork v. Marine Cooks & Stewards Union*,
  642 F.2d 966 (5th Cir. 1981) ............................................................ 40, 57

*Xereas v. Heiss*,
  987 F.3d 1124 (D.C. Cir. 2021) ........................................................ 28, 50

**STATUTES**

5 U.S.C. § 553 ............................................................................................ 35

5 U.S.C. § 702 ............................................................................................ 25

5 U.S.C. § 704 ............................................................................................ 25

26 U.S.C. § 4975 ................................................................................. 7, 8, 52

29 U.S.C. § 1001 .................................................................................... 5, 7

29 U.S.C. § 1002 ............................................................................... *passim*

29 U.S.C. § 1104 .................................................................................... 5, 6

29 U.S.C. § 1106 ......................................................................................... 6

29 U.S.C. § 1108 .................................................................................... 1, 6

29 U.S.C. § 1135 ............................................................................... *passim*

5 U.S.C.A. § App. 1 .......................................................................................................... 7

Employee Retirement Income Security Act of 1974,
    Pub. L. No. 93-406, 88 Stat. 829 (1974) .................................................................. 5

Government Reorganization Plans Ratification,
    Pub. L. No. 98-532, 98 Stat. 2705 (1984) ................................................................ 7

**RULES**

Fed. R. Civ. P. 12 .................................................................................................... 18, 19

Fed. R. Civ. P. 56 .................................................................................................... 18, 21

**REGULATIONS**

17 C.F.R. § 240.15 ......................................................................................................... 12

26 C.F.R. § 54.4975-9 ............................................................................................. 8, 9, 16

29 C.F.R. § 2510.3-21 ............................................................................................... *passim*

40 Fed. Reg. 50,840 (Oct. 31, 1975) .................................................................. 1, 7, 8, 50

42 Fed. Reg. 32,395, (Jun. 24, 1977) ..................................................................... 34, 52

49 Fed. Reg. 13,208 (Apr. 3, 1984) ................................................................... 8, 24, 34

71 Fed. Reg. 5,887 (Feb. 3, 2006) ................................................................................ 11

75 Fed. Reg. 65,266 (Oct. 22, 2010) ................................................................. 15, 51, 52

81 Fed. Reg. 20,946 (Apr. 8, 2016) ................................................................... 9, 10, 15

81 Fed. Reg. 21,147 (Apr. 8, 2016) ......................................................................... 9, 11

85 Fed. Reg. 40,834 (Jul. 7, 2020) ................................................................................ 1

85 Fed. Reg. 82,798 (Dec. 18, 2020) ............................................................................ 1

**OTHER AUTHORITIES**

HB 1777,
    https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB01777F.pdf .......................... 13

HB 1777 Adoption Order, Oct. 14, 2021,
    https://www.tdi.texas.gov/rules/2021/documents/20217020.pdf............................................ 13

NAIC Model Regulation 275, Project History,
    https://content.naic.org/sites/default/files/model-laws-project-history-275.pdf ..................... 13

NAIC Model Regulation 275, Section 6.A,
    https://content.naic.org/sites/default/files/MO275.pdf ......................................................... 13

## INTRODUCTION

The Department of Labor has broad authority under the Employee Retirement Income Security Act of 1974 ("ERISA") to protect Americans' retirement savings.  One way that ERISA seeks to protect retirement savings is by defining and setting requirements for fiduciaries to ERISA-qualified retirement plans.  ERISA authorizes the Secretary of Labor to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of [Title I of ERISA]," 29 U.S.C. § 1135, and to grant exemptions that would allow fiduciaries to certain ERISA-qualified retirement plans to receive compensation that would otherwise be prohibited as self-dealing. *See* 29 U.S.C. § 1108(a).  Pursuant to these authorities, the Department in 1975 issued a regulation stating when a person "renders investment advice for a fee or other compensation" within the meaning of one prong of ERISA's "fiduciary" definition.  40 Fed. Reg. 50842 (Oct. 31, 1975) (codified at 29 C.F.R. § 2510.3-21(c)(1)) ("the 1975 Regulation").  The 1975 Regulation adopted a five-part test to implement ERISA's functional fiduciary definition, requiring consideration of the facts and circumstances as a whole.

In July 2020, the Department proposed a new class exemption, setting forth the Department's proposed interpretation of the 1975 Regulation as applied to current market dynamics, especially regarding when advice to roll over Plan assets to an Individual Retirement Account ("IRA") could be considered fiduciary investment advice under ERISA and the Code. *See* 85 Fed. Reg. 40834.  After a robust public comment period and a hearing, the Department finalized Prohibited Transaction Exemption 2020-02, 85 Fed. Reg. 82798 (December 18, 2020) ("the Exemption" or "PTE 2020-02").  The Exemption's preamble addressed, among other things, the comments received regarding financial advice provided to retirees in the context of rollovers from ERISA plans to Individual Retirement Accounts ("IRAs") and set forth the Department's

1

final interpretation of when such advice would meet the statutory and regulatory definition of fiduciary investment advice, as spelled out in the 1975 Regulation.

The crux of Plaintiffs' Complaint, *see* ECF No. 1, and Motion for Summary Judgment and supporting materials, *see* ECF Nos. 19-21, is that the Department's new regulatory interpretation impermissibly resurrects a 2016 Rulemaking that was invalidated by the Fifth Circuit in *Chamber of Commerce v. Department of Labor*, 885 F.3d 360 (5th Cir. 2018). To the contrary, the 2020 Exemption is far more modest than the 2016 Rulemaking and was deliberately structured to comply with the Fifth Circuit's ruling in *Chamber of Commerce*. The Department explained that it would demand adherence to the terms of the 1975 Regulation—which established a five-part test for determining fiduciary investment advice—and would consider "objective evidence" to determine whether "the parties," in the context of the transactions at issue, "mutually intend an ongoing advisory relationship." AR 9-10.[1]

The Department did not revive any of the elements of the 2016 Rule that were invalidated by the Fifth Circuit, including the 2016 Rule's elimination of the 1975 Regulation's five-part test and the requirement that investment professionals enter into a binding contract with IRA retirement investors that could trigger legal liability in the case of breach, and the prohibitions from including in those contracts exculpatory provisions or provisions waiving rights and remedies, including the right to participate in a class action in court. The 2016 Rule also narrowed another exemption previously available to insurance professionals involved in the sales of annuities and insurance

---

[1] Citations with the prefix "AR" refer to the Administrative Record filed in this case. *See* ECF No. 18. A joint appendix containing portions of the record cited by the parties will be filed on November 25, 2022. *See* ECF No. 16 at 2. Citations with the prefix "App." refer to the Appendix attached to Plaintiffs' Motion for Summary Judgment, *see* ECF Nos. 19 (Motion), 21 (Appendix). The Brief in Support of Plaintiffs' Motion for Summary Judgment, *see* ECF No. 20, is cited herein as FACC Br.

contracts to retirement investors, among other regulatory changes.  *See Chamber of Commerce*, 885 F.3d at 366 (holding that the "overhaul of the investment advice fiduciary definition, together with amendments to six existing exemptions and two new exemptions to the prohibited transaction provision in both ERISA and the Code," was inconsistent with ERISA and was arbitrary and capricious under the APA).  Accordingly, Plaintiffs' suggestion that the Exemption somehow violates *res judicata* principles in the Fifth Circuit is meritless.

Indeed, in their effort to force the Department into conflict with *Chamber of Commerce*, Plaintiffs adopt several extreme positions in their brief that far exceed *Chamber of Commerce*'s reasoning and defy logic.  First, they argue that there is an ironclad distinction between those who provide fee-based investment advice and everyone else, who are mere salespeople.  Plaintiffs appear to contend that, as insurance agents, they are categorically exempt from fiduciary status when providing advice to clients to purchase annuities.  But they have made no attempt to show that the market consistently recognizes them as mere salespeople and that a fiduciary relationship is unlikely to develop.  Second, Plaintiffs claim that the first instance of investment advice can *never* be part of a fiduciary relationship, distorting the Fifth Circuit's observations and selective quotes from common law cases.  While some relationships of trust and confidence arise from lengthy interactions, there is no logical reason that a fiduciary relationship cannot arise from the interactions surrounding the first instance of investment advice.  Third, they argue that a bright line exists between the regulatory framework for ERISA plans and IRAs such that the Department lacks authority to interpret fiduciary investment advice in the context of rollovers from ERISA plans to IRAs.  This disregards the fact that a statutory reorganization in 1984 conclusively gave the Department interpretive and exemption authority over ERISA's amendments to the Code.

Indeed, Plaintiffs' central contentions are not compelled by the statutory definition

provided in ERISA, *see* 29 U.S.C. § 1002(21)(A); the operative regulations promulgated by the Department in 1975, *see* 29 C.F.R. §2510.3-21(c)(1); the common law backdrop from which ERISA's fiduciary standards were borrowed; or *Chamber of Commerce*. Instead, all they demonstrate is the intensity of Plaintiffs' desire to make recommendations to roll assets out of ERISA-covered plans entirely free from fiduciary responsibility. The plain language of these statutory and regulatory provisions supports the Department's interpretation of investment advice fiduciaries as applied to rollover recommendations. Even if those provisions were ambiguous, the Department's interpretation of its regulations would be subject to deference under *Auer v. Robbins*, 519 U.S. 452 (1997).

Plaintiffs also lack standing to bring this lawsuit. Despite bearing the burden of establishing subject matter jurisdiction, *see St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (1998), and despite needing to demonstrate at summary judgment "by affidavit or other evidence" that they would be "directly affected" by the Department's regulation, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992),[2] Plaintiffs proffer no more than conclusory (and carbon copy) affidavits averring that each of them is now subject to a new regulatory regime and has suffered harm as a result. These assertions and affidavits fall woefully short of demonstrating the required harms needed to establish a concrete and particularized injury-in-fact for standing purposes.

This Court should either dismiss this lawsuit for lack of jurisdiction or, if it finds that jurisdiction exists, grant summary judgment to Defendants.

---

[2] Internal citations, quotations, and alterations are omitted in this brief unless otherwise indicated.

## LEGAL AND PROCEDURAL BACKGROUND

### A.      ERISA Statutory Framework

Congress enacted ERISA in 1974 based on its determination that Americans' retirement savings were not adequately protected, to their detriment and that of the country.  Pub. L. No. 93-406, 88 Stat. 829, 898 (1974) (codified at 29 U.S.C. §§ 1001, *et seq.*).  Prior to ERISA, "federal involvement in the monitoring of pension funds in this country was minimal."  *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 689 (7th Cir. 1986).  Congress thus enacted ERISA "after determining that the then present system of regulation was ineffective in monitoring and preventing fraud and other pension fund abuses."  *Id.*   The statutory framework included, *inter alia*, enhanced "disclosure and reporting" requirements, "standards of conduct, responsibility, and obligation for fiduciaries [to] employee benefit plans," and "appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans."); *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 621 (5th Cir. 2014) (An ambitious statutory scheme, ERISA is designed to protect ... the interests of participants in employee benefit plans and their beneficiaries.").

Title I of ERISA imposes stringent obligations on individuals who engage in important plan-related activities, *i.e.*, "fiduciar[ies]." 29 U.S.C. § 1104. Under ERISA, "a person is a fiduciary with respect to a plan to the extent":

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

> (ii) *he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan*, or has any authority or responsibility to do so, *or*

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added).  A "fiduciary" under Title I of ERISA must adhere to duties of loyalty and prudence. *Id.* § 1104.  The former requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration. *Id.* § 1104(a)(1).  The latter requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).

As an additional protective measure, Congress prohibited fiduciaries from engaging in specified transactions Congress deemed inherently fraught with conflicts of interest. *Id.* § 1106; *see Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (Congress's goal was to "bar categorically" transactions likely to injure a plan and its beneficiaries).  In particular, a fiduciary must not "deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1), (3).  Given the breadth of the prohibited transaction provisions, Congress enumerated statutory exemptions from some of them. *Id.* § 1108(b).  In addition, Congress delegated to the Secretary of Labor ("the Secretary") the broad authority to grant "conditional or unconditional" administrative exemptions on a class-wide or individual basis, if the Secretary finds that such an exemption is: (1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan. *Id.* § 1108(a).

In Title II of ERISA, Congress amended the Internal Revenue Code ("the Code") to adopt

a "fiduciary" definition parallel to that in Title I.  26 U.S.C. § 4975(e)(3).  Title II covers most employee benefit plans covered by Title I, as well as other tax-favored retirement and savings plans.  While the Code provisions do not include duties of loyalty and prudence, they do, as in Title I, prohibit fiduciaries and others from engaging in specified conflicted transactions. *Id.* § 4975(c). The Secretary has the authority to grant administrative exemptions from these Code provisions on the same terms as in Title I.  *Id.* § 4975(c)(2). Those who violate the Code's prohibited transaction provisions are subject to excise taxes enforced by the Internal Revenue Service ("IRS"). *Id.* § 4975(a)-(b).

ERISA also delegated to the Secretary broad authority to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of [Title I of ERISA]." 29 U.S.C. § 1135. "Among other things, such regulations may define accounting, technical and trade terms used in such provisions."  *Id.*  The parallel provisions of Title I of ERISA and § 4975 of the Code led to redundancy. To harmonize their administration and interpretation, President Carter issued Reorganization Plan No. 4 in 1978, 5 U.S.C. App. 1, 29 U.S.C. § 1001 note ("Reorg. Plan"), which Congress ratified in 1984. *See* Pub. L. No. 98-532, 98 Stat. 2705 (1984).  Among other things, the Reorganization Plan transferred to the Department the interpretive, rulemaking, and exemptive authority for the fiduciary definition and prohibited transaction provisions that apply to both employer-based plans and IRAs.  *See* Reorg. Plan § 102 (transferring "all authority of the Secretary of the Treasury to issue [regulations, rulings, opinions, and exemptions under section 4975 of the Code] . . . to the Secretary of Labor").

## B.    ERISA Regulations

Pursuant to its broad interpretive authority, in 1975, the Department issued regulations interpreting when a person "renders investment advice for a fee or other compensation" for purposes of ERISA's "fiduciary" definition.  40 Fed. Reg. 50842 (Oct. 31, 1975) ("1975

Regulation").[3]   The regulations set forth a five-part test, under which a person was deemed to "render[] investment advice" when the person: (1) renders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property, (2) on a regular basis, (3) pursuant to a mutual agreement, arrangement or understanding, with the plan or a plan fiduciary, (4) where that advice will serve as a primary basis for investment decisions with respect to plan assets, and (5) the advice will be individualized based on the particular needs of the plan.  *See* 29 C.F.R. § 2510.3–21(c)(1).

Pursuant to its authority to craft exemptions for fiduciary conflicts, the Department adopted numerous class exemptions to permit fiduciaries to engage in conduct that would otherwise be prohibited.   Insurance companies and insurance agents were among those who sought an exemption.  Insurance companies sell annuity contracts as retirement investment options for plan and IRA investors.  Annuities are sold through different types of distributors, including broker-dealers, banks, independent insurance agents, and career insurance agents.  As Plaintiffs note, under the five-part test, "[a]bsent an exemption created by statute or regulation, the prohibited transaction provisions of ERISA and the Code generally prohibit fiduciaries with respect to a plan or IRA from, among other things, receiving compensation from third parties, such as commissions, in connection with transactions involving the plan or IRA."   FACC Br. at 4 n.3.   In 1984 the Department promulgated Prohibited Transaction Exemption (PTE) 84-24, which expanded upon a 1977 exemption and permits fiduciary insurance companies and their agents to receive otherwise prohibited compensation in connection with their recommendations of annuity purchases.  *See* 49 Fed. Reg. 13208, 13211 (Apr. 3, 1984); *Chamber of Commerce*, 885 F.3d at 367 (noting that PTE

---

[3] At that time, the Department of the Treasury issued a virtually identical regulation under the Code.  *See* 26 CFR 54.4975-9(c), which interprets Code section 4975(e)(3). 40 Fed. Reg. 50840 (Oct. 31, 1975).

84-24 "cover[s] transactions involving insurance and annuity contracts and permit[s] customary sales commissions where the terms were at least as favorable as those at arm's-length, provided for "reasonable" compensation, and included certain disclosures"); *see also Chamber of Com. of the United States of Am. v. Hugler*, 231 F. Supp. 3d 152, 159 (N.D. Tex. 2017) (noting that PTE 84-24 allows insurance professionals "to receive commissions on all annuity sales as long as the sale was as favorable to the consumer as an arms-length transaction and the adviser received no more than reasonable compensation."). Plaintiffs here are insurance professionals and can thus avail themselves of PTE 84-24, as Plaintiffs note in their brief. *See* FACC Br. at 41 n. 11.

### C.   The 2016 Fiduciary Rulemaking and the *Chamber of Commerce* Decision

The 1975 Regulation was promulgated before 401(k) plans existed and before IRAs were commonplace, and the market for retirement savings has since undergone a dramatic shift both in the degree to which retirement investors are responsible for investing their retirement savings and the role played by IRAs and rollovers from ERISA-covered Plans.

In 2016, in an effort to adjust to these changes, the Department finalized a new regulation that would have replaced the 1975 Regulation and granted new associated prohibited transaction exemptions. The 2016 Fiduciary Rule, as described in Plaintiffs' brief, is in fact a package of seven different rules, *see Chamber of Commerce*, 885 F.3d at 363, falling into three major categories.

*First,* the Department revised the definition of "fiduciary" under ERISA and the Code, and eliminated several of the conditions from the 1975 Regulation. *See* 81 Fed. Reg. 20946 (Apr. 8, 2016). The Rule defined "investment advice" in terms of specified "recommendations" to an advice recipient regarding, *inter alia*, "the advisability of acquiring, holding, disposing of, or exchanging," or "the management of," "securities or other investment property," including how the securities should be invested after they are rolled over, transferred, or distributed from a plan.

81 Fed. Reg. 20997.  The Rule further defined a "recommendation" as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." *Id.*  Under the 2016 Rule, a person could become a fiduciary if he or she "[d]irect[s] . . . advice to a specific advice recipient" regarding the "advisability of a particular investment . . . decision." *Id.*  Thus, the 2016 Rule on its face eliminated the requirements under the 1975 Regulation that fiduciary investment advice be given "on a regular basis," "pursuant to a mutual agreement, arrangement or understanding" as to fiduciary status, and that it "serve as a primary basis" for the participant or plan's decision.

*Second*, the Department promulgated two new exemptions, including the Best Interest Contract Exemption (BICE), which allowed fiduciaries to receive conflicted income only if they adhere to certain conditions, including signing a written contract with the consumer that contained enumerated provisions, and exposed financial institutions and advisers to suits for breach of contract if those provisions were violated.  *See* 81 Fed. Reg. 21,002 (Apr. 8, 2016).  In particular, to rely on the exemption, financial institutions were required to, *inter alia*, acknowledge fiduciary status with respect to investment advice to the investors in a written contract with any IRA or non-ERISA plan; implement policies and procedures reasonably and prudently designed to prevent violations of certain impartial conduct standards; refrain from giving or using incentives for advisers to act contrary to the customer's best interest; and fairly disclose the fees, compensation, and material conflicts of interest associated with their recommendations. *See Chamber of Commerce*, 885 F.3d at 367.  The contract required under the exemption could not include provisions that commonly are used to limit liability, such as a liquidated damages clause or waiver of the ability to participate in class actions.  *Id.*

*Third,* given that the BICE would be available to all annuities and many other products, DOL amended existing exemptions, including PTE 84-24, 71 Fed. Reg. 5887 (Feb. 3, 2006), which had previously provided prohibited transaction relief for sales of insurance and annuity contracts. *See* Amendment to and Partial Revocation of Prohibited Transaction Exemption 84–24, 81 Fed. Reg. 21147 (Apr. 8, 2016). After the notice-and-comment period, the Department determined that PTE 84-24 should be available for the receipt of commissions for IRA and plan transactions only in connection with recommendations involving "fixed rate annuity contracts," which was defined to exclude variable annuities and fixed indexed annuities.   *See* 81 Fed. Reg. 21176-77, § VI(k). As a result, fiduciaries advising on many annuity products could no longer rely on PTE 84-24 but instead needed to use the BICE if they wished to be exempted from the prohibited transaction provisions that would otherwise apply.

A variety of legal challenges ensued following the promulgation of the 2016 Fiduciary Rule. Four federal courts upheld the rule, *see Market Synergy Grp, Inc. v. Dep't of Labor,* 885 F.3d 676 (10th Cir. 2018); *Market Synergy Grp, Inc. v. Dep't of Labor*, No. 16-CV-4083-DDC-KGS, 2017 WL 661592 (D. Kan. Feb. 17, 2017); *Chamber of Com. of the United States of Am. v. Hugler*, 231 F. Supp. 3d 152 (N.D. Tex. 2017); *Nat'l Assoc. for Fixed Annuities v Perez,* 217 F. Supp. 3d 1, 23 (D.D.C. 2016). However, the U.S. Court of Appeals for the Fifth Circuit vacated the 2016 rulemaking, including the new exemptions, in *Chamber of Commerce*, 885 F.3d 360. Specifically, the court found that the 2016 rule—which did away with the "regular basis," "mutual agreement," and "primary basis" prongs of the 1975 rule—was inconsistent with ERISA, and took particular issue with a requirement in the 2016 rulemaking that financial services providers, as a condition for receiving the associated exemption, enter into an enforceable contract with the retirement investor, which would have given IRA investors the right to sue financial institutions

and advisers for breach of contract. *See id.* at 366-67. The contours of the Fifth Circuit's decision, and its implications for this case, are discussed *infra* Section II.

### D.        Subsequent Regulatory Developments

The market conditions that motivated the 2016 Rulemaking have only accelerated.  For example, rollovers from ERISA-covered Plans to IRAs were expected to approach $2.4 trillion cumulatively from 2016 through 2020. AR 6, 75.  These market conditions have spurred other regulators into action, and as a result the regulatory environment for investment professionals has changed significantly since the adoption and vacatur of the 2016 Rulemaking.  In June 2019, the Securities and Exchange Commission ("SEC") finalized a regulatory package relating to conduct standards for broker-dealers and investment advisers. Included in the package were (1) Regulation Best Interest which establishes a best interest standard applicable to broker-dealers when making a recommendation of any securities transaction or investment strategy involving securities to retail customers, (2) an interpretation of the fiduciary conduct standards applicable to investment advisers under the Investment Advisers Act of 1940, and (3) a new form, which requires broker-dealers and SEC-registered investment advisers to provide retail investors with a short relationship summary with specified information. *See* AR 4 & nn. 23-25.[4]

In addition, in Spring 2020, the National Association of Insurance Commissioners ("NAIC"), a standard-setting organization governed by state chief insurance regulators, updated its Suitability in Annuity Transactions Model Regulation.  This model regulation now requires that

---

[4] *See also* Regulation Best Interest, 17 C.F.R. § 240.15I-l ("A broker, dealer, or a natural person who is an associated person of a broker or dealer, when making a recommendation of any securities transaction or investment strategy involving securities (including account recommendations) to a retail customer, shall act in the best interest of the retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or natural person who is an associated person of a broker or dealer making the recommendation ahead of the interest of the retail customer.").

agents and insurers "when making a recommendation of an annuity, shall act in the best interest of the consumer under the circumstances known at the time the recommendation is made, without placing the producer's or the insurer's financial interest ahead of the consumer's interest." NAIC Model Regulation 275, Section 6.A (https://perma.cc/T47L-YTJG); *see also* NAIC Model Regulation 275, Project History at 1-2 (https://perma.cc/K522-S2K3), explaining that NAIC's new best interest standard was intended to be "more than the model's current suitability standard, but . . . not a fiduciary standard" while requiring satisfaction of "four obligations: 1) care, 2) disclosure, 3) conflict of interest, and 4) documentation").

Numerous states have updated their insurance regulations in light of the NAIC's action. *See* AR 4 (noting that Arizona and Iowa had acted in 2020). For example, in June 2021, Texas passed HB 1777, which amended the state's insurance code "to require an agent to act in the best interest of the consumer when making a recommendation of an annuity." HB 1777 § 2 (amending Section 1115.001 Insurance Code) (https://perma.cc/8PDL-9V3F); *see also id.* § 8 (amending Section 1115.051) ("When making a recommendation of an annuity, an agent shall act in the best interest of the consumer under the circumstances known to the agent at the time the recommendation is made, without placing the agent's or the insurer's financial interest ahead of the consumer's interest." "An agent is presumed to act in the best interest of the consumer if the agent satisfies the care, disclosure, conflict of interest, and documentation obligations described by this subchapter."). This statute was implemented by regulation in October 2021. *See* Tex. Dep't of Ins., HB 1777 Adoption Order, Oct. 14, 2021 (https://perma.cc/83VS-2R9K).

### E.   The Department's 2020 Interpretation and Exemption

On July 7, 2020, the Department proposed a new class exemption, which took into consideration the Fifth Circuit's ruling, public correspondence and comments received by the Department since February 2017, and informal industry feedback seeking an administrative class

exemption for otherwise-prohibited transactions. *See* AR 70.[5] The Notice "set[] forth the Department's  interpretation of the [1975] five-part test of investment advice fiduciary status and provide[d] the Department's views on when advice to roll over Plan assets to an IRA could be considered fiduciary investment advice under ERISA and the Code." AR 71.  In light of the Fifth Circuit's ruling in *Chamber of Commerce*, the Notice made clear that:

> [a]ll prongs of the [1975] five-part test must be satisfied for the investment advice provider to be a fiduciary within the meaning of the regulatory definition, including the "regular basis" prong and the prongs requiring the advice to be provided pursuant to a "mutual" agreement, arrangement, or understanding that the advice will serve as "a primary basis" for investment decisions.

AR 75.  In contrast to the 2016 Rulemaking, the final Exemption was not accompanied by a change in the definition of fiduciary investment advice under either ERISA or the Code; did not impose any contractual requirements on brokers, financial advisors, or insurance advisors as a precondition for availing themselves of the exemption; and did not amend or alter PTE 84-24. Rather it served to bring regulatory requirements into alignment with the changes brought about by the SEC's Best Interest Regulation and NAIC Model Regulation 275, both of which generally require that brokers and insurance agents act in the best interest of their customers. *See* AR 9 (noting that "the updated conduct standards adopted by the SEC and the NAIC reflect an acknowledgment of the fact that broker-dealers and insurance agents commonly provide investment and annuity recommendations to their customers").   With respect to insurance companies and agents, the Department noted that insurance professionals "would have several

---

[5] At the same time, the Department published a technical amendment to the Code of Federal Regulations, implementing the Fifth Circuit's vacatur of the 2016 rulemaking by removing language from the CFR that the 2016 rulemaking added and reinstating the 1975 Regulation.  *See* AR 102-107.  Plaintiffs suggest that the Department "could have complied with the Fifth Circuit's ruling by simply reinstating the five-part test," FACC Br. at 18, and indeed the Department did just that.

options for compliance" with the proposed Exemption, including "by overseeing independent insurance agents," or by "creating oversight and compliance systems through contracts with insurance intermediaries such as independent marketing organizations (IMOs), field marketing organizations (FMOs) or brokerage general agencies (BGAs)"; they could also continue to "rely on the existing class exemption for insurance transactions, PTE 84-24, as an alternative." AR 15.

In the preamble to the proposed Exemption, the Department announced that it did not intend to rely on a prior Advisory Opinion, commonly known as the Deseret Letter, *see* Advisory Opinion 2005-23A (Dec. 7, 2005). That Advisory Opinion, which lacked analysis and failed to reconcile its conclusory statements with the history and purpose of the 1975 Regulation and the 1977 precursor to PTE 84-24, had been the source of controversy and confusion among regulated entities. Just five years after issuing the letter, the Department sought comments on whether its guidance should continue to be followed. *See* 75 Fed. Reg. 65266 (Oct. 22, 2010) ("Concerns have been expressed that, as a result of this position [AO 2005-23A], plan participants may not be adequately protected from advisers who provide distribution recommendations that subordinate participants' interests to the advisers' own interests. The Department, therefore, is requesting comment on whether and to what extent the final regulation should define the provision of investment advice to encompass recommendations related to taking a plan distribution."). The 2016 Rulemaking specifically "supersede[d] the Department's position in Advisory Opinion 2005-23A (Dec. 7, 2005)." 81 Fed. Reg. 20964.

In the 2020 exemption proceeding, the Department received 106 written comments on the proposed exemption from a variety of interested parties. Federation of Americans for Consumer Choice ("FACC"), a Plaintiff here, submitted a comment on August 6, 2020. AR 291. Following a public hearing on September 3, 2020—at which commenters, including Plaintiff FACC, were

permitted to give additional testimony, AR 1178—the Department published Prohibited Transaction Exemption 2020-02 on December 18, 2020. *See* AR 1. In the preamble to the Exemption, which contained a lengthy discussion of the various comments that were received and the rationale for the Department's decision-making with respect to the Exemption, the Department characterized part of the preamble to the Exemption as its "final interpretation of when advice to roll over Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code." AR 2.

Critically, the Department did not amend the 1975 five-part test as it had done in the 2016 Rulemaking. *See* AR 49 ("While this exemption proceeding interprets aspects of the five-part test, including by providing a new interpretation as to how it applies to rollovers, this exemption has not put at issue the five-part test itself as codified at 26 CFR 54.4975-9 and 29 CFR 2510.3-21"). Instead, as explained in the preamble:

> The Department's interpretation does not amend the five-part test, but only provides interpretive guidance, in the context of the relief provided in the new exemption, as to how that test applies to current practices in providing investment advice. The regulatory five-part test has long been understood to provide a functional fiduciary test, and the Department's interpretation is based on this understanding. The Department's interpretation does not effectively eliminate any of the elements of the five-part test, but rather applies them to current marketplace conduct and harmonizes with the current regulatory environment.

AR 12.

The preamble noted the agency's final view that a one-time rollover recommendation, without other "objective evidence" demonstrating that the parties "mutually intend an ongoing advisory relationship," would not "be considered fiduciary investment advice under the five-part test set forth in the Department's regulation." AR 9-10. The Department noted that "[p]arties can and do, for example, enter into one-time sales transactions in which there is no ongoing investment advice relationship, or expectation of such a relationship," noting as an example that if "a

participant purchases an annuity based upon a recommendation from an insurance agent without receiving subsequent, ongoing advice, the advice does not meet the "regular basis" prong as specifically required by the regulation." AR 7. As with other transactions involving plan assets, "whether insurance transactions will fall within or outside the scope of the fiduciary definition in Title I and the Code depends on the related facts and circumstances," and "insurance and annuity transactions must be evaluated based on application of the five-part test to the particular scenario." AR 10.

Unlike the 2016 Rulemaking, the Exemption did not alter PTE 84-24, and the preamble included detailed language explaining that this prior exemption remained available for qualifying insurance professionals. *See* AR 13 (noting that, "unlike the 2016 fiduciary rulemaking, this project did not amend other, previously granted, prohibited transaction exemptions."). Specifically, "[t]o the extent that insurance companies determine that the supervisory requirements of this exemption are not well-suited to their business models, it is important to note that insurance and annuity products can also continue to be recommended and sold under the existing exemption for insurance transactions, PTE 84-24." AR 16. PTE 84-24 does not require a written fiduciary acknowledgment, *see* AR 31, so while regulated parties "may decide to rely on this new exemption, instead of the Department's existing exemptions," the new exemption simply provides parties "with flexibility to choose between this new exemption or existing exemptions, depending on their needs and business models." AR 50-51.

Additionally, the preamble addressed a variety of comments received during the rulemaking with respect to the Fifth Circuit's *Chamber of Commerce* decision, including comments (from Plaintiff FACC and others) suggesting the proposed Exemption was inconsistent with that opinion. Most prominently, the Department noted that "[u]nlike the 2016 fiduciary rule

and related exemptions, the present exemption provides relief to a more limited group of persons already deemed to be fiduciaries within the meaning of the five-part test and does not impose contract or warranty requirements on fiduciaries." AR 25. In light of the Fifth Circuit's concern that the 2016 BICE had created a private right of action for retirement investors to sue financial advisors and insurance agents, the Department further noted that neither "the fiduciary acknowledgment" nor "any of the disclosure obligations" under the Exemption "create a private right of action as between a Financial Institution or Investment Professional and a Retirement Investor," and the Department "does not intend that any of the exemption's terms, including the acknowledgement, give rise to any causes of action beyond those expressly authorized by statute." AR 31.

Plaintiff filed this lawsuit on February 2, 2022. *See* Compl., ECF No. 1.

## ARGUMENT

The court should either dismiss Plaintiff's claims for lack of subject matter jurisdiction under Rule 12(b)(1) or should grant summary judgment to Defendants under Rule 56 and deny Plaintiff's motion for summary judgment.

## I.   THIS COURT LACKS JURISDICTION TO ADJUDICATE PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS LACK STANDING.

Plaintiffs cannot invoke the jurisdiction of this court unless it "can show 'a personal stake in the outcome of the controversy.'" *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *see also Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) ("Every party that comes before a federal court must establish that it has standing to pursue its claims."). "Standing is a threshold issue that [courts] consider before examining the merits." *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016). At its "irreducible constitutional minimum," the standing doctrine requires satisfaction of three elements: (1) a

concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendant's challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. Moreover, "[w]hen a party files a Rule 12(b)(1) motion with other motions to dismiss or for summary judgment, the Rule 12(b)(1) motion is considered before addressing the other attacks." *Lester v. Lester*, No. 3:06-CV-1357-BH, 2009 WL 3573530, at *3 (N.D. Tex. Oct. 29, 2009).

Here, Plaintiffs have not met their burden to establish a concrete and particularized injury-in-fact, and the Court should dismiss Plaintiff's complaint pursuant to Rule 12(b)(1) for that reason.

### A.    Plaintiffs Have Not Established That They Have Suffered a Cognizable Injury in Fact.

As part of the burden to establish subject matter jurisdiction at summary judgment, Plaintiffs must establish "by affidavit or other evidence" that they would be "directly affected" by the Department's regulation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992); *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (affirming "[t]he requirement that a party seeking review must allege facts showing that he is himself adversely affected"). It is not enough, as Plaintiffs seem to suggest, to assert in conclusory fashion that "[a]s state-regulated insurance agents selling annuities to clients who may be rolling over funds from an ERISA plan or an IRA," they inevitably would fall within the Department's interpretation of the five-part test in the ordinary course of their work. *See* FACC Br. at 8. The very cases cited by Plaintiffs, *see* FACC Br. at 9, illustrate the requirement that a party proffer detailed, non-conclusory affidavit evidence demonstrating concrete effects on their members in order to establish standing at summary judgment. *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879, at *5 (E.D. Tex.

Feb. 23, 2022) (finding standing where "Plaintiffs submit detailed affidavits with specific facts establishing that their injuries are not only likely and imminent, but inevitable."); *Sabre, Inc. v. Dep't of Transp.,* 429 F.3d 1113, 1118 (D.C. Cir. 2005) ("Sabre has proffered evidence in a sealed supplemental declaration that confirms the present existence of marketing plans, which it could otherwise implement presumably at considerable profit, that might very well result in enforcement actions and consequent civil fines."). *See also Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002) ("the plaintiff . . . must 'set forth' by affidavit or other evidence 'specific facts'").

Here, Plaintiffs' affidavits fall short of demonstrating actual compliance costs with the Department's interpretation of the 1975 test. *See Sierra Club*, 292 F.3d at 898 ("Bare allegations are insufficient . . . to establish a petitioner's standing to seek judicial review of administrative action[.]"). The only assertions of injury in the Plaintiffs' proffered affidavits are the following, which are repeated verbatim with no variation among the Plaintiffs:

- Complying with the Final Interpretation and the requirements of a necessary PTE has subjected me and my business to additional compliance requirements, such as additional disclosures and documentation, potential liability under ERISA, and potential enforcement actions by the Department. (Couch Decl., App. 3-4; Lown Decl., App. 06; Bellman Decl., App. 08; Buckholdt Decl., App. 10-11; Messing Decl., App. 13-14; Miles Decl., App. 15-16).

- Due to the Final Interpretation adopted by the U.S. Department of Labor (the "Department"), which accompanied the Department's adoption of Prohibited Transaction Exemption 2020-02, Fed. Reg. 82798 (December 18, 2020) and became effective as to enforcement by the Department February 1, 2022, I have had to consider my business practices to be subject to ERISA requirements for the first time and have had to meet the requirements of a Prohibited Transaction Exemption (a "PTE") . . . as a result of the Department's New Interpretation, I am now subject to an entirely new regulatory regime. (Couch Decl., App. 3-4; Lown Decl., App. 06; Bellman Decl., App. 08; Buckholdt Decl., App. 10-11; Messing Decl., App. 13-14; Miles Decl., App. 15-16).

Plaintiffs provide no details about these purported "additional compliance requirements," nor explain how specific sales of annuity products to current or potential clients would satisfy the

Department's detailed interpretation of the application of the 1975 five-part test as contained in the preamble. These allegations, and suggestions of additional expense, are unduly vague and insufficiently "concrete" for purposes of Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (in addition to being particularized to plaintiff, "[a]n injury in fact must also be 'concrete'"). *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (general "averments that harm . . .was caused" are "conclusory allegations . . . inadequate to demonstrate standing"). For example, state insurance codes and regulations have recently been updated to require a best interest standard, with accompanying disclosure and documentation requirements. *See* Background § D, *supra*. Yet Plaintiffs do not explain how the Department's action will increase the compliance costs already imposed by state action.

Moreover, contrary to settled precedent in the Fifth Circuit, the affidavits simply state the Plaintiffs' opinion on the Exemption and what it means, in effect announcing Plaintiffs' legal conclusion that they are "subject to an entirely new regulatory regime." Such legal conclusions in factual affidavits are not sufficient. *See Serna v. L. Off. of Joseph Onwuteaka, P.C.*, 614 F. App'x 146, 153 (5th Cir. 2015) ("This Court has recognized that, as a general matter, unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment.").

Second, on its face this affidavit evidence is not "particularized" to any individual plaintiff because each insurance agent plaintiff has the verbatim same affidavit. *See Guzman v. Allstate Assurance Co.,* 18 F.4th 157, 161 (5th Cir. 2021) (factual evidence in affidavits "must be particularized, not vague or conclusory."). Instead, the Plaintiffs each allege—in identical

21

language—that they sell annuities, they are subject to the interpretation and the Exemption, and it has caused them to incur some unspecified costs. Courts have found similar affidavits, which essentially parrot a party's legal position, too conclusory to support injury at summary judgment. *See Skrzypczak v. Roman Cath. Diocese Of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010) (finding affidavits insufficient to overcome summary judgment where "[a]ll three affidavits contain identical language" and "each affidavit merely parrots a general rule that a court could consider"); *Mancini v. City of Providence by & through Lombardi*, 282 F. Supp. 3d 459, 466 (D.R.I. 2017) (noting that courts have "rejected conclusory affidavits that lack factual specificity and merely parrot the legal conclusions required by the cause of action at the summary judgment stage.").

Third, with respect to Plaintiff FACC, the evidence it produced—particularly the affidavit of Kim O'Brien—is similarly speculative and conclusory. Her affidavit alleges that "[d]ue to the Final Interpretation . . . FACC's agent members have had to consider their business practices to be subject to ERISA requirements for the first time and have had to meet the requirements of a Prohibited Transaction Exemption," which in turn have necessitated "additional compliance requirements," O'Brien Decl., App. 19-20. Her affidavit is similarly bare-bones and bereft of the required specificity for the same reasons noted as to the other Plaintiffs.

As to FACC's claim to have associational standing to sue on behalf of its members, *see* FACC Br. at 9, even assuming FACC had "the indicia of membership in an organization" that would allow its members to "express their collective views and protect their collective interests," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977), FACC has failed to show that "its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. Associational standing cannot be established by "accepting the organization's self-

description of the activities of its members" and determining that "there is a statistical probability that some of those members are threatened with concrete injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  Here, because the individual FACC members suing in their own right have failed to establish evidence of a concrete injury arising from agency action, FACC cannot establish associational standing for its broader membership based on the conclusory assertions in the O'Brien Declaration.

### B.    Plaintiffs Do Not Challenge PTE 84-24, Which They Acknowledge Would Provide Alternative Exemptive Relief and Remains Available to Plaintiffs.

Apart from the conclusory nature of their affidavit evidence, Plaintiffs' injuries are also speculative because, insofar as Plaintiffs challenge the Department's promulgation of the Exemption (separate from the Department's interpretation of the five-part test), Plaintiffs—as insurance professionals—can avail themselves of another avenue to receiving otherwise prohibited compensation under ERISA and the Code: PTE 84-24.  That exemption, which does not require a written fiduciary acknowledgment, has been on the books for decades, and Plaintiffs do not challenge that exemption in this lawsuit.  In a footnote at the end of their brief, Plaintiffs acknowledge that "most insurance agents will likely avail themselves of PTE 84-24 rather than the Revised Exemption under current circumstances," but brush this aside as "irrelevant for purposes of this lawsuit." FACC Br. at 41 n. 11.

But PTE 84-24 plainly is relevant because it demonstrates that compliance with the new Exemption is not obligatory for Plaintiffs.  *See Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*, 422 F. Supp. 2d 75, 78 (D.D.C. 2006) (no standing where "compliance with . . . safe harbor methodologies is entirely voluntary").  Plaintiffs certainly *may* avail themselves of the new Exemption as an avenue to relief, and the Department specifically noted that the Exemption may streamline compliance costs by permitting regulated parties "to rely on one exemption for

investment advice transactions under a single set of conditions. . . . as compared to relying on multiple exemptions with multiple sets of conditions, resulting in a lower overall compliance burden for some Financial Institutions." AR 51. But the Department also noted that Insurance Companies and agents "could rely on the existing class exemption for insurance transactions, PTE 84-24, as an alternative." AR 15. Plaintiffs seem to recognize this, too. *See* FACC Br. at 38 (noting that if fiduciary status attached, "[t]he agent would therefore be subject to the full regulatory authority the DOL possesses over ERISA fiduciaries and must now comply with the Revised Exemption *or another existing exemption, such as PTE 84-24*, 49 Fed. Reg. 13208, *et seq*.") (emphasis added).

Given that available option—which Plaintiffs themselves concede they "will likely avail themselves" of "rather than the Exemption" at issue in this case—Plaintiffs' claim to have suffered an injury from the new Exemption is in essence a voluntary or self-inflicted injury, which cannot be used to manufacture standing to challenge PTE 2020-02, to the extent that Plaintiffs' Complaint challenges the terms of that Exemption. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *McConnell v. FEC,* 540 U.S. 93, 228 (2003) (no standing for political candidates who claimed injury from law increasing limits on "hard money" contributions; injury was caused by "their own personal 'wish' not to solicit or accept large contributions"); *Taylor v. FDIC,* 132 F.3d 753, 767 (D.C. Cir. 1997) (no standing for plaintiffs who claim constructive discharge based upon voluntary resignations).

Plaintiffs also speculate that, with respect to PTE 84-24, "the current circumstances may soon change for the worse" FACC Br. at 41 n. 11, because the Department has indicated that it

"anticipates taking further regulatory and sub-regulatory actions, as appropriate, including amending the investment advice fiduciary regulation, amending PTE 2020-02, and amending or revoking some of the other existing class exemptions available to investment advice fiduciaries." AR 1350.  Whatever the merits of that speculation, that is a matter for another day: the contours of any future rulemaking are still uncertain, and "unadorned speculation" about what may occur in the future "will not suffice to invoke the federal judicial power." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 44 (1976).  Moreover, given that such rulemaking has not yet even begun, it is obviously not "final agency action," *see* 5 U.S.C. §§ 702, 704, and thus Plaintiffs cannot rely on what they think the Department will do to manufacture standing.  *See Texas v. EEOC*, 993 F.3d 433, 441 (5th Cir. 2019) (final agency action is one that marks "the consummation of the agency's decision-making process").   And of course, in the very document cited by Plaintiffs, the Department made clear that "[r]egulatory actions will be preceded by notice and an opportunity for public comment," AR 1350, so Plaintiffs are free to participate in any notice-and-comment process in a future rulemaking (just as they did here).

In short, because Plaintiffs have not met their evidentiary burden of demonstrating that "application of the regulations by the Government will affect *them* in the manner" they suggest, *Summers v. Earth Island Inst.,* 555 U.S. 488, 494 (2009), and because another, unchallenged exemption promulgated by the Department remains available to Plaintiffs for the same relief, Plaintiffs cannot demonstrate an injury-in-fact flowing from the Exemption. The Court should therefore dismiss this action for lack of subject matter jurisdiction.

## II.   THE EXEMPTION IS CONSISTENT WITH THE FIFTH CIRCUIT'S *CHAMBER OF COMMERCE* DECISION.

Assuming this court has jurisdiction, Plaintiffs' claims on the merits fail.   At its core, Plaintiffs' principal legal argument is that the Department has essentially resurrected the 2016

Fiduciary Rule and sought to reimpose on regulated parties a set of regulations and policies found to be unlawful by the Fifth Circuit in *Chamber of Commerce*. *See* FACC Br. at 1-2, 12. That argument misreads both *Chamber of Commerce* and what the Department did here.[6]  The specific aspects of the 2016 Rule that the Fifth Circuit found objectionable—none of which are present in the current Exemption—are discussed in greater detail below.  Moreover, to the extent that the Department's interpretation of the 1975 Regulation differs from its prior regulations, it is hornbook law that "[a]n initial agency interpretation is not instantly carved in stone." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 863–64 (1984).  *See POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 413 (D.C. Cir. 2020) (noting, with respect to interpretations of prior regulations, that "agencies are free to shift interpretive positions, especially where . . . they do so on a comprehensively updated record").

The most egregious error in Plaintiffs' framing of the case is their argument that *Chamber of Commerce* precludes for all time the regulation of rollovers as fiduciary investment advice.  According to Plaintiffs, the Fifth Circuit adopted a rigid common law formulation of fiduciary status that simultaneously 1) announced that only the 1975 Regulation is faithful to the common law understanding of fiduciary, and 2) somehow suggested that the 1975 Regulation cannot be interpreted to apply to rollovers.  On this tortured reading, insurance agents providing advice are

---

[6] Plaintiffs suggest that the Department is seeking to "overrule the judicial branch." FACC Br. at 13.  Hogwash.  Plaintiffs are correct that in briefing before the US District Court for the Middle District of Florida in a lawsuit challenging two guidance documents issued by the Department following the promulgation of the Exemption, the Department has taken the position that the Fifth Circuit's ruling was in error.  However, that does not mean that the Department has not complied with that ruling or taken it into consideration in subsequent rulemaking.  To the contrary, as the very brief cited by Plaintiffs notes, "the Department took special pains to address the Fifth Circuit's concerns in its subsequent promulgation of the Exemption so as to bring the Department's regulation of fiduciary investment advice in line with the Fifth Circuit's interpretation of ERISA's text." App. 54.

free to hold themselves out as acting in their clients' best interest while prioritizing lucrative commissions from sales of annuities and rollover recommendations that may involve a retiree's life savings—so long as they are not on a monthly retainer and providing constant investment advice. Moreover, Plaintiffs argue, because any fiduciary relationship must be fixed prior to the rollover, first-time advice can *never* be the start of a fiduciary relationship. Nothing in the Fifth Circuit's ruling commands this extreme result, and the Department is not precluded under *Chamber of Commerce*'s reasoning from taking note of current market realities and reasonably interpreting the 1975 Regulation to prevent this outcome. Notably, market regulation has changed since the Department issued its 2016 Rulemaking. The SEC has required both broker-dealers and registered investment advisers to employ a best interest standard in the rollover context. *See* AR 14 ("[T]he best interest standard applicable to broker-dealers under Regulation Best Interest is rooted in fiduciary principles . . . The Department's exemption places the transaction-based advice model on an even playing field with the investment adviser model, and applies fiduciary standards in both contexts that are generally consistent with the standards imposed by the SEC."). And the NAIC has likewise proposed a best interest standard for insurance agents that has been adopted by numerous states, including Texas, which includes obligations of care, disclosure, conflict of interest, and documentation. *See id.*; *see also* Background § D, *supra*.

A.   **The 2016 Rule Amended and Changed the Five-Part Test, While the Current Interpretation Narrowly Applies That Test to Discrete Market Events.**

In *Chamber of Commerce*, the Fifth Circuit held that ERISA's definition of fiduciary incorporated the common law of trusts, necessitating "a special relationship of trust and confidence between the fiduciary and his client." 885 F.3d at 365. In reviewing the aspect of the 2016 Fiduciary Rule that altered the definition of "fiduciary," including by doing away with the "regular basis" and "mutual agreement" prongs, the Fifth Circuit stated that the 2016 Fiduciary Rule was

inconsistent with ERISA's text in part because it "expressly includes one-time IRA rollover or annuity transactions" in situations where a "special relationship of trust and confidence" was lacking. 885 F.3d at 376, 380.

Under the 1975 Regulation, which the Department reinstated following the Fifth Circuit's opinion in *Chamber of Commerce*, the Department agrees that a fiduciary relationship requires more than a one-time recommendation. Accordingly, the Department stated on a number of occasions in the preamble to PTE 2020-02 and in later-published FAQs that a one-time rollover recommendation, without other "objective evidence" demonstrating that the parties "mutually intend an ongoing advisory relationship," AR 9-10, would not "be considered fiduciary investment advice under the five-part test set forth in the Department's regulation." AR 7; *see also* AR 1351 (FAQ 7) ("A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test."). This approach—under which "the Department intends to consider the *reasonable* understandings of the parties based on the totality of the circumstances" to determine whether a fiduciary relationship exists—is entirely consistent with the approach taken by the Fifth Circuit. *Id.* Such a totality-of-the-circumstances test is also consistent with how courts approach common law fiduciary issues. *See, e.g., Xereas v. Heiss*, 987 F.3d 1124, 1131 (D.C. Cir. 2021) ("Whether a fiduciary relationship exists is a fact-intensive question involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties"); *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) ("The existence of a fiduciary relationship, outside of formal relationships that automatically give rise to fiduciary duties, is usually a fact intensive inquiry."); *Janvey for Stanford Int'l Bank, Ltd. v. Alvarado*, No. 3:10-CV-2584-N, 2015 WL 13739416, at *5 (N.D. Tex. June 24, 2015) ("Whether and to what extent a

fiduciary duty is owed by an employee to an employer requires consideration of all aspects of the relationship.").

In fact, the preamble makes plain that the 1975 five-part test needs to be satisfied in full and that a one-time rollover recommendation, without more, would fail to satisfy the regular basis test.[7]  The Department received and rejected one comment suggesting "that a rollover transaction should always satisfy the regular basis prong on the grounds that it can be viewed as involving two separate steps—the rollover and a subsequent investment decision." AR 7. Instead, the Department's view for purposes of the exemption was that "[t]hese two steps do not, in and of themselves, establish a regular basis." *Id.*

Plaintiffs seem to suggest that the Department has ignored the Fifth Circuit's guidance that the "touchstone of common law fiduciary status" is "the parties' underlying relationship of trust and confidence." *Chamber of Commerce*, 885 F.3d at 369; *see* FACC Br. 12. To the contrary, the Department expressly acknowledges that principle throughout its discussion. For example, in rejecting comments proposing that all rollover recommendations should be deemed fiduciary, the Department explained that "the facts and circumstances analysis required by the five-part test applies to rollover recommendations," such that only recommendations meeting all five criteria would be covered, concluding that this "outcome is more aligned with both the facts and circumstances approach taken by Congress in drafting the Act's statutory functional fiduciary test, and with an approach centered on whether the parties have entered into a relationship of trust and

---

[7] *See* AR 7 ("The Department agrees that not all rollover recommendations can be considered fiduciary investment advice under the five-part test set forth in the Department's regulation. Parties can and do, for example, enter into one-time sales transactions in which there is no ongoing investment advice relationship, or expectation of such a relationship."); AR 1351 (FAQ 7) ("A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test").

confidence." AR 7. And in discussing the regular basis prong, the Department emphasized that the five-part test's fact and circumstances analysis can address when "the relationship of trust and confidence starts." *See* AR 10 ("Every relationship has a beginning, and the five-part test does not provide that the first instance of advice in an ongoing relationship is automatically free from fiduciary obligations. The fact that the relationship of trust and confidence starts with a recommendation to roll the investor's retirement savings out of a Title I Plan is not an argument for treating the recommendation as nonfiduciary.").[8]

Instead of ignoring the Fifth Circuit's common law framing of the definition of fiduciary investment advice, the Department is simply applying that framework to a discrete market event—rollovers from ERISA plans to Title II plans. Indeed, the Department's facts and circumstances approach allows for a much fuller assessment of whether a "relationship of trust and confidence" is involved that Plaintiffs' categorical exclusions of certain advice.

Apart from ignoring the Department's detailed discussion of this topic in the very regulation they challenge, Plaintiffs retort that, if the 1975 Regulation on its own terms could have applied to rollovers, there would have been no need for the Department to scrap and replace that regulatory definition in the context of the 2016 Rulemaking. *See* FACC Br. at 37. But the Department's 2016 objection to how the test had historically been *applied* "as the marketplace for

---

[8] *See also* AR 5 ("the Impartial Conduct Standards are strong fiduciary standards based on longstanding concepts in the Act and the common law of trusts."); AR 8 ("advice to roll over plan assets can also occur as part of an ongoing relationship or an intended ongoing relationship that an individual enjoys with his or her investment advice provider."); AR 9 ("If a Financial Institution or Investment Professional does not want to assume a fiduciary relationship or create misimpressions about the nature of its undertaking, it can . . . avoid holding itself out to its Retirement Investor customer as acting in a position of trust and confidence."); AR 25 ("This exemption merely recognizes that fiduciaries of IRAs, if they seek to use this exemption for relief from prohibited transactions, should adhere to a best interest standard consistent with their fiduciary status and a special relationship of trust and confidence.").

financial services has developed in the years since 1975," *id.* (quoting 81 Fed. Reg. at 20953), and decision to take a substantially different regulatory approach, was not based on a conclusion that the regulation could not "comfortably bear[] more than one interpretation," *Texas Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 776 (5th Cir. 2010), as many regulations can.

Plaintiff may disagree with the Department's interpretation of how the 1975 Regulation applies to particular market conditions, but the fact remains that the Department has reinstated that regulation; continually has taken the position throughout this exemption proceeding that the regulation applies; and has structured the Exemption to accord with the Fifth Circuit's common-law understanding of the definition of fiduciary under ERISA. *Chamber of Commerce* does not justify the extreme interpretation that Plaintiffs seek to foist upon it. Moreover, Plaintiffs ignore entirely the other critical elements of the 2016 Fiduciary Rule that the Fifth Circuit found to be invalid. It was the combination of these elements, as discussed below—particularly the requirement that investment advisors enter into an enforceable contract with the Retirement Investor in order to avail themselves of the objection—that the Fifth Circuit struck down.

### B.      The Exemption Does Not Impose Any Contractual Requirements.

One of the key features of the 2016 Fiduciary Rule was a requirement that fiduciaries that received conflicted compensation enter into an enforceable contract with the IRAs receiving advice as a condition for relief from the prohibited transaction provisions that otherwise barred the compensation (the Best Interest Contract Exemption or BICE). The Department had characterized the BICE "and the potential for liability" it offered as "central goals of this regulatory project." 81 Fed. Reg. at 21021, 21033. The required contractual arrangements and the specter of legal liability were the principal concerns of the financial services industry during the prior rulemaking. The Fifth Circuit found these contractual requirements particularly problematic, concluding that "[t]he BICE supplants former exemptions with a web of duties and legal vulnerabilities," and that,

because "the contracts may not include exculpatory clauses such as a liquidated damages provision nor may they require class action waivers . . . a BIC Exemption comes at a high price." *Chamber of Commerce*, 885 F.3d at 367.  The Fifth Circuit ultimately found this contractual requirement to be inconsistent with Congressional intent under Title II.  *See id.* at 381-82.

Here, by contrast and indeed by design (so as to comply with the Fifth Circuit's ruling), the contract requirement has been excluded from the Exemption.  This, it should be noted, caused concerns among some commentators that "the conditions of the proposed exemption were not sufficiently enforceable to provide meaningful protections," and that "unlike the Best Interest Contract Exemption granted in connection with the 2016 fiduciary rule, this exemption did not include a contract or other means of making the Impartial Conduct Standards enforceable" and "[t]herefore, IRA owners would not have a mechanism to enforce the requirements of the exemption." AR 44.  However, in light of the Fifth Circuit's opinion that a contract-based compliance mechanism was unlawful in this context, the Department has not imposed one in PTE 2020-02.

###    C.    No Private Right of Action Has Been Created.

Relatedly, the Fifth Circuit was concerned that the form contract language included in the BICE would subject plaintiffs to state law liability, in effect creating a private right of action for retirement investors against advisors, brokers, and agents. *See Chamber of Commerce*, 885 F.3d at 384 (finding that the BICE "provisions regarding lawsuits also violate the separation of powers" by creating a "private right of action").  The Fifth Circuit found that "whether federal or state law may be the vehicle for DOL's BICE-enabled lawsuits is immaterial in the absence of statutory authorization," and that the potential for state law breach-of-contract lawsuits under the required language of the BICE in turn rendered the BICE arbitrary and capricious under the APA. *Id.* at 385.

No such concerns are present here, where the Exemption contains no contract requirement at all. As the Department noted in the preamble, this is a meaningful distinction from the 2016 Rule. *See* AR 31 ("The Department does not intend that the fiduciary acknowledgment or any of the disclosure obligations create a private right of action as between a Financial Institution or Investment Professional and a Retirement Investor, and it does not intend that any of the exemption's terms, including the acknowledgement, give rise to any causes of action beyond those expressly authorized by statute.").

### D.   The Exemption Contains No Limitation on Arbitration.

The 2016 Rule also limited an investment adviser's ability to require an advice recipient to agree to binding, pre-dispute arbitration, which the Fifth Circuit found in *dicta* likely violated the Federal Arbitration Act ("FAA"). *See id.* at 385 ("Although it is now disavowed by DOL, another unsustainable feature of the BIC Exemption is the forced rejection, in transactions involving transaction-based compensation, of contractual provisions that would have allowed arbitration of class action claims. This contractual condition violates the Federal Arbitration Act."). The rejection of arbitration contained within the BICE, according to the Fifth Circuit, ran contrary to congressional intent to promote arbitration under the FAA and Supreme Court case law interpreting that statute. The current exemption does not limit the rights of any advisor, insurance agent, or other market participant to incorporate arbitration clauses into any investor agreement.

### E.   PTE 84-24 Was Not Amended and Remains Available to Insurance Professionals.

In the 2016 Rulemaking, PTE 84-24 was amended such that it excluded fixed indexed annuities, "leaving only fixed-rate annuities within its scope." *Chamber of Commerce*, 885 F.3d at 367. The Fifth Circuit found that "this action place[d] a disproportionate burden on the market for fixed indexed annuities, as opposed to competing annuity products," *id.*, as such transactions

were not subject to "the same Impartial Conduct Standards as in the BICE exemption." *Id.* Here, by contrast, the status quo with respect to PTE 84-24 has been restored: that exemption now "cover[s] transactions involving insurance and annuity contracts and permit[s] customary sales commissions where the terms were at least as favorable as those at arm's-length, [and] provide[s] for "reasonable" compensation, and included certain disclosures." *Id.* at 367; *see* 49 Fed. Reg. 13208, 13211 (Apr. 3, 1984); 42 Fed. Reg. 32395 (June 24, 1977) (precursor to PTE 84-24).

The Department made clear in the preamble to the Exemption that PTE 84-24 remains in effect and that parties can determine which exemption that best suited their needs. *See* AR 16 ("To the extent that insurance companies determine that the supervisory requirements of this exemption are not well-suited to their business models, it is important to note that insurance and annuity products can also continue to be recommended and sold under the existing exemption for insurance transactions, PTE 84-24. Unlike in the Department's 2016 fiduciary rulemaking, PTE 84-24 is not being amended in connection with the current proposed exemption."). As Plaintiffs themselves note, *see* FACC Br. at 41 n. 11, as insurance professionals PTE 84-24 remains available to them as a mechanism for receiving otherwise prohibited compensation, and Plaintiffs concede it is likely they will avail themselves of this exemption rather than PTE 2020-02. *Id.*

## III.   THE EXEMPTION IS A REASONABLE INTERPRETATION OF ERISA AND THE DEPARTMENT'S PRIOR REGULATIONS.

With the Fifth Circuit's *Chamber of Commerce* ruling providing no barrier to the exemption at issue here, Plaintiffs' substantive claims also fail. First, Plaintiffs' suggestion of incongruity between the preamble and prior statutes and regulations—and that the Department exceeded its statutory authority in promulgating the Exemption, *see* Compl. ¶¶ 42-45—does not hold water. Indeed, the plain meaning of ERISA and the 1975 regulations supports the Department's interpretation, and that interpretation is also in accord with the Fifth Circuit's

opinion in *Chamber of Commerce*.   Second, the Department's explanation for its new interpretation was adequately explained.[9]   Third, the Department's interpretation of ERISA and the 1975 regulations is entitled to deference under settled law, and the interpretation is reasonable in any event.

### A.   The Department's Interpretation is Consistent With The Fifth Circuit's Reading of ERISA's Text and With The Plain Meaning Of The 1975 Regulation.

In *Chamber of Commerce*, the Fifth Circuit held that ERISA's definition of fiduciary incorporated the common law of trusts, necessitating "a special relationship of trust and confidence between the fiduciary and his client."  *Chamber of Commerce*, 885 F.3d at 365.  The Department took special pains to address the Fifth Circuit's concerns in its subsequent promulgation of the Exemption so as to bring the Department's regulation of fiduciary investment advice in line with the Fifth Circuit's interpretation of ERISA's text.  Though Plaintiffs' brief argues extensively that the Department's interpretation of the 1975 regulation as contained in the preamble (reaffirmed in later FAQs) is inconsistent with *Chamber of Commerce* based purely on the Department's view

---

[9] Plaintiffs do not allege in their complaint that the Department's actions were procedurally deficient, *see* Compl. ¶¶ 42-49, ECF No. 1, and interpretive rules are exempt from the notice and comment procedure.  *See* 5 U.S.C. § 553(b).  Nevertheless, in their brief, Plaintiffs criticize the Department's interpretation set forth in the preamble to the Exemption as occurring "entirely outside of rulemaking processes prescribed by the APA."  FACC Br. at 39.  Any such procedural claim rings utterly hollow here where the Department announced its proposed interpretation in the Notice of Proposed Exemption and invited comments on the interpretation—an invitation welcomed by Plaintiff FACC, which provided a comment *and* appeared at a hearing to provide testimony.  Plaintiffs cannot seriously suggest that "the Department did not provide a meaningful opportunity for comment."  FACC Br. at 39-40 (quoting *North Carolina Growers Association v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012)).  Moreover, Plaintiffs' suggestion that the Department should have conducted a "cost-benefit analysis, and other procedural steps that are required for new regulations," FACC Br. at 40, misses the obvious point that here the Department is not promulgating a new regulation but interpreting a prior regulation, and in any event here the Department *did* request comments on costs and benefits of the exemption and provided its views on these issues in the preamble. *See* AR 50-52.

that in *some cases*, advice to roll over assets from an ERISA plan to an IRA might meet the definition of fiduciary investment advice, in fact Plaintiffs misread *Chamber of Commerce* as precluding for all time and in all circumstances the regulation of rollover recommendations.

The Fifth Circuit opinion does no such thing. Rather, the Fifth Circuit held that the 2016 Fiduciary Rule was inconsistent with ERISA's text in part because "disregard[ed] the essential common law trust and confidence standard" and would have encompassed circumstances where it was "ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id.* at 380 (emphasis added). For purposes of the interpretation at issue here, the Department agrees and stated on a number of occasions in the preamble and the FAQs that a one-time rollover recommendation, without other "objective evidence" demonstrating that the parties "mutually intend an ongoing advisory relationship," AR 9-10, would not "be considered fiduciary investment advice under the five-part test set forth in the Department's regulation." AR 7; *see also* AR 1351 (FAQ 7) ("A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test."). This approach—under which "the Department intends to consider the *reasonable* understandings of the parties based on the totality of the circumstances" to determine whether a fiduciary relationship exists—is entirely consistent with the approach taken by the Fifth Circuit. *Id.* In other words, to the extent that the Fifth Circuit suggested that a special relationship of trust and confidence between parties "is the *sine qua* non" of a fiduciary relationship as used in ERISA's definition of "fiduciary investment-advice," the Department's interpretation here is consistent with that reading. *Chamber of Commerce*, 885 F.3d at 370-71.

In addition to its consistency with the plain meaning of fiduciary "investment advice" as used in ERISA, the Department's interpretation also comports with the plain text of the 1975

regulation.  Regulations are interpreted "in the same manner as statutes, looking first to the regulation's plain language." *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016).  Before determining that a regulation is ambiguous, however, courts must also "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2424 (2019).

Here, the 1975 Regulation defines a "fiduciary" as one who "(1) renders advice to the plan as to the value of securities or other property, or makes *recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property*," (2) "*on a regular basis*," (3) "pursuant to a mutual agreement, arrangement or *understanding*," with the plan or a plan fiduciary that (4) the "advice will serve as *a primary basis* for investment decisions with respect to plan assets," and (5) the advice *will be individualized* "based on the particular needs of the plan." 29 C.F.R. § 2510.3-21(c)(1) (emphasis added); *see also* AR 293, AR 489-90. The Department's interpretation that a first-time provision of investment advice to rollover assets, when "objective evidence" demonstrates that the parties "mutually intend an ongoing advisory relationship," AR 9-10, is consistent with that regulatory "text, structure, history, and purpose." *Kisor*, 139 S. Ct. at 2424.  With respect to the text, in a fiduciary rollover scenario, the financial advisor or broker is "render[ing] advice . . . as to the advisability . . . or selling securities or other properties" from the ERISA plan; has begun to provide such advice "on a regular basis" given the mutual expectation of an ongoing relationship;  is doing so "pursuant to a mutual . . . understanding"; is providing advice that will be *a* "primary basis" for the rollover decision; and is providing "individualized" advice.  29 C.F.R. § 2510.3-21(c)(1).

Plaintiffs' effort to exempt insurance salespeople from the plain application of the text of this regulation based on what they describe as an historic dichotomy between "salespeople and

fiduciary investment advisers" is unpersuasive. FACC Br. at 39. There cannot be a wall categorically separating salespeople from fiduciaries by title or position when ERISA adopts a functional definition of fiduciary that applies only "to the extent" that an entity "renders investment advice . . . with respect to any moneys or other property of such plan." 29 U.S.C. § 1002(21)(A). The Department has always understood this (and the five-part test implementing this standard) to mean an entity may be a salesperson in certain contexts and a fiduciary in others. *See, e.g.*, 1975 Regulation, 40 Fed. Reg. 50842 (explaining in preamble that "a person who is a fiduciary with respect to a plan by reason of rendering investment advice to such plan shall be deemed to be a fiduciary with respect to only those assets of the plan for which such person, directly or indirectly, renders investment advice"). Here, the Department has been clear that its interpretation does not make everyone involved in a rollover from an ERISA plan a fiduciary, but instead that the five-part test adequately assesses the "facts and circumstances" to determine whether a fiduciary relationship of trust and confidence has been established. And the Department has taken pains to make clear how sales can proceed in a discrete, nonfiduciary manner. *See, e.g.*, AR 9 ("[I]f a Financial Institution or Investment Professional does not want to assume a fiduciary relationship or create misimpressions about the nature of its undertaking, it can clearly disclose that fact to its customers up-front, clearly disclaim any fiduciary relationship, and avoid holding itself out to its Retirement Investor customer as acting in a position of trust and confidence."). Not least, other regulators have recognized that those recommending annuities are not mere salespeople and have imposed best interest standards on them. *See supra*, Background § D.

The Department's interpretation is also in keeping with the statutory purpose behind ERISA, which was enacted by Congress "after determining that the then present system of regulation was ineffective in monitoring and preventing fraud and other pension fund abuses."

*Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 689 (7th Cir. 1986). Congress enacted ERISA with the broad purpose of protecting retirement benefits. *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 (1993) (noting ERISA's "broadly protective purposes" regarding retirement benefits). Such a "[r]emedial statute[] [is] to be construed liberally," in particular "in an era of increasing individual participation in [the] market." *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 173 (5th Cir. 2000); *see also Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1251 (5th Cir. 1990) (ERISA is to be given "a liberal construction … in keeping with its remedial purposes").

Here, it is beyond dispute that the "amounts accrued in a Title I Plan can represent a lifetime of savings, and often comprise the largest sum of money a worker has at retirement." AR 5. For that reason, "the decision to roll over assets from a Title I Plan to an IRA is potentially a very consequential financial decision" for the investor and a sound decision "will typically turn on numerous factors, including the relative costs associated with the new investment options, the range of available investment options under the plan and the IRA, and the individual circumstances of the particular investor." AR 5-6. It is also clear that extremely large sums of retirement investments are rolled over annually from Title I plans. *See* AR 6 ("expected to approach $2.4 trillion cumulatively from 2016 through 2020"). And the investment professionals to whom people turn have significant incentives to encourage such transactions. *See id.* ("These large sums of money eligible for rollover represent a significant revenue source for investment advice providers. A firm that recommends a rollover to a Retirement Investor can generally expect to earn transaction-based compensation such as commissions, or an ongoing advisory fee, from the IRA[.]"). With such stakes, and the precise risks of harm through conflicts of interest that ERISA was designed to address, the Department's interpretation plainly serves ERISA's remedial

purpose. The Interpretation aligns the definition of investment advice with today's marketplace realties and ensures, consistent with ERISA's text and congressional intent, that fiduciary status applies to "persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co.*, 510 U.S. at 96. *See, e.g., Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 969 (5th Cir. 1981) (recognizing that "[o]ne of the purposes of ERISA is to protect … the interests of participants in employee benefit plans … by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies").

### 1.   *The Major Questions Doctrine is Inapplicable.*

In an effort to evade a normal application of statutory and regulatory interpretation focusing on the text, Plaintiffs invoke the Supreme Court's "major questions" doctrine. *See* FACC Br. at 35. Although the contours of the major questions doctrine are still somewhat nebulous, it has no application to this case. Here, unlike in *West Virginia v. EPA,* 142 S. Ct. 2587 (2022), the Department has not found "a newfound power" in an "ancillary provision" of ERISA, as the Supreme Court found the EPA had done with the Clean Power Plan. *See id.* at 2602, 2610 (concluding that EPA had identified for its regulation a statutory "backwater" that had been "used . . . only a handful of times since the enactment of the statute.") To the contrary, Congress expressly granted the Department of Labor the authority to grant exemptions and to interpret the term "fiduciary" in ERISA and the Code. *See* 29 U.S.C. § 1135; Reorg. Plan § 102; *see also Johnson v. Buckley*, 356 F.3d 1067, 1073 (9th Cir. 2004) ("not[ing] the broad authority of both the Secretary of Labor and the Secretary of the Treasury to promulgate regulations governing ERISA"); *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 708 (10th Cir. 1993), *rev'd in part on other grounds*, 39 F.3d 1078 (10th Cir. 1994) (en banc) ("Congress

delegated broad authority to the Secretary of Labor to publish regulations under ERISA.").[10]  The Department has continuously exercised its authority since the passage of ERISA to grant various exemptions, including PTE 84-24—which provides relief to the very Plaintiffs here and which Plaintiffs do not challenge as somehow extending beyond the permissible authority of the Department. Moreover, here the Department has reinstated the 1975 Regulation and interpreted the Regulation's application to discrete market events: it has not "discover[ed]" any new "authority." *West Virginia*, 142 S. Ct. at 2612.[11]  Plaintiffs' effort to shoehorn this case into the major questions doctrine—and thus to dodge the plain text of the statute and regulations—is unpersuasive and should be rejected.  Instead, as in other cases requiring a court to interpret statutes and regulations, the analysis of an agency's statutory authority "begins with the statutory text"— and, when the text is clear, it "ends there as well." *National Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 631 (2018).  Courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (upholding HHS's religious and moral exemptions to the

---

[10]  Under ERISA, "the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter," including "defin[ing] accounting, technical and trade terms." 29 U.S.C. § 1135.  Beyond ERISA, similar "necessary and appropriate" language has been construed to confer broad authority on the relevant agencies. *See, e.g., Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1191 (9th Cir. 2000) ("Congress delegated to the Secretary of the Interior the broad authority to 'prescribe such regulations as are necessary and appropriate to carry out his responsibilities under [ANILCA].'"); *Pharm. Research & Manufacturers of Am. v. Fed. Trade Comm'n*, 44 F. Supp. 3d 95, 116-17 (D.D.C. 2014) (statute gave FTC a "blank slate" to "define the terms used in this section" and "broadly awarded" the FTC authority to "prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section").

[11]  Plaintiffs do not support their claim that "virtually all" rollover recommendations will satisfy the Department's interpretation of the five-part test.  *See* FACC Br. at 35.  Some commenters believe that the five-part test gives investment professionals too many ways to avoid fiduciary status.  *See* AR 4, AR 269.  The Department has been clear that investment professionals can clearly avoid becoming investment advice fiduciaries under ERISA and the Code by communicating that intent clearly and consistently to their clients.  *See* AR 9.

contraceptive coverage requirement despite the absence of specific authority to create such exemptions).

        2.    *The Department Has Reasonably Interpreted the "Regular Basis" Prong of the 1975 Regulation.*

Plaintiffs simply misread the preamble in arguing that the Department's interpretation of the five-part test renders that test meaningless. FACC Br. at 13-14. Most obviously, Plaintiffs' suggestion that the Department has eliminated the "regular basis" prong of the 1975 test takes aim at a strawman: under the Department's clear interpretation, "not all rollover recommendations can be considered fiduciary investment advice under the five-part test set forth in the Department's regulation," because "[p]arties can and do . . . enter into one-time sales transactions in which there is no ongoing investment advice relationship, or expectation of such a relationship." AR 7; *see also* AR 8 ("In applying the regular basis prong . . . the Department intends to preserve the ability of financial services professionals to engage in one-time sales transactions without becoming fiduciaries under the Act, including by assisting with a rollover."); AR 1351 ("A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test"). The Department's clear language, as used throughout the preamble, is completely in accord with the various cases cited by Plaintiff that suggest that one-time sales pitches for annuities are not fiduciary in nature. *See, e.g., Am. Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable Life Assur. Soc. of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988) (cited by FACC Br. at 15) ("Simply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products"); *accord* AR 7 ("If, for example, a participant purchases an annuity based upon a recommendation from an insurance agent without receiving subsequent, ongoing advice, the advice does not meet the "regular basis" prong as specifically required by the regulation."). Plaintiffs appear to either ignore this language or not

42

appreciate its import.

Plaintiff's puzzling rejoinder appears to be that because "all financial salespeople attempt to cultivate relationships with their customers . . . [i]t is difficult to conceive how any stockbroker or insurance agent could avoid satisfying the DOL's . . . standard for the regular basis element." FACC Br. at 19; *see also* Compl. ¶ 33 ("all Investment Professionals seek to establish and maintain relationships with customers and potential customers, not avoid them."). As an initial matter, the Department considered and rejected this very argument. *See* AR 9 (noting that "one commenter stated that every financial professional wants to develop an ongoing relationship with her customers" but concluding that "parties who do not wish to enter into an ongoing relationship can make that fact consistently clear in their communications and act accordingly"). And the Department believes that, in fact, there are many instances of one-time investment advice that would fall outside the scope of the 1975 five-part test. *See* AR 7 ("Parties can and do, for example, enter into one-time sales transactions in which there is no ongoing investment advice relationship, or expectation of such a relationship."); AR 8 (stating that "sporadic interactions between a financial services professional and a Retirement Investor do not meet the regular basis prong" such as where "the investor subsequently sought the professional's advice in connection with another transaction long after receiving the rollover assistance" but at the time of the rollover, the investor "expresses the intent to direct his or her own investments in a brokerage account, without any expectation of entering into an ongoing advisory relationship and without receiving repeated investment recommendations from the investment professional"). On the other side of the ledger, the Department received and rejected one comment suggesting "that a rollover transaction should always satisfy the regular basis prong on the grounds that it can be viewed as involving two separate steps—the rollover and a subsequent investment decision." AR 7. Instead, the

Department's view for purposes of the exemption was that "[t]hese two steps do not, in and of themselves, establish a regular basis." *Id.* In other words, the Department appropriately balanced competing views on this issue and arrived at a conclusion under which "fiduciary status is determined by the facts as they exist at the time of the recommendation, including whether the parties, at that time, mutually intend an ongoing advisory relationship." AR 10.[12]

Moreover, even if Plaintiffs were correct that many if not all insurance agents seek to develop long-lasting relationships with their clients arising out of the sale of an annuity, this would not undermine the Department's rationale for its interpretation of the 1975 five-part test: it would bolster it. A major topic of concern in the Department's process that led to the promulgation of the Exemption was the concern about "potential conflicts of interest related to rollovers from Title I Plans to IRAs," AR 6, and indeed "many commenters opposed the approach taken in the proposed exemption as insufficiently protective of Retirement Investors" because "the conditions [in the proposed exemption] would not protect Plans and IRAs and their participants and beneficiaries from the dangers of conflicts of interest and self-dealing." AR 4. Put another way, if the Plaintiffs are contending that every insurance agent holds themselves out as a trusted advisor to a potential client in the hopes of establishing an ongoing relationship—while operating without the duties of prudence and loyalty to the client—that would be precisely the problem that animated DOL's new

---

[12] Plaintiffs' strawman hypothetical, *see* FACC Br. at 18, where only "the broker-dealer's expectation of a continuing relationship" is enough to establish fiduciary status is at odds with the plain text of the preamble and Exemption, which focuses on the mutual understanding of *the parties*, as well as with the Fifth Circuit's ruling in *Chamber of Commerce*. *See* 885 F.3d at 369 (noting that the "touchstone of common law fiduciary status" is "the parties' underlying relationship of trust and confidence"). There is nothing in the record to suggest that a single party's subjective views, standing alone, would be sufficient to establish the regular basis or mutual intent requirements under the Department's interpretation.

interpretation, as spelled out in the preamble and Exemption.[13]   It would be a perverse interpretation of ERISA and the Fifth Circuit's opinion if insurance agents could obtain the benefits from cultivating relationships of trust and confidence with clients without any of the legal obligations that flow from it.

Plaintiffs also appear to argue that the "regular basis" prong must be satisfied by transactions preceding the rollover recommendation. *See* FACC Br. at 20 (arguing that "as a matter of law," a fiduciary relationship cannot be found to exist "where there is no prior relationship and there is nothing more than hope or expectation" that "such a relationship may take root in the future").  A pre-existing relationship is not an inherent requirement for common law fiduciaries.[14]

---

[13] Plaintiffs also ignore the text of the preamble in arguing that the Department's interpretation would subject unsuccessful sales pitches to fiduciary status based on the agent or broker's hope that he or she would establish a relationship with a client that ultimately does not come to fruition, *see* FACC Br. at 20 n. 8, when this very issue (like Plaintiffs' other arguments) was addressed in the very document Plaintiffs are challenging.  Unsuccessful sales pitches cannot qualify because the agent receives no compensation. *See* AR 8 ("In addition to satisfying the five-part test, a person must also receive a fee or other compensation to be an investment advice fiduciary under the provisions of Title I and the Code."); *see also* AR 11 ("[I]f a Retirement Investor does not act on a recommendation made by a financial professional, the financial professional would not have any liability for that recommendation.").  What matters is not the agent's unilateral hope but the reasonable understanding of the parties from the totality of the circumstances. *See* AR 10 (noting that the Department's interpretation "does not mean that fiduciary status applies to a prior isolated interaction, if the facts and circumstances surrounding the interaction do not reflect that the interaction marked the beginning of an ongoing fiduciary advice relationship").

[14] While, in Texas, suits for an "informal fiduciary duty in a business transaction" must be based on a "special relationship of trust and confidence" that existed "prior to, and apart from, the agreement made the basis of the suit," *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005), that requirement for one type of state-law claim does not define when a fiduciary relationship arises. Other Texas cases emphasize that a fiduciary relationship can arise where "one party is in fact accustomed to being guided by the judgment or advice of the other, *or is justified in placing confidence in the belief that such party will act in its interest*." *San Antonio Garment Finishers, Inc. v. Levi Strauss & Co.*, 18 F. Supp. 2d 669, 672 (W.D. Tex. 1998), *aff'd*, 174 F.3d 198 (5th Cir. 1999) (emphasis added).  Courts have applied similar standards to the parties' first agreement. *See, e.g.*, *SCF Arizona v. Wachovia Bank, N.A.*, No. 09-CIV-9513, 2010 WL 5422505, at *6 (S.D.N.Y. Dec. 14, 2010) (holding that insurance carrier's agreement for bank to manage its investments plausibly created fiduciary relationship under Arizona's standard that "there must be

*(footnote continued on next page)*

Nor, for reasons explained in detail by the Department, is it logically commanded by the "regular basis" prong:

> [F]iduciary status is determined by the facts as they exist at the time of the recommendation, including whether the parties, at that time, mutually intend an ongoing advisory relationship. *Every relationship has a beginning, and the five-part test does not provide that the first instance of advice in an ongoing relationship is automatically free from fiduciary obligations.* The fact that the relationship of trust and confidence starts with a recommendation to roll the investor's retirement savings out of a Title I Plan is not an argument for treating the recommendation as nonfiduciary. Rather, fiduciary status extends to the entire advisory relationship, including the first—and often most important—advice on rolling the investor's retirement savings out of the Title I Plan in the first place.

AR 10 (emphasis added). What matters is "the parties' understanding of their relationship[]", including "whether the parties, at that time, mutually intend an ongoing advisory relationship." *Id.* For similar reasons, the Department rejected comments arguing that advice regarding a rollover should be sealed off from advice regarding the assets after the rollover is completed. The Department explained that such "advice is rendered to the exact same Retirement Investor (first as a Plan participant and then as IRA owner), and the IRA assets are derived, in the first place, from that Retirement Investor's Title I Plan account." *Id.* Given that the same five-part test appears in the regulations for Title II, it would make no sense to treat someone who would satisfy the fiduciary definition with respect to the Title II plan *following* the rollover as exempt from fiduciary status with respect to the original rollover recommendation. *See id.* ("A different outcome could all too easily defeat legitimate investor expectations of trust and confidence by arbitrarily dividing an

_____

something approximating business agency, professional relationship, or family tie, impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise"); *see also Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 546 (S.D.N.Y. 1997) (finding adequately pled fiduciary relationship in solicitation and sale of insurance, applying New York law "which recognizes that, under the right circumstances, the relationship between insurer and insured may be imbued with elements of trust and confidence which render the relationship more than a mere arm's-length association").

ongoing relationship . . . and uniquely carving out rollover advice from fiduciary protection."). It defies logic to treat the rollover recommendation—a decision of monumental consequence for a Retirement Investor from which the broker-dealer may obtain a lucrative commission—as exempt from fiduciary status, while imposing fiduciary status on residual instances of advice between the same two parties following the rollover. And in any event, a broker-dealer or insurance agent engaging in a purely one-time transaction need not worry about fiduciary status under the Department's interpretation.

Finally, Plaintiffs posit a number of absurd hypotheticals—including cold calls from brokers, *see* FACC Br. 18, or firms that "hold themselves out to the public as providing such services generally," *id.* at 19—and suggest that the Department has reduced the regular basis element of the test to a "just checking in" standard. *See* FACC Br. at 19. It is not clear that any of these incomplete hypotheticals would even constitute providing investment advice (much less a rollover recommendation). In any event, these scenarios say nothing about the broader course of dealing and communications between the parties, much less the level of detail that would be required to meet the "facts and circumstances analysis of rollover recommendations under the five-part test," AR 7, or to determine "whether the parties have entered into a relationship of trust and confidence," *id.*, as the Department has made clear is required under the 1975 Regulation.

3.      *The Department Has Reasonably Interpreted the "Mutual Agreement" Prong of the 1975 Regulation.*

Plaintiffs argue that the Department's interpretation "neuters" the mutual agreement prong of the 1975 test, based on the perplexing suggestion that the Department undertook no "meaningful consideration of whether the marketplace or the parties themselves would expect" an ongoing fiduciary relationship. FACC Br. at 21. The exact opposite is the case: the Department discussed what "the parties" would expect as being among the most important factors to determining the

prong of the test. *See, e.g.,* AR 7 (Department's "approach centered on whether the parties have entered into a relationship of trust and confidence"); AR 9 ("the Department intends to consider the *reasonable* understanding of each of the parties"); *id.* ("[T]he Department also intends to consider marketing materials in which Financial Institutions and Investment Professionals hold themselves out as trusted advisers, in evaluating the parties' reasonable understandings with respect to the relationship."); AR 11 ("The focus is on the facts and circumstances surrounding the recommendation and the relationship, including whether those facts and circumstances give rise to a mutual agreement, arrangement, or understanding that the advice will serve as a primary basis for an investment decision."); AR 1351 ("When firms and investment professionals hold themselves out . . . as making individualized recommendations that the investor can rely upon to make an investment decision that is in the best interest of the investor, and the investor, accordingly, relies upon the recommendation to make an investment decision, the 1975 test's requirement for a 'mutual agreement, arrangement, or understanding' is satisfied."). Thus, it is difficult to understand how Plaintiffs could assert with a straight face that "mention of a special relationship of trust and confidence or any facts that would evidence the same" is "conspicuously absent" from the Department's interpretation. *See* FACC Br. at 22. Moreover, the preamble is littered with discussion of trust and confidence and the five-part test's role in identifying functional fiduciaries. *See* AR 5, 7, 9, 10, 25.

In any event, the Department's analysis makes clear that the "mutual understanding" prong of the 1975 Regulation remains applicable and vital to the Department's interpretation of fiduciary investment advice under that regulation, which "has long been understood to provide a functional fiduciary test," AR 12, and "with an approach centered on whether the parties have entered into a relationship of trust and confidence." AR 7. Salespersons that wish to avoid fiduciary

obligations can make that consistent and clear in their interactions with potential customers. *See* AR 9 ("Similarly, if a Financial Institution or Investment Professional does not want to assume a fiduciary relationship or create misimpressions about the nature of its undertaking, it can clearly disclose that fact to its customers up-front, clearly disclaim any fiduciary relationship, and avoid holding itself out to its Retirement Investor customer as acting in a position of trust and confidence."). Thus, written disclaimers of a fiduciary role are relevant, but must be consistent with the financial professional's other behavior. *See* AR 11 ("A financial services provider should not, for example, expect to avoid fiduciary status through a boilerplate disclaimer buried in the fine print, while in all other communications holding itself out as rendering best interest advice that can be relied upon by the customer in making investment decisions."). In this way, the Department is "appropriately applying the five-part test to current marketplace conduct and realities." *Id.*

        4.    *The Department Has Reasonably Interpreted Other Elements of the 1975 Regulation.*

Plaintiffs assert in conclusory fashion that the Department's interpretation is inconsistent with the 1975 Regulation's requirement that the advice "serve as a primary basis" for the investment decision. *See* FACC Br. at 26. While Plaintiffs' argument on this issue is not entirely clear, the Department examined the "primary basis" prong in depth in its interpretation, including rejecting arguments that the Department should read "a primary basis" to mean "the primary basis." *See* AR 10 ("The Department does not interpret the 'primary basis' requirement as requiring proof that the advice was the single most important determinative factor in the Retirement Investor's investment decision. This is consistent with the regulation's reference to the advice as 'a' primary basis rather than 'the' primary basis."). Likewise, "the fact that a Retirement Investor may consult multiple financial professionals about a particular investment" does not

undermine the primary basis prong, provided that "all elements of the five-part test must be satisfied for a particular recommendation to be considered fiduciary investment advice." AR 11. As with the "regular basis" and "mutual agreement" prongs, the Department's interpretation is faithful to the text of ERISA and the 1975 Regulation with respect to whether investment advice is "a primary basis" for the decision taken by the Retirement Investor. While Plaintiffs want an "objective" simple standard for fiduciary status, FACC Br. at 26, the five-part test has always required balancing various factors. And indeed, outside the ERISA context, courts recognize that fiduciary status is often a fact-intensive inquiry. *See, e.g.*, *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) ("The existence of a fiduciary relationship, outside of formal relationships that automatically give rise to fiduciary duties, is usually a fact intensive inquiry."); *see also Xereas v. Heiss*, 987 F.3d 1124, 1131 (D.C. Cir. 2021) ("Whether a fiduciary relationship exists is a fact-intensive question involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties").

>    5.    *Commissions Have Long Been Treated as Investment Advice Fiduciary "Fees" Provided the Other Elements of the Test Are Satisfied.*

Plaintiffs suggest that the Department's interpretation is inconsistent with the requirement under ERISA that a person providing fiduciary investment advice does so "for a fee or other compensation, direct or indirect." 29 U.S.C. § 1002(21)(A); FACC Br. at 27. But the "for a fee" requirement is a statutory requirement separate from the five-part test's definition of investment advice. And the Department has long taken the position—going back to the 1975 Regulation— that this requirement covers "all fees or other compensation incident to the transaction in which the investment advice to the plan has been rendered or will be rendered," including "brokerage commissions, mutual fund sales commissions, and insurance sales commissions." *See* Preamble

to 1975 Regulation, 40 Fed. Reg. 50842 (October 31, 1975).  In *Chamber of Commerce*, the Fifth Circuit noted that brokerage commissions would presumably meet the statutory criteria of advice provided "for a fee" if "the broker-dealer who earned the commission otherwise satisfied the regulation's requirements that the broker-dealer provide individualized advice on a regular basis pursuant to a mutual agreement with his client." *Chamber of Commerce*, 885 F.3d at 373.  In this context, the Department reasonably concluded that "fees and compensation received from transactions involving rollover assets would be incident to the advice to take a distribution from the Plan and to roll over the assets to an IRA." AR_12.  Plaintiffs cannot plausibly challenge this longstanding, consistent understanding of ERISA.  In any event, it would be illogical for financial professionals to evade ERISA coverage simply by structuring their compensation differently.  And Plaintiffs do not support their speculative notion that investors and the market narrowly construe the compensatory purpose for commissions.

> 6.    *The Department's Interpretation Does Not Conflate ERISA Plans With IRAs.*

Finally, Plaintiffs take issue with the Department's decision to withdraw Advisory Opinion 2005-23a (December 7, 2005), commonly known as the "Deseret Letter." App. 64-66.  Of course, the Department is free to withdraw prior advisory opinions just as it is free to change prior interpretations of its own regulations, provided it adequately explain its reasoning. *See, e.g., POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 413 (D.C. Cir. 2020).  And here, as the Department noted, that Letter had proven controversial, and the Department in prior rulemakings in 2010 and 2016 had sought comments on the Deseret Letter and whether its guidance should continue to be followed.[15]  *See* 75 Fed. Reg. 65266 ("Concerns have been expressed that, as a

---

[15] Plaintiffs' characterization of the Deseret Letter as the Department's "longstanding position" which was "always regarded as consistent with the text of ERISA," FACC Br. at 32, ignores that

*(footnote continued on next page)*

result of this position [AO 2005-23A], plan participants may not be adequately protected from advisers who provide distribution recommendations that subordinate participants' interests to the advisers' own interests. The Department, therefore, is requesting comment on whether and to what extent the final regulation should define the provision of investment advice to encompass recommendations related to taking a plan distribution."). And of course, "[t]he five-part test still applies without the Deseret Letter, as it did for decades before the letter." AR 7.

The Department reasonably concluded that the Deseret Letter arbitrarily drew a line between fiduciary advice provided to an ERISA plan and advice to rollover assets that comprise part of that plan. In the years since the Deseret Letter, the Supreme Court has rejected such a myopic focus on *plans* to the exclusion of the money or property that make up a particular ERISA plan. In *LaRue v. DeWolff, Boberg & Associates, Inc.*, the court rejected a ruling by the Fourth Circuit which had found that Section 502(a)(2) of ERISA—which authorizes civil actions against fiduciaries for breach of fiduciary duties and resulting harm to ERISA plans—"provides remedies only for entire plans, not for individuals." 552 U.S. 248, 250 (2008). Instead, the court held that

---

as early as 1977—and the promulgation of the precursor to PTE 84-24—the Department had noted that insurance brokers could be subject to fiduciary duties arising from sales activity directed at ERISA plans. *See* 42 Fed. Reg. 32395 (June 24, 1977) (precursor to PTE 84-24) (noting availability of exemption for "certain transactions involving employee benefit plans and insurance agents and brokers, pension consultants, insurance companies, investment companies and investment company principal underwriters for, or in connection with the purchase of insurance or annuity contracts and the purchase or sale of securities issued by an investment company, if certain conditions are met.") Moreover, the Department concluded that "a determination of whether such sales presentation, recommendations, and advice constitute "investment advice" under section 3(21) (A) (11) of the Act and section 4975(e) (3) (B) of the Code and the regulations issued thereunder can be made only on a case-by-case basis." *Id.* 32396. And in the 2010 Rulemaking noted *supra*, the Department identified concerns with the approach identified in the Deseret Letter, including that "plan participants may not be adequately protected" under that framework. 75 Fed. Reg. 65266. The 2016 Rulemaking repudiated the Deseret Letter's analysis, and the Department withdrew the letter in 2020. At most, the Deseret Letter represented the Department's "position" for five years.

"although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 256. *See also id.* at 262 (Thomas, J., concurring) ("The question presented here, then, is whether the losses to petitioner's individual 401(k) account resulting from respondents' alleged breach of their fiduciary duties were losses 'to the plan.' In my view they were, because the assets allocated to petitioner's individual account were plan assets.").[16] Here, of course, individual retirement assets included in an ERISA plan—which would be the very assets subject to a rollover—plainly constitute "*moneys or other property of such plan*" as used in the statutory definition of "fiduciary" under ERISA. *See* 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). The 1975 regulation reflects a similar focus on plan assets and property. *See* 29 C.F.R. § 2510.3–21(c)(1) (fiduciary "makes recommendations as to the advisability of investing in, purchasing, or selling securities or *other property*"); *see also id.* (fiduciary's advice is designed to serve as a primary basis for investment decisions "with respect to *plan assets*.").

Consistent with this view, the Department concluded in the preamble that a "recommendation to roll assets out of a Title I Plan is necessarily a recommendation to liquidate or transfer the plan's property interest in the affected assets and the participant's associated property interest in plan investments." AR 6. Again, Plaintiffs may disagree with this interpretation, but that does not render the interpretation inconsistent with ERISA. Indeed, as with many issues considered by the Department in the course of the promulgation of PTE 2020-02,

---

[16] One case cited by Plaintiffs, *Beeson v. Fireman's Fund Ins. Co.*, No. C-09-2776 SC, 2009 WL 2761469 (N.D. Cal. Aug. 31, 2009), attempts to cabin *LaRue*, concluding that no ERISA fiduciary relationship from advice to withdraw Plan funds and place them in the control of the adviser. *See* 2009 WL 2761469, at *7. While *LaRue* dealt with authority to sue under a different ERISA provision, the Supreme Court's recognition that individual assets are Plan assets supports the Department's position.

some commenters "stated the Department's proposed interpretation did not go far enough in protecting Retirement Investors, and that all rollover recommendations should be deemed fiduciary investment advice regardless of whether the five-part test is satisfied." AR 6. [17]

### B.   The Interpretation is Not Arbitrary and Capricious.

Because the Department's interpretation is consistent with the text of ERISA and the 1975 Regulation, Plaintiffs' argument that the Department acted in excess of its statutory authority should be rejected.   As to Plaintiffs' claim that the Department's interpretation is arbitrary and capricious, "[t]he APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). When applying this deferential standard, courts "must not substitute" their "own policy judgment for that of the agency." *Id.* An agency's actions are arbitrary and capricious if it "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) ("[W]e must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment.") Moreover where, as here, "[t]he Secretary is expressly delegated the authority to grant [an] exemption and is required to make certain other determinations in order to do so," the granting of an exemption is "entitled to great deference under the 'arbitrary and capricious' standard." *AFL-CIO v. Donovan*, 757 F.2d 330, 343 (D.C. Cir. 1985).

---

[17] Plaintiffs plainly err in suggesting that by interpreting the 1975 Regulation's application of ERISA's definition of "fiduciary" the Department "arrogate[s] to itself significant regulatory power over the IRA marketplace that Congress has not granted." FACC Br. at 38.  As noted above, the Reorganization Plan transferred to the Department the interpretive, rulemaking, and exemptive authority for the fiduciary definition and prohibited transaction provisions that apply to both employer-based plans and IRAs. *See* Background § A, *supra*.

As a starting point, the Department's authority to prescribe regulations under ERISA is clearly spelled out by statute in a manner that gives the Department broad flexibility. In enacting ERISA, Congress gave DOL the authority to "prescribe such regulations as ... necessary or appropriate to carry out the [relevant] provisions," including to "define accounting, technical and trade terms used in" the Act. 29 U.S.C. § 1135. Congress also adopted a broad definition of "fiduciary" to allow DOL to "consider varying interpretations and the wisdom of its policy on a continuing basis," *Brand X*, 545 U.S. at 981, to serve ERISA's "broadly protective purposes." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96, (1993). In exercise of that discretion, DOL promulgated a reasonable interpretation of fiduciary "investment advice" that comports with the text, history, and purposes of ERISA. That reasonable interpretation is entitled to deference. *Chevron*, 467 U.S. at 837.

To be sure, as the Department itself noted in the preamble, the application of the 1975 test to rollovers is in some respects a "new" interpretation. *See* AR 7, 49. But that is not central to the reviewing court's analysis on arbitrary and capricious review, as agencies are of course free to adopt new regulations or interpretations of their authorizing statute to account for changing circumstances germane to their regulatory authority. *See, e.g., Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 863–64 (1984) ("An initial agency interpretation is not instantly carved in stone."); *Verizon v. F.C.C.*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("so long as an agency 'adequately explains the reasons for a reversal of policy,' its new interpretation of a statute cannot be rejected simply because it is new."); *POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 413 (D.C. Cir. 2020) (noting, with respect to interpretations of prior regulations, that "agencies are free to shift interpretive positions, especially where . . . they do so on a comprehensively updated record"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015)

(through the APA, "Congress decided to adopt standards that permit agencies to promulgate freely such [interpretive] rules—whether or not they are consistent with earlier interpretations."). Here, the Department interpreted the 1975 Regulation to apply to rollover advice in light of the growth of 401(k) plans and IRAs, which were not popular retirement investment vehicles when ERISA was enacted, as well as from a desire to better align the Department's approach with the SEC's Regulation Best Interest and the NAIC's Model Regulation 275, both of which generally hold brokers and insurance agents to a best interest standard.

In such cases, *Chevron* deference applies even where an agency revises its previous interpretation, so long as the agency "display[s] awareness that it is changing position, and show[s] that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016); *see also Brand X*, 545 U.S. at 981 ("[I]f the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'").

Here, the Department clearly fulfilled its obligation to adequately explain its reasoning for adopting a new interpretation of fiduciary investment advice in the context of rollover recommendations. Indeed, several commenters, including Plaintiff FACC, requested greater clarity on the Department's thinking, as noted in FACC's letter to the Department:

> The Department must correct or clarify its commentary to ensure the essence of the regular basis prong remains intact and is not eroded by interpretation inconsistent with the Fifth Circuit decision. This is important so financial services professionals who interact with clients or potential clients are not deemed to have satisfied this prong merely based on periodic, occasional, or contemplated business dealings but rather based on continuity of interaction that is indicative of and equates to a relationship built on trust and confidence.

AR 294. Consistent with this suggestion, the Department engaged in an open dialogue with a variety of interested of parties in the course of promulgating PTE 2020-02 and explained its

reasoning at length in the preamble and in the FAQs. That explanation, as requested by FACC, did indeed make clear that "the essence of the regular basis prong remains intact" and was consistent with the Fifth Circuit's opinion.

In addition, the Department's interpretation of the five-part test, every prong of which must be satisfied, was reasonable and furthers the broad remedial purposes of ERISA by protecting against activities that pose the precise harms Congress enacted the statute to avoid. *See John Hancock Mut. Life Ins. Co.*, 510 U.S. at 96 (noting ERISA's "broadly protective purposes"). Such a "[r]emedial statute[] [is] to be construed liberally," in particular "in an era of increasing individual participation in [the] market." *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 173 (5th Cir. 2000); *see also Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1251 (5th Cir. 1990) (ERISA is to be given "a liberal construction … in keeping with its remedial purposes"). The Interpretation thus aligns the definition of investment advice with today's marketplace realties and ensures, consistent with ERISA's text and congressional intent, that fiduciary status applies to "persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co.*, 510 U.S. at 96. *See, e.g., Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 969 (5th Cir. 1981) (recognizing that "[o]ne of the purposes of ERISA is to protect … the interests of participants in employee benefit plans … by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies").

Plaintiffs' counterarguments lack force. The suggestion that the Department "rewrote" the meaning of fiduciary "without reference to the common law trust and confidence standard," FACC Br. at 36, is simply belied by the undisputed record. *See, e.g.*, AR 5, 7, 9, 10, 25. Moreover, as the Department noted in the preamble—and as discussed *supra* Arg. § II—the Fifth Circuit "did

not indicate that, in an ongoing relationship, there should be any initial instances of advice free of fiduciary status until some later period in which a relationship of trust and confidence has been demonstrated repeatedly." AR 12.

Plaintiffs also assert, without evidence, that the Department is being "disingenuous" or "insincere," FACC Br. at 37, in suggesting that it can interpret the 1975 five-part test to cover rollover transactions. In fact, the Department's principal concern about the 1975 Regulation during the course of the 2016 Rulemaking was that, as applied, the five-part test "allows many advisers to avoid fiduciary status and disregard ERISA's fiduciary obligations of care and prohibitions on disloyal and conflicted transactions." 81 Fed. Reg. at 20955. While the Department *could* have proceeded in 2016 with an interpretive rule that applied the exiting regulation to the evolving marketplace, the Department also had other regulatory goals that made it preferable to proceed with amending the regulation entirely—including imposing Best Interest Contract requirements, prohibiting class action waivers, amending PTE 84-24 and its scope of covered annuities, and so on. *See supra* Arg. § II. The Department did not take the position then that the 1975 regulation was not subject to varying interpretations, and the Fifth Circuit likewise did not bar application of that regulation to rollover transactions, provided the trust and confidence standard was met.

Next, Plaintiffs reiterate their unfounded argument that, for ERISA purposes, a wall separates salespeople and fiduciary investment advisors such that insurance agents and brokers, no matter their level of involvement with a Retirement Investor's decision to rollover assets from an ERISA plan into an IRA, can never be fiduciaries. *See* FACC Br. at 39. For the reasons discussed above, this both conflicts with how ERISA has been understood from its inception and with other regulators' recent actions demonstrating that those recommending rollovers and

annuities are not mere salespeople.  *See supra* Arg. § III.A.  In addition, the Fifth Circuit itself rejected this overly rigid dichotomy.  *See Chamber of Commerce*, 885 F.3d at 374 (noting that "if, under the particular facts and circumstances, the services provided by the broker-dealer include the provision of 'investment advice' " as defined by the regulation," it may "be reasonably expected that, even in the absence of a distinct and identifiable fee for such advice, a portion of the commissions paid to the broker-dealer would represent compensation for the provision of such investment advice.").  Plaintiffs editorialize and suggest that the Fifth Circuit held that such circumstances would be "rare," FACC Br. at 29, but the Fifth Circuit's opinion says no such thing.

**C.     To The Extent That The 1975 Regulation Is Ambiguous, The Department's Interpretation Of Its Own Regulation Is Entitled To Deference, And Its Interpretation Was Reasonable.**

Alternatively, were the court to find the 1975 Regulation ambiguous with respect to whether the "regular basis" and "mutual agreement" prongs can be satisfied on objective evidence that a rollover recommendation is the start of a fiduciary relationship with respect to the new plan, an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kisor*, 139 S. Ct. at 2412 ("We have explained *Auer* deference (as we now call it) as rooted in a presumption about congressional intent—a presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities.").  Such deference is particularly appropriate in specialized regulatory fields where the agency's expertise warrants a special role in interpreting prior regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program."). Additionally, when an agency discusses its views on a prior regulation in the context of a preamble to a new regulation, that preamble can have "independent legal effect," *Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1223 (D.C.

Cir. 1996), or may also inform the proper interpretation of a regulation. *See U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*, 446 F. Supp. 2d 651, 654 (N.D. W. Va. 2006). The Supreme Court has recently clarified that the application of *Auer* deference turns on whether "a regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414.

Here, assuming the 1975 regulation is ambiguous with respect to the "regular basis" prong, the Department's interpretation is reasonable and entitled to deference. As an initial matter, the Department received considerable public comment on the importance of rollover decisions for plan participants and the need for greater safeguards in this area to protect retirement investors. *See* AR 158 (Comment from Committee on Investment of Employee Benefit Assets) ("Defined contribution 401(k) plans are an increasingly important source of retirement income and investing, and rollover decisions for the average saver can be daunting. As such, the average 401(k) participant needs both advice from trusted experts *and* safeguards from conflicted advice when considering whether and how to rollover their retirement savings."). Some commenters suggested doing away with the regular basis prong altogether. *See* AR 203 (Comment from Morningstar, Inc.) ("The broader applicability of the standard in the Proposed Rule is necessary to prevent investors from receiving conflicted advice. Conflicted advice has been linked to millions of Americans rolling over low-cost 401(k) accounts into higher-cost IRAs and investing in funds with higher expense ratios and loads."). The Department appropriately balanced comments on both sides of the issue within the context of the 1975 five-part test, which it retained, explained that one-off rollover recommendations would not qualify, and required objective evidence of an intent to establish an ongoing relationship of trust and confidence prior to finding fiduciary status.

IV.    **ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS BEFORE THE COURT.**

Should the Court disagree with the Department, Plaintiffs' effort to seek a nationwide injunction against the Department's interpretation should be rejected. *See* FACC Br. at 42 (requesting that the court "permanently enjoin[] the DOL and all of its officers, employees and agents from implementing, applying, or taking any action of any type under the New Interpretation *anywhere within the DOL's jurisdiction*.") (emphasis added). APA cases do not routinely warrant any injunction after summary judgment. *See, e.g.*, *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, No. 20-11179, 2022 WL 3440652, at *8 (5th Cir. Aug. 17, 2022) ("The default rule is that vacatur is the appropriate remedy."); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). While courts have found universal or nationwide injunctions permissible in some cases in the past, as the Fifth Circuit has recently explained, prior precedent "does not hold that nationwide injunctions are required or even the norm." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). Instead, "[p]rinciples of judicial restraint control," and "the scope of the injunction must be justified based on the 'circumstances.'" *Id.* at 263. Moreover, many jurists have questioned the wisdom and even constitutionality of nationwide injunctions. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of a stay) ("Injunctions like these thus raise serious questions about the scope of courts' equitable powers under Article III."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter universal injunctions"); *Georgia v. President of the United States*, No. 21-14269, 2022 WL 3703822, at *13 (11th Cir. Aug. 26, 2022) ("In their universal reach to plaintiffs and nonplaintiffs alike, nationwide injunctions push against the boundaries of judicial power, and very often impede the proper functioning of our federal court system."); *Arizona v.*

*Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) ("Call them what you will—nationwide injunctions or universal remedies—they seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case.").

While Plaintiffs are not entitled to relief in any event, should the court disagree, injunctive relief should be appropriately tailored and limited to the Plaintiffs before the court (which here would include FACC's individual members).

## CONCLUSION

For the foregoing reasons, Defendants are entitled to dismissal or summary judgment on all claims, and the Court should deny Plaintiffs' motion for summary judgment.

Dated: September 2, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

s/ Galen N. Thorp
GALEN N. THORP
Senior Trial Counsel
ALEXANDER N. ELY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Washington, DC 20005
Tel: (202) 993-5177; Fax: (202) 616-8470
alexander.n.ely@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 2, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

/s/ Galen N. Thorp
Galen N. Thorp

*Counsel for Defendants*

63