## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22-cv-00243-K |
| UNITED STATES DEPARTMENT OF LABOR, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF
## CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION OR, IN THE
## ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.      **Plaintiffs Have Not Carried Their Burden to Establish Standing.** ............... 2

II.     **Plaintiffs' Attack on the Department's Interpretation Depends on Several
Key Errors.** ....................................................................................................... 3

     A.    ERISA's Fiduciary Investment Advice Standard Requires a Case-by-Case
Assessment, Not the Categorical Exclusions for Brokers and Insurance
Agents That Plaintiffs Desire. ................................................................. 3

     B.    Insurance Agents and Brokers Are Often Not Mere Salespeople ........... 6

     C.    Because ERISA Defines Investment Advice Fiduciaries Identically for
Title I Plans and IRAs, Which the Department Has Implemented Through
Identical Five-Part Tests, Plaintiffs' Effort to Isolate the Plans Must Be
Rejected .................................................................................................... 9

     D.    The Department's Motivation by Similar Policy Concerns in Both the
2016 Rulemaking and the 2020 Interpretation Does Not Undermine the
Lawfulness of the Much Narrower Action Taken Here ......................... 11

     E.    Plaintiffs Avoid Addressing the Five-Part Test as a Whole, Instead
Attacking the Straw Man That Each Part in Isolation May Not Be
Sufficient to Establish a Fiduciary Relationship ................................... 12

          1.    Regular Basis Prong .................................................................... 13

          2.    Mutual Agreement Prong ............................................................ 16

          3.    Remaining Prongs ....................................................................... 17

          4.    Compensation for Advice ........................................................... 18

III.   **The Department's Interpretation of Its 1975 Regulation is Not an
"Extraordinary Case" Requiring Application of the Major Questions
Doctrine** ........................................................................................................... 19

IV.   **The Interpretation is Not Arbitrary and Capricious** ..................................... 21

V.    **To The Extent That the 1975 Regulation Is Ambiguous, the Department's
Interpretation of Its Own Regulations Is Entitled to Deference** ................... 22

VI.   **Any Relief Should Be Limited to Plaintiffs** .................................................. 24

**CONCLUSION** ......................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*10 Ring Precision, Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013) ................................................... 13

*Alabama Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) .......................................................... 20

*ARA Auto. Grp. v. Cent. Garage, Inc.*,
  124 F.3d 720 (5th Cir. 1997) ................................................... 13

*Auer v. Robbins*,
  519 U.S. 452 (1997) ........................................................ 23, 24

*Biden v. Missouri*,
  142 S. Ct. 647 (2022) ........................................................... 21

*Carfora v. Teachers Ins. Annuity Ass'n of America*,
  Case No. 21 CIV. 8384 (KPF), 2022 WL 4538213 (S.D.N.Y. Sept. 27, 2022) ...... 11

*Chamber of Commerce v. Department of Labor*,
  885 F.3d 360 (5th Cir. 2018) ............................................. *passim*

*Chevron USA Inc. v. Natural Resources Def. Counsel, Inc.*,
  467 U.S. 837 (1984) ............................................................ 22

*Chiste v. Hotels.com L.P.*,
  756 F. Supp. 2d 382 (S.D.N.Y. 2006) ........................................... 15

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) .......................................................... 25

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) .................................................. 3

*Eaves v. Penn*,
  587 F.2d 453 (10th Cir. 1978) ................................................. 19

*Ellis v. Rycenga Homes, Inc.*,
  484 F. Supp. 2d 694 (W.D. Mich. 2007) ......................................... 19

*Farm King Supply, Inc. Integrated Profit Sharing Plan & Tr. v. Edward D. Jones & Co.*,
  884 F.2d 288 (7th Cir. 1989) .................................................. 19

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ............................................................................... 21

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................... 20

*Goldsenson v. Steffens*,
  Case No. 2:10-CV-00440, 2014 WL 12788001 (D. Me. Mar. 7, 2014) .................................. 15

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ................................................................................... 20

*Johnson v. BOKH Nat'l Ass'n*,
  15 F.4th 356 (5th Cir. 2021) ...................................................................... 23, 24

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ............................................................................ 23, 24

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ................................................................................ 20

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) ...................................................................... 21, 25

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ..................................................................................... 3

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) .................................................................................... 22

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*,
  128 F.3d 910 (5th Cir. 1997) ........................................................................... 3

*POET Biorefining, LLC v. Env't Prot. Agency*,
  970 F.3d 392 (D.C. Cir. 2020) ......................................................................... 10

*Rodriguez v. Texas Comm'n of Arts*,
  992 F. Supp. 876 (N.D. Tex. 1998) ..................................................................... 2

*St. Paul Reinsurance Co., Ltd. v. Greenberg*,
  134 F.3d 1250 (5th Cir. 1998) ......................................................................... 2

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) .......................................................................... 2

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ........................................................ 24, 25

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ............................................................................. 23

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001) ................................................................................. 13

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ................................................................... 19, 20

*Xereas v. Heiss*,
   987 F.3d 1124 (D.C. Cir. 2021) ......................................................... 13

*XY Planning Network, LLC v. SEC*,
   963 F.3d 244 (2d Cir. 2020) ................................................................. 7

**Statutes**

5 U.S.C. § 706 ........................................................................................... 25

26 U.S.C. § 4975 .................................................................................... 9, 24

29 U.S.C. § 1002 ................................................................................ passim

29 U.S.C. §§ 1108 ............................................................................... 21, 24

42 U.S.C. § 1302 ..................................................................................... 21

42 U.S.C. § 1395 ..................................................................................... 21

**Regulations**

29 C.F.R. § 2510.3–21 ..................................................................... *passim*

40 Fed. Reg. 50842 (Oct. 31, 1975) ................................................. 5, 18

41 Fed. Reg. 56760 (Dec. 29, 1976) ..................................................... 5

42 Fed. Reg. 32395 (June 24, 1977) ...................................................... 5

84 Fed. Reg. 33318 (July 12, 2019) ...................................................... 7

84 Fed. Reg. 33681 (July 12, 2019) ...................................................... 7

85 Fed. Reg. 82798 (Dec. 18, 2020) ............................................. passim

86 Fed. Reg. 61602 (Nov. 5, 2021) ..................................................... 21

**Other Authorities**

H.R. Doc. 95-375 (Aug. 10, 1978) ................................................................ 9

John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*,
37 Yale J. on Reg. Bull. 37 (2020) ......................................................... 25

NAIC Model No. 275, Suitability In Annuity Transactions Model Regulation,
https://content.naic.org/sites/default/files/model-law-275.pdf ................................................. 8

## INTRODUCTION

The Employee Retirement Income Security Act of 1974 (ERISA) declares that a "person is a fiduciary with respect to a plan to the extent" the person, among other things, "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan." 29 U.S.C. § 1002(21)(A). The Department of Labor issued a regulation in 1975 adopting a five-part test to determine when this conduct-based fiduciary standard is met. At issue here is the Department's adoption, after notice and comment, of an interpretation of the five-part test's application to advice to roll over plan assets to an individual retirement account (IRA). *See* AR 1, 85 Fed. Reg. 82798 (Dec. 18, 2020).[1] The Department addressed each part of the 1975 test in light of ERISA's statutory text and context, the current market realities, and *Chamber of Commerce v. Department of Labor*, 885 F.3d 360 (5th Cir. 2018), concluding that, in certain circumstances, rollover advice can meet the terms of the test and thus require compliance with ERISA's fiduciary requirements.

For the reasons discussed in the Department's opening brief and below, the Department has reasonably interpreted its own regulation. Contrary to Plaintiffs' suggestion, the Department's Interpretation is not intended to, and on its own terms does not, mean that all advice provided by an insurance agent or stockbroker is fiduciary investment advice. Instead, the Department's approach requires weighing the totality of the circumstances to assess whether a fiduciary relationship of trust and confidence has been established for purposes of the advice and transaction. In an effort to evade this standard, Plaintiffs would have the Court draw a number of stark—and unjustified—lines, proposing (1) that *Chamber of Commerce* precludes for all time the regulation

---

[1] Citations with the prefix "AR" refer to the Administrative Record filed in this case. *See* ECF No. 18. A joint appendix will be filed on December 30, 2022. *See* ECF No. 52. Citations with the prefix "App." refer to Plaintiffs' Appendix to their summary judgment motion. *See* ECF No. 21.

of rollovers as fiduciary investment advice, (2) that insurance agents and brokers are "financial salespeople" who fall outside ERISA's fiduciary requirements, no matter how they pitch their services to customers, and (3) that first-time advice on a rollover from a Title I ERISA plan to an IRA can never be fiduciary investment advice. The Court should reject these extreme arguments and should either dismiss Plaintiffs' claims for lack of subject matter jurisdiction or grant summary judgment to Defendants and deny Plaintiffs' motion for summary judgment.

## ARGUMENT

## I.   PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO ESTABLISH STANDING.

As the party invoking federal court jurisdiction, Plaintiffs bear the burden of establishing subject matter jurisdiction. *See St. Paul Reinsurance Co., Ltd. v. Greenber*g, 134 F.3d 1250, 1253 (5th Cir. 1998). The Department challenges Plaintiffs' standing based on the insufficiency of the declarations submitted in support of Plaintiffs' summary judgment motion (at which point, they can no longer rest on the allegations in their complaint to support standing). *See Texas v. United States*, 50 F.4th 498, 513-14 (5th Cir. 2022) ("At summary judgment, [plaintiffs] can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts."). This is a factual challenge, not a facial challenge based on the pleadings. *See Rodriguez v. Texas Comm'n of Arts*, 992 F. Supp. 876, 879 (N.D. Tex. 1998), *aff'd*, 199 F.3d 279 (5th Cir. 2000). Thus, Plaintiffs do have the "evidentiary burden" they disclaim. *See* Pls.' Reply at 2.

In light of the substantial developments in state insurance regulation and Securities and Exchange Commission (SEC) regulations, which have bolstered the obligations on financial professionals making investment recommendations, as well as the documentation for that advice, *see* Defs.' Br. at 12-13, ECF No. 40; *see also infra*, Arg. §§ II.B. Plaintiffs have failed to establish that they lacked the capacity to comply with the Department's Interpretation, that the requirements

were sufficiently more burdensome, or that they reasonably withdrew from certain work rather than comply with the Interpretation and employ one of the available exemptions. While some of Plaintiffs' declarations aver that "[c]omplying with the Final Interpretation and the requirements of a necessary PTE has subjected me and my business to additional compliance requirements, such as additional disclosures and documentation," *see, e.g.,* Lown Decl., App. 6-7, they fail to show that the ERISA disclosure and documentation requirements impose meaningful burdens beyond what state insurance and SEC regulations have grown to include. This is unlike a case cited by Plaintiffs, where the plaintiffs established with "little or no resistance by the defendants" that they were forced to either "forego bidding on" particular projects or "undertake the extra burdens and costs of complying with" the rule in question. *See Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997).

## II.   PLAINTIFFS' ATTACK ON THE DEPARTMENT'S INTERPRETATION DEPENDS ON SEVERAL KEY ERRORS.

### A.   ERISA's Fiduciary Investment Advice Standard Requires a Case-by-Case Assessment, Not the Categorical Exclusions for Brokers and Insurance Agents That Plaintiffs Desire.

Stripped to its essence, Plaintiffs' argument is that rollover recommendations by people like the named Plaintiffs can never be fiduciary investment advice under ERISA. Plaintiffs' categorical approach cannot be squared with ERISA's text and purpose. ERISA defined investment advice fiduciaries functionally, "to the extent" that they provide advice about plan assets and receive compensation for that advice. *See* 29 U.S.C. § 1002(21)(A); *Chamber of Commerce*, 885 F.3d at 371 ("[Congress] addressed fiduciary status for ERISA purposes in terms of enumerated functions."). *See also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (holding that "ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms . . . thus expanding the universe of persons subject to fiduciary duties"); *Donovan v. Cunningham*, 716

F.2d 1455, 1464 n.15 (5th Cir. 1983) ("ERISA's modifications of existing trust law include imposition of duties upon a broader class of fiduciaries."). The Department's five-part test implements that functional definition by focusing not on the advisor's title or position in the constellation of financial professionals, but instead on aspects of the advisor's interaction with the retirement investor or ERISA plan. *See* 29 C.F.R. § 2510.3–21(c)(1).[2]

Nor is Plaintiffs' stark position consistent with *Chamber of Commerce*, which expressly noted that its holding "does not mean that any regulation of such transactions, or of IRA plans, is proscribed." 885 F.3d at 379 n.13. *See also id.* ("To the extent . . . that some brokers and agents hold themselves out as advisors to induce a fiduciary-like trust and confidence, the solution is for an appropriately authorized agency to craft a rule addressing that circumstance[.]"). The Fifth Circuit's core holding was that ERISA's investment advice fiduciary definition incorporated the common law understanding that "[f]iduciary status turns on the existence of a relationship of trust and confidence between the fiduciary and client." *Id.* at 370. While vacating the 2016 Fiduciary Rule for conflicting with that understanding, the Fifth Circuit also concluded that the five-part test "upheld the common law understanding of fiduciary relationships." *Id.* at 381; *id.* at 374 ("DOL's 1975 regulation . . . contemplated an intimate relationship between adviser and client beyond

---

[2] "A person shall be deemed to be rendering 'investment advice' to an employee benefit plan . . . only if: (i) Such person renders advice to the plan as to the value of securities or other property, or *makes recommendation* as to the advisability of investing in, purchasing, or selling securities or other property; and (ii) Such person either directly or indirectly (e.g., through or together with any affiliate)— . . .

> (B) Renders any advice described in paragraph (c)(1)(i) of this section *on a regular basis* to the plan pursuant to a *mutual agreement, arrangement or understanding*, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as *a primary basis* for investment decisions with respect to plan assets, and that such person will render *individualized investment advice* to the plan based on the particular needs of the plan . . . ."

29 C.F.R. § 2510.3–21(c)(1) (elements of the five-part test indicated by italics).

ordinary buyer-seller interactions"). The court also approvingly quoted the Department's

longstanding conclusion that the five-part test can apply to brokers and insurance agents:

> [A] fee or other compensation, direct or indirect, for the rendering of investment advice to a plan by a fiduciary [where the five-part test has been met], should be deemed to include all fees or other compensation incident to the transaction in which the investment advice to the plan has been rendered or will be rendered. *This may include, for example, brokerage commissions, mutual fund sales commissions, and insurance sales commissions*.

40 Fed. Reg. 50842 (Oct. 31, 1975) (emphasis added) (approvingly quoted in 885 F.3d at 373).[3]

> The provision of [securities] research and/or recommendations to a plan [by broker-dealers] would not in and of itself constitute the rendering of "investment advice" under the regulation *unless rendered pursuant to a mutual agreement, written or otherwise, to provide individualized advice to a plan on a regular basis which will serve as the primary basis for plan investment decisions* . . . . [A] determination whether the provision of research and/or recommendations by a broker-dealer constitutes the rendering of "investment advice" within the meaning of [the five-part test] *will depend on the particular facts and circumstances*.

Adv. Op. 83-60A (Nov. 21, 1983) (emphasis added) (approvingly quoted in 885 F.3d at 373-74).

In sum, the Department has consistently taken the position that the application of the five-

part test is a "facts and circumstances" analysis, and the Fifth Circuit has approved use of that test

to distinguish "between mere sales conduct, which does not usually create a fiduciary relationship

under ERISA, and investment advice for a fee, which does." 885 F.3d at 374. Here, the

Department's Interpretation applies the same framework, clarifying the application of individual

prongs of the five-part test to the rollover context but emphasizing that "[t]he focus is on the facts

and circumstances surrounding the recommendation and the relationship" and that "fiduciary

---

[3] *See also* 41 Fed. Reg. 56760, 56762 (Dec. 29, 1976) ("The advice and recommendations made to plans and plan fiduciaries by insurance agents and brokers . . . could constitute 'investment advice' . . . if it is rendered under circumstances described in [the five-part test]. A determination whether such advice constitutes 'investment advice' . . . *can be made only on a case-by-case basis*.") (emphasis added); 42 Fed. Reg. 32395, 32396 (June 24, 1977) ("[A] determination of whether such sales presentation, recommendations, and advice constitute [ERISA fiduciary] "investment advice" . . . *can be made only on a case-by-case basis*.") (emphasis added).

status applies only if all five prongs are satisfied." AR11.

### B.    Insurance Agents and Brokers Are Often Not Mere Salespeople.

Plaintiffs use variations of the term "salesperson" at least 25 times in their reply brief, adopting this characterization to minimize the role and expectations for brokers and insurance agents. And while they claim they "have never made" an argument that "a salesperson can never be a fiduciary," FACC Reply at 17, it is difficult to discern any way Plaintiffs would apply ERISA to a broker's or insurance agent's advice that resulted in a transaction and commission. *See, e.g.*, FACC Reply at 31 n.10 (claiming five-part test "clearly contemplates not advice incidental to a sale but advice regarding the investor's portfolio"); *id.* at 17 (claiming "the existence of a fiduciary relationship between a salesperson and a potential client" would "ordinarily be 'inconceivable'").[4]

While Plaintiffs' arguments depend on a hard-and-fast distinction between "a traditional investment adviser who is hired to manage a client's portfolio" on the one hand, and "financial salespeople" on the other, FACC Reply at 15, that distinction is not as stark as Plaintiffs presume. The Department acknowledges the distinct regulations applicable to different financial professionals, but, as discussed above, what matters most for ERISA purposes are the circumstances surrounding the compensated investment advice. And importantly, regulators of stockbrokers and insurance agents have, in recent years, adopted heightened conduct standards that recognize that these financial professionals are not mere salespeople.

---

[4] Plaintiffs characterize this as something the Fifth Circuit "held," FACC Reply at 17, but in fact *Chamber of Commerce* merely observed that it was "ordinarily inconceivable" that certain "one-time . . . transactions" would involve "an intimate relationship of trust and confidence," 885 F.3d at 380, and this was dicta based on the Fifth Circuit's general expectation about such circumstances rather than a holding rooted in detailed information about the specific facts and circumstances of any actual investment interactions. It is baseless for Plaintiffs to twist such dicta into far broader pronouncements. At any rate, the Department's view is that a reasonable application of the five-part test to actual interactions is necessary before determining how common or rare relationships of trust and confidence are, even for certain "one-time" transactions. *See* AR 8-9, 11.

In 2019, the SEC observed that "broker-dealer investment advice can be consequential" and "need not be trivial, inconsequential, or infrequent" under the securities regulations. *See* 84 Fed. Reg. 33681, 33685 (July 12, 2019). In the same regulatory package, the SEC issued "Regulation Best Interest," which established a best interest standard applicable to broker-dealers when making a recommendation of any securities transaction or investment strategy involving securities to retail customers. *See* 84 Fed. Reg. 33318 (July 12, 2019). This standard "draws from key principles underlying fiduciary obligations, including those that apply to [registered] investment advisers under the Investment Advisers Act of 1940." *Id.* at 33318, 33320, 33332. The SEC emphasized that, "regardless of whether a retail investor chooses a broker-dealer or an investment adviser (or both), the retail investor will be entitled to a recommendation (from a broker-dealer) or advice (from an investment adviser) that is in the best interest of the retail investor and that does not place the interests of the firm or the financial professional ahead of the interests of the retail investor." *Id.* at 33321. While the SEC did not impose the full Advisers Act fiduciary standard on broker-dealers, the primary remaining distinction is that a registered investment adviser's "fiduciary duty generally includes a duty to provide ongoing advice and monitoring, while Regulation Best Interest imposes no such duty and instead requires that a broker-dealer act in the retail customer's best interest at the time a recommendation is made." *Id.*; *see also XY Planning Network, LLC v. SEC*, 963 F.3d 244, 255 (2d Cir. 2020). It is thus clear that the SEC's distinction is not between investment advisers on the one hand and mere salespeople on the other.

Likewise, in 2020, the National Association of Insurance Commissioners (NAIC) revised its model regulation to provide that insurance agents must act in the best interest of the consumer when making a recommendation of an annuity, and insurers must establish and maintain a system to supervise recommendations so that the insurance needs and financial objectives of consumers

at the time of the transaction are effectively addressed. *See* NAIC Model No. 275, Suitability In Annuity Transactions Model Regulation, https://perma.cc/5LF6-M5SQ. The insurance agent's best interest obligation includes four components, including care and conflict of interest. *Id.*, NAIC Model Rule section 6. Regulations based upon the NAIC Model Regulation have been adopted in at least 30 states. *See* Allison Bell, Massachusetts Adopts Annuity Sales Regulations, *Think Advisor* (Dec. 15, 2022), https://perma.cc/22JJ-EQKE; NAIC, Annuity Suitability & Best Interest Standard, https://perma.cc/YRL8-2TM3 (updated June 23, 2022). The NAIC adopted a best interest standard in part to promote "harmonization across regulatory platforms." *See id.*

Plaintiffs attempt to dismiss these actions by claiming "a world of difference" between them and the ERISA fiduciary obligations, FACC Reply at 39, but they are mistaken. Fiduciary status under Title I of ERISA prominently includes the obligation to comply with statutory standards of prudence and loyalty and the obligation to avoid conflicts of interest. Plaintiffs identify no meaningful difference between a broker's obligations under Regulation Best Interest and ERISA's requirements for fiduciary investment advice. Because ERISA does not require ongoing monitoring and advice for investment advice fiduciaries, *see supra* Arg. § II.A, the SEC's reservation of its "fiduciary" label for those who must provide such ongoing services does not preclude brokers from satisfying the distinct ERISA fiduciary standard. And while there are differences of degree between ERISA's obligations and those adopted by NAIC Model Regulation, they are not a world apart. These overlapping best interest standards inform the expectations of both financial professionals and retirement investors about the relationships being formed.

Plaintiffs' observation that these other regulators' conduct standards cannot alter ERISA's fiduciary definition, FACC Reply at 41, is beside the point. The Department has not these other conduct standards as evidence of Congressional intent regarding the ERISA's definition. Instead,

having accepted the Fifth Circuit's opinion that the ERISA fiduciary standard is grounded in a relationship of trust and confidence, the Department looks to the marketplace realities shaped by these regulatory developments to inform the five-part test's exploration of whether there is a relationship of trust and confidence between a broker or an insurance agent and their customer.

### C.   Because ERISA Defines Investment Advice Fiduciaries Identically for Title I Plans and IRAs, Which the Department Has Implemented Through Identical Five-Part Tests, Plaintiffs' Effort to Isolate the Plans Must Be Rejected.

Plaintiffs argue that the Department has exceeded "the limitations on [its] authority under ERISA" by "attempt[ing] to dissolve the distinction between Title I ERISA plans and IRAs." FACC Reply at 19, 23. False. The Fifth Circuit held that the 2016 Fiduciary Rule "impermissibly conflate[d]" the two types of plans because IRA fiduciaries "are not saddled" with the duties of loyalty and prudence that apply to Title I fiduciaries, and therefore "these ERISA provisions must have different ranges" such that the Department cannot "comparably regulate fiduciaries to ERISA plans and IRAs." 885 F.3d at 381. The Fifth Circuit's concerns centered on the 2016 BICE exemption's imposition of duties of loyalty and prudence on IRA fiduciaries and exposure to "potential liability beyond the tax penalties provided in ERISA Title II." *See* 885 F.3d at 381-82.

These concerns are inapplicable to this case. Instead, the Department is simply employing its well-established authority to apply the parallel fiduciary definitions under both Title I and Title II of ERISA. *See* 885 F.3d at 381 (noting that "IRA plan 'fiduciaries' [are] . . . defined statutorily in the same way as ERISA plan fiduciaries").[5] The Department has not imposed fiduciary duties

---

[5] As previously explained, Section 102(a) of the Reorganization Plan No. 4 of 1978 gives the Department "all authority" for "regulations, rulings, opinions, and exemptions under section 4975 [of the Code]" subject to certain exemptions not relevant here. This includes the definition of "fiduciary" at 26 U.S.C. § 4975(e)(3) which parallels the Title I definition at 29 U.S.C. § 1002(21). In President Carter's transmittal message to Congress, he made explicitly clear that, "Labor will have statutory authority for fiduciary obligations. . . . Labor will be responsible for overseeing fiduciary conduct under these provisions." H.R. Doc. 95-375 at 1 (Aug. 10, 1978).

of prudence and loyalty on IRA fiduciaries or exposed them to liability beyond Title II's tax penalties. *See, e.g.*, AR 8 (explaining that, after the rollover, "[f]iduciary investment advice concerning investment of the rollover assets . . . once distributed from the Title I Plan into the IRA, would be subject to obligations in the Code").

Plaintiffs are asking the Court to treat Title I and Title II plans as hermetically sealed off from each other, so that there can be no practical considerations about advisers' interactions with both plans. This is unreasonable, and is not required by *Chamber of Commerce*, which did not address this issue. The Department rescinded Advisory Opinion 2005-23a (the Deseret Letter) on the ground that it was incorrect and that "the better view is that advice to roll assets out of a Title I plan is advice with respect to moneys or other property of the plan." AR 6. Plaintiffs cannot show that this short-lived opinion is required by ERISA. *See* Defs.' Br. at 51-52 & n.15 (noting public consideration of rescission began within five years after it was issued). Here, the Department has explained numerous factors that make advice about a rollover *from* a Title I plan advice *about* "moneys or other property of [the Title I] plan." *See* 29 U.S.C. § 1002(21)(A)(ii); AR 6-7; Defs.' Br. at 51-54. Plaintiffs offer no specific response to these textual and practical arguments. *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 413 (D.C. Cir. 2020) (holding that with adequate explanation, an agency is free to withdraw prior interpretations of its own regulations).

Second, Plaintiffs object to the Department's conclusion that the regular basis prong of the five-part test can be satisfied by considering both advice with respect to the Title I plan and advice with respect to an IRA holding assets rolled over from that Title I plan. *See* FACC Reply at 19. This conclusion is rooted in the well-established principle that advice to a participant in a Title I plan is considered advice to the plan. See AR 8. Because of the practical reality that ongoing advice would be provided to the same advice recipient (i.e., the Title I plan participant who then becomes

the IRA owner) with respect to the same assets, it is reasonable to consider both aspects. *See* AR 10 ("A different outcome could all too easily defeat legitimate investor expectations of trust and confidence by arbitrarily dividing an ongoing relationship of ongoing advice and uniquely carving out rollover advice from fiduciary protection."). The case Plaintiffs cite, *Carfora v. Teachers Ins. Annuity Ass'n of America*, 2022 WL 4538213 (S.D.N.Y. Sept. 27, 2022), does not support Plaintiffs' broader argument about "dissolving the distinction" between the types of plans. Instead, *Carfora*'s holding focused on the plaintiffs' failure to allege facts that would trigger fiduciary status during the relevant timeframe. *See id.* at *16. The decision specifically did not apply the Department's Interpretation retroactively to the facts of that case and offered no opinion as to whether, taking into account the deference it may afford the Department's Interpretation when analyzing conduct to which the Interpretation would apply, it would reach the same conclusion.

### D.   The Department's Motivation by Similar Policy Concerns in Both the 2016 Rulemaking and the 2020 Interpretation Does Not Undermine the Lawfulness of the Much Narrower Action Taken Here.

The central way Plaintiffs claim the Department's Interpretation is inconsistent with *Chamber of Commerce* is by asserting that it is "based on the exact same concerns, to get to virtually the same result" as the 2016 Fiduciary Rule. FACC Reply at 44; *id.* at 13 ("designed to reach essentially the same conduct on the part of the same actors as the 2016 Fiduciary Rule").

The Department does not dispute that the Interpretation is motivated by policy concerns similar to some of those that prompted the 2016 Fiduciary Rule. *See, e.g.*, AR 5-6. But overlapping concerns do not make an agency action unlawful or unreasonable, much less an effort to "overrule the judicial branch." FACC Opening Br. at 13. And the Department's description of the marketplace changes is not—as Plaintiffs suggest—evidence that the Department "works backwards from the desired conclusion" FACC Reply at 13, but rather necessary context for determining the parties' reasonable expectations. Moreover, the Department's Interpretation does

11

not produce virtually the same result or reach all of the same conduct as the 2016 Fiduciary Rule. In *Chamber of Commerce*, the Fifth Circuit concluded that the definition the 2016 Fiduciary Rule adopted to replace the five-part test would have "comprise[d] nearly any broker or insurance salesperson who deals with IRA clients." 885 F.3d at 832. The Fifth Circuit explained that its overbreadth holding "flows from DOL's concession that any financial services or insurance salesman who lacks a relationship of trust and confidence with his client can nonetheless be deemed a fiduciary." 885 F.3d at 379 n.13; *id.* at 376 (noting that "DOL . . . conced[es] that the [2016 Fiduciary] Rule would 'sweep in some relationships' that 'the Department does not believe Congress intended to cover as fiduciary'").

Here, by contrast, the five-part test reaches only relationships of trust and confidence, as evidenced by a reasonable facts-and-circumstances application of each prong of the test. The Department is not seeking to "redefine all financial salespeople as fiduciaries," FACC Reply at 31, nor will the Department's Interpretation reach "nearly any broker or insurance salesperson who deals with IRA clients," 885 F.3d at 832. Instead, the Department is doing what the Fifth Circuit contemplated—targeting "brokers and agents [who] hold themselves out as advisors to induce a fiduciary-like trust and confidence." 885 F.3d at 379 n.13.

### E.   Plaintiffs Avoid Addressing the Five-Part Test as a Whole, Instead Attacking the Straw Man That Each Part in Isolation May Not Be Sufficient to Establish a Fiduciary Relationship.

Plaintiffs challenge the Department's Interpretation by focusing on each individual prong of the test, asking the Court to find that each prong is insufficient to identify a fiduciary, and then extrapolating that if the prongs are not individually sufficient, the entire test must also fail. This approach not only conflicts with Plaintiffs' own acknowledgment that "[a]ll of the elements of the five-part test must be satisfied to be an investment advice fiduciary," FACC Reply at 31 n.10, but also is inconsistent with the common law understanding that "[w]hether a fiduciary relationship

exists is a fact-intensive question involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." *See Xereas v. Heiss*, 987 F.3d 1124, 1131 (D.C. Cir. 2021); *see also ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) ("The existence of a fiduciary relationship . . . is usually a fact intensive inquiry.").

In its current iteration, the five-part test serves as an appropriate tool to determine whether the parties were engaged in a relationship that is fairly characterized as one of "trust and confidence." *See Chamber of Commerce*, 885 F.3d at 369. Plaintiffs repeatedly contend that the Court should assume that the Department's Interpretation means something other than what it actually says. But well-established case law provides for a presumption of regularity to the actions of government agencies. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 725 n. 79 (5th Cir. 2013). Plaintiffs' doubts about the Department's sincerity are not a sufficient reason to set aside the Interpretation. Instead, the Department's Interpretation must be considered on its own terms.

### 1. Regular Basis Prong

Plaintiffs err in claiming that the Department's Interpretation means that "any type of ongoing or anticipated relationship with the client" imposes fiduciary obligations on any advice resulting in a sale. FACC Reply at 15; *see also id.* at 16 (suggesting that the only way for rollover advice not to be deemed fiduciary is "the absence of evidence that the parties anticipated an ongoing relationship"). First, this prong only applies where a financial professional "[r]enders any advice . . . on a regular basis." 29 C.F.R. § 2510.3–21(c)(1)(ii)(B). Accordingly, this prong does not encompass "any kind of future relationship," FACC Reply at 26, but instead encompasses only an "ongoing advice relationship." *See, e.g.*, AR 9 ("[W]hen the parties reasonably expect an ongoing advice relationship at the time of the rollover recommendation, the regular basis prong is

satisfied."); AR 8 ("In circumstances in which the investment advice provider has been giving advice to the individual about investing . . . the advice to roll assets out of a Title I Plan is part of an ongoing advice relationship that satisfies the regular basis prong."). Relationships that do not, or are not expected to, include advice on a regular basis would not satisfy this prong. *See, e.g.*, AR 7 ("Parties can and do, for example, enter into one-time sales transactions in which there is no ongoing investment advice relationship, or expectation of such a relationship."). Thus, this prong does not encompass every instance where a salesperson may "seek to develop a relationship . . . in the hopes of making additional sales." FACC Reply at 27.[6]

Second, this prong does not stand alone. Not every interaction on a regular basis will ultimately qualify as fiduciary. *See* AR 9 (stating that financial professionals in ongoing advice relationships are ERISA fiduciaries only "if the other prongs of the test are satisfied"). Even where this prong is met, the other prongs are necessary to discern whether a relationship of trust and confidence has formed. Therefore, Plaintiffs cannot contort this prong to reach only fiduciaries.

Third, Plaintiffs' assertion that the common law requires a pre-existing relationship is overstated. While *some* states require a pre-existing relationship before *some* types of fiduciary status will be recognized, *see* FACC Reply at 26 (citing two Texas cases), the circumstances where the necessary "relationship of trust and confidence" can arise are necessarily diverse. For example, one court held that "a common law fiduciary relationship arises when one party places trust and confidence in the other," ultimately concluding that "a fact-finder could reasonably conclude that

---

[6] Despite all of the Department's clear statements focused on the parties' mutual expectations, Plaintiffs claim that this is "obfuscation" and the Department intends the regular basis prong to be triggered by "the unilateral expectations of an agent or broker." FACC Reply at 29 n.9. Any ambiguity in the language Plaintiffs quote is addressed by the beginning of the same paragraph in the preamble: "fiduciary status is determined by the facts as they exist at the time of the recommendation, including whether the parties, at that time, mutually intend an ongoing advisory relationship." AR 10.

there was a common law fiduciary relationship between [the parties]" even though they had met "a handful of times, always at social events" but only once at the adviser's office to discuss business. *Goldsenson v. Steffens*, 2014 WL 12788001, at *83-84 (D. Me. Mar. 7, 2014). And even one-time advice can be fiduciary advice if the recipient of the advice has a reasonable expectation that the relationship is one of trust and confidence. *See, e.g.*, *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 416 (S.D.N.Y. 2006) (comparing a travel agent to "a broker, which engages in a single business transaction with the principal," and owes a resulting fiduciary obligation, including an obligation to disclose to the client "a conflict of interest or some interest that would be adverse to the client or affect the client's decision"). Plaintiffs have not backed up their assertion that a pre-existing relationship is always a prerequisite to being a functional fiduciary. ERISA focuses on the "extent" to which someone "renders investment advice." 29 U.S.C. § 1002(21)(A). Here, the Department reasonably recognizes that "[e]very relationship has a beginning, and the five-part test does not provide that the first instance of advice in an ongoing relationship is automatically free from fiduciary obligations." AR 10.

Fourth, the examples the Department provided as "objective evidence" of "the parties' expectation at the time of the rollover recommendation," AR 9—such as an agreement between the parties "to check in periodically on the performance of the customer's post-rollover financial products" or financial professionals "hold[ing] themselves out to the customer as providing such ongoing services" at that time—are relevant to whether the parties intended an ongoing advice relationship that satisfies the regular basis prong. The key is whether advice has been provided, or is expected to be provided, on a regular basis.

Finally, the Department reasonably explained that the regular basis prong depends on "the facts as they exist at the time of the recommendation, including whether the parties, at that time,

mutually intend an ongoing advisory relationship." AR 10; *see also* AR 9 ("[W]hen the parties reasonably expect an ongoing advice relationship at the time of the rollover recommendation, the regular basis prong is satisfied."). Because the current advice and an intended ongoing advice relationship can evidence a present relationship of trust and confidence, the five-part test do not depend on "what will in fact ensue in the future." FACC Reply at 29.

2.    *Mutual Agreement Prong*

The Department agrees with Plaintiffs that this prong "is intended to make clear that the parties' intention is what should control." FACC Reply at 30; *see* AR 11 ("This interpretation will not deprive parties of the ability to define the nature of their relationship, but recognizes that there needs to be consistency in that respect."). The Department simply explains that this prong requires "evaluating the parties' reasonable understandings with respect to the relationship." AR 9. The reason that a disclaimer asserting that financial professionals are not acting as a fiduciary would not be dispositive is that written boilerplate could contradict how they may continue to hold themselves out as acting in a position of trust and confidence. *See* AR 11 ("[W]ritten statements disclaiming a mutual understanding . . . will not be determinative, although such statements can be appropriately considered in determining whether a mutual understanding exists"); *id.* ("While financial services professionals may contractually disclaim engaging in activities that trigger elements of the five-part test, . . . they must do so clearly and act accordingly to demonstrate that there is in fact no mutual agreement, arrangement, or understanding to the contrary.").

Plaintiffs cannot show that the Department's approach to the "mutual agreement" prong will be "circular," treating any advice leading to a rollover transaction as satisfying this prong. FACC Reply at 30. To the contrary, the Department emphasized repeatedly that each prong of the test must be satisfied. *See* AR 8 ("All the elements of the five-part test must be satisfied for the investment advice provider to be a fiduciary . . . , including . . . requirements that the advice be

16

provided pursuant to a ''mutual'' agreement, arrangement, or understanding that the advice will serve as ''a primary basis'' for investment decisions.''); *see also* AR 11, 12.[7] And the Department has also emphasized the steps a financial professional can take to prevent any misunderstanding about whether there is a mutual agreement. *See, e.g.*, AR 9 (one who "does not want to assume a fiduciary relationship or create misimpressions about the nature of its undertaking, [] can clearly disclose that fact to its customers up-front, clearly disclaim any fiduciary relationship, and avoid holding itself out to its . . . customer as acting in a position of trust and confidence").

### 3.   *Remaining Prongs*

Under the five-part test, there must also be a "*recommendation* as to the advisability of investing in, purchasing, or selling securities or other property," "*individualized investment advice* . . . based on the particular needs of the plan," and the parties must mutually agree or understand "that such services will serve as *a primary basis* for investment decisions with respect to plan assets." *See* 29 C.F.R. § 2510.3–21(c)(1) (emphasis added). These prongs further distinguish ERISA fiduciary advice from mere sales activity. Plaintiffs have no specific criticism of the recommendation and individualized advice requirements, which helps to distinguish a general sales pitch from particular advice that one could more reasonably rely upon. Instead, Plaintiffs complain that the primary basis prong (1) can apply where the investor consults with multiple professionals, and (2) will typically be met for "advice based on the individual needs of the Retirement Investor" because of a "reasonable understanding by both parties that the advice will

---

[7] Plaintiffs claim that one of the Department's observations—that a financial professional who "recommends that Retirement Investors roll potential life savings out of a Title I Plan" and satisfies the "regular basis" prong "should reasonably understand that the provider will be held to fiduciary standards," AR 10—means that the other prongs are irrelevant or prejudged. FACC Reply at 30. Plaintiffs are simply misreading this sentence, which merely concerned the reasonableness of the Department's interpretation of the "regular basis" prong, not the negation of the other prongs.

serve as at least a primary basis for the decision." FACC Reply at 31 (quoting AR 11). These interpretations are reasonable applications of the regulation's specific use of "a primary basis" and the practical context of individualized advice. *See* AR 11. It is not that financial professionals are "swept into a fiduciary relationship if the investor merely deems any advice important to his or her decision," FACC Reply at 32, but that both those giving and receiving individualized advice— especially advice pursuant to the SEC and NAIC best interest standards—can reasonably expect that the advice may be a basis for decision. As discussed above, the best way for a financial professional to ensure nonfiduciary status is to expressly and consistently "make clear in its communications that it does not intend to enter an ongoing relationship to provide investment advice and act in conformity with that communication." AR 11-12.

### 4. Compensation for Advice

In addition to the five-part test, ERISA only makes someone an investment advice fiduciary where they receive "a fee or other compensation, direct or indirect." 29 U.S.C. § 1002(21)(A). This further limits the circumstances in which advice can trigger ERISA fiduciary status, because commission-based compensation only occurs when there is a transaction.

Plaintiffs attempt to turn this provision into yet another alleged defect with the Department's Interpretation. They appear to ask the Court to adopt an extraordinarily restrictive reading that would treat as compensation only a fee paid exclusively for advice. *See* FACC Reply at 18. The Fifth Circuit did not make such a holding. Instead, *Chamber of Commerce* approvingly quoted the preamble to the 1975 Rule, which stated that the term "fee or other compensation, direct or indirect" "should be deemed to include all fees or other compensation incident to the transaction in which the investment advice to the plan has been rendered or will be rendered" and "'may include' brokerage commissions" where the five-part test is met. 885 F.3d at 373 (quoting 40 Fed. Reg. 50842 (Oct. 31, 1975)); *see also* 40 Fed. Reg. 50842 ("brokerage commissions, mutual fund

sales commissions, and insurance sales commissions").

Indeed, the Department specifically rejected Plaintiffs' proposed approach in a 1983 advisory opinion. There, the requester had asked that broker-dealers not be deemed an investment advice fiduciary "unless the broker-dealer provides investment advice for distinct, non-transactional compensation." Advisory Opinion 83-60A at 1 (Nov. 21, 1983). The Department rejected this request, concluding that where the five-part test is met "under the particular facts and circumstances," then "it may reasonably be expected that, even in the absence of a distinct and identifiable fee for such advice, a portion of the commissions paid to the broker-dealer would represent compensation for the provision of such investment advice." *Id.* at 3. The Fifth Circuit quoted this language from the 1983 advisory opinion with approval, *see* 885 F.3d at 373-74,[8] and the Department's challenged Interpretation makes no change to this longstanding, reasonable interpretation of compensation triggering ERISA fiduciary status.

## III.   THE DEPARTMENT'S INTERPRETATION OF ITS 1975 REGULATION IS NOT AN "EXTRAORDINARY CASE" REQUIRING APPLICATION OF THE MAJOR QUESTIONS DOCTRINE.

Plaintiffs ask this Court to cut corners on statutory interpretation and instead apply the major questions doctrine. The doctrine is inapplicable here. It is limited to "certain extraordinary cases," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), such as those involving "decisions of vast economic and political significance", *id.* at 2605; assertions of "extravagant statutory power

---

[8] Other courts have also widely supported this conclusion. *See, e.g.*, *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 291-92 (7th Cir. 1989) (ERISA investment advice includes "stock brokers and dealers who recommend certain securities and then participate in the acquisition . . . of those securities and receive a commission for their services"); *Eaves v. Penn*, 587 F.2d 453, 458 (10th Cir. 1978) (ERISA investment advice "includes … stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of those securities and receive a commission for their services"); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 710 (W.D. Mich. 2007) (rejecting as "untenable" broker's argument that it was paid only "commissions for sales, not a fee for investment advice" and that "the advice ... was free").

over the national economy", *id.* at 2609; or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* This doctrine stands in contrast to general statutory interpretation principles, including that courts ordinarily may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

Here, contrary to Plaintiffs' hyperbole, the Department has not asserted a "highly consequential power" or even suddenly regulated "an entire industry of financial salespeople." FACC Reply at 37. ERISA has long given the Department responsibility to address those who are fiduciaries to Title I or Title II ERISA plans based on the provision of "investment advice." As discussed above, that has never categorically excluded those who consider themselves salespeople. The 1975 five-part test, from its inception, applied not only to those who held themselves out as SEC fiduciaries, but also to broker-dealers and insurance agents who met the terms of the test. *See supra* Arg. § II.A. The Department's 2020 Interpretation simply applies that same five-part test to a specific type of transaction—rollovers—and requires analysis of all the facts and circumstances to determine whether the parties intend to enter a fiduciary relationship. *See supra* Arg. § II.A, E.

Nor does the Department's Interpretation "substantially restructure a significant portion of the economy" like the complete reorganization of American energy infrastructure, *West Virginia*, 142 S. Ct. at 2604; changing the terms of 80% of American residential leases, *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021), regulating the entire tobacco industry, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); or unilaterally rescinding physicians' state-issued licenses to practice medicine, *Gonzales v. Oregon*, 546 U.S. 243 (2006). Indeed, in the twenty-two months it has been effective, *see* AR 1, few litigants or others have claimed the Interpretation is significantly disruptive. The Department's action has less impact than the

20

Department of Health and Human Services (HHS) rule the Supreme Court recently upheld in the face of a major questions doctrine challenge. *See Biden v. Missouri*, 142 S. Ct. 647 (2022). That HHS rule, requiring COVID-19 vaccinations for approximately 10.4 million healthcare workers at facilities accepting federal Medicare or Medicaid funds, had been enjoined or invalidated by lower courts, including the Fifth Circuit, under the major questions doctrine. *See, e.g.*, *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021) (per curiam). However, the Supreme Court did not apply the doctrine, even though the rule was to have total costs of approximately $1.38 billion in the first year, 86 Fed. Reg. 61555, 61602, 61609 (Nov. 5, 2021), and went further than any condition HHS had previously placed on funding for the purpose of infection control, *Missouri*, 142 S. Ct. at 653. Here, by contrast, the Department's Interpretation has an estimated compliance cost roughly 6% of the rule at issue in *Missouri*. *See* AR 52 (estimating $87.8 million in the first year, and "annualized to $80.1 million per year" over a ten-year period). HHS's authority in *Missouri* was comparable to the Department's authority here both because HHS relied on general authority to issue regulations and impose conditions on the receipt of funds, 42 U.S.C. § 1302(a); 42 U.S.C. § 1395x(e)(9); *cf.* 29 U.S.C. §§ 1108, 1135; and because setting funding conditions was consistent with HHS's "longstanding practice," *Missouri*, 142 S. Ct. at 652; *cf. Chamber of Commerce*, 885 F.3d at 367 (noting that "[s]ince 1977," the Department-issued PTE 84-24 "had covered transactions involving insurance and annuity contracts"). As in *Missouri*, this Court should rely on normal principles of statutory interpretation, not the major questions doctrine.

## IV.    THE INTERPRETATION IS NOT ARBITRARY AND CAPRICIOUS

Plaintiffs' arguments that the Department's Interpretation is arbitrary and capricious fare no better. Under settled law, "[t]he APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Plaintiffs advance no arguments under this heading distinct from their overall

statutory arguments. They simply claim that the Interpretation is unreasonable because an agency "cannot override the plain intent of Congress." FACC Reply at 39.

For the reasons discussed above, the Department has not attempted to alter the statutory meaning of fiduciary investment advice, and the Interpretation of the 1975 five-part test is consistent with the Fifth Circuit's holding that the statute requires a relationship of trust and confidence. *See supra* Arg. § II. Here, the Department's clarification of its 1975 five-part test with regard to rollover recommendations must be assessed in light of the Supreme Court's repeated observations that "'[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis,' for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (quoting *Chevron USA Inc. v. Natural Resources Def. Counsel, Inc.*, 467 U.S. 837, 863-64 (1984)).[9] It is reasonable for the Department to consider current market practices and the current regulatory environment in assessing the reasonable expectations of the parties to retirement investment advice. *See supra* Arg. § II.D.

## V.   TO THE EXTENT THAT THE 1975 REGULATION IS AMBIGUOUS, THE DEPARTMENT'S INTERPRETATION OF ITS OWN REGULATIONS IS ENTITLED TO DEFERENCE.

Alternatively, were the Court to find the 1975 Regulation ambiguous with respect to whether the "regular basis" and "mutual agreement" prongs can be satisfied on objective evidence

---

[9] Plaintiffs argue *Brand X* is inapplicable on the theory that *Chamber of Commerce* is "judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill." FACC Reply at 38-39 (quoting *Brand X* at 982-83). But the Fifth Circuit did not purport to comprehensively interpret the five-part test, and for the reasons discussed above, Plaintiffs repeatedly overstate and misconstrue the Fifth Circuit's holdings. At any rate, *Chamber of Commerce* does not have the sort of *res judicata* effect over all future rulemakings that Plaintiffs seem to wish.

that a rollover recommendation is the start of a fiduciary relationship with respect to the new plan, an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) ("We have explained *Auer* deference (as we now call it) as rooted in a presumption about congressional intent—a presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities."); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program."). While Plaintiffs cast aspersions on *Auer* and *Kisor*, *see* FACC Reply at 41 & n.16, these decisions remain controlling in the Fifth Circuit. *See, e.g.*, *Johnson v. BOKH Nat'l Ass'n*, 15 F.4th 356, 362-65 (5th Cir. 2021) (applying *Kisor* to defer to agency interpretation of ambiguous regulation).

The threshold question for application of *Auer* deference is whether "a regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414. Plaintiffs argue that the application of the five-part test to rollover recommendations cannot be ambiguous by declaring that the *Chamber of Commerce* decision adopted an "authoritative construction of those terms," *i.e.*, Plaintiffs' own absolutist reading of the test. FACC Reply at 43. To the contrary, the Fifth Circuit was not called upon to definitively interpret each of the terms in the five-part test, or the nuances of their application to rollovers—the question before that court was the effort to replace the test with another approach. *See supra* Arg. § II.D. While the Department's primary argument is that the Interpretation is unambiguously consistent with the regulation, there is far more basis to find the five-part test genuinely ambiguous about rollovers than to adopt Plaintiffs' stark approach. The agency's interpretation must also be "reasonable." *Johnson*, 15 F.4th at 363 (quoting *Kisor*, 139 S. Ct. at 2415). This factor is satisfied for all of the reasons discussed above. *See supra* Arg. § II.

Deference is also warranted because "the character and context of the agency interpretation entitles it to controlling weight." *Johnson*, 15 F.4th at 363 (quoting *Kisor*, 139 S. Ct. at 2416). Here, there is no doubt that the Interpretation "reflects the agency's 'authoritative' or 'official position'", *id.* at 364, because it was the subject of notice and comment and adopted in the preamble to an exemption published in the Federal Register. *See, e.g.*, *Auer*, 519 U.S. at 455 (deferring to "regulations promulgated by the Secretary" and published in the Federal Register). Moreover, the Interpretation "implicates [the agency's] substantive expertise" because the Department is responsible for interpreting and defining terms and granting exemptions for investment advice fiduciaries under ERISA, both for Title I and Title II plans. *See* 26 U.S.C. § 4975(c)(2); 29 U.S.C. §§ 1108, 1135.

The Department also satisfies the third "important marker" for determining whether "controlling weight" is warranted: "whether the agency's construction is rooted in its 'fair and considered judgment.'" *Johnson*, 15 F.4th at 363-64 (quoting *Kisor*, 139 S. Ct. at 2416-17). The Department's considered action is not "merely a 'convenient litigating position' or 'post hoc rationalization.'" *Id.* at 364. Plaintiffs' attempt to weigh this factor against deference simply repeats the notion that the Department "intended to distort and confuse the plain meaning of the 1975 rule's language" in an attempt to overturn what the Fifth Circuit already decided. An agency's fair and considered judgment need not turn on whether it fully aligns with a single court's conclusions, and here, as the Department has shown above, the Interpretation is consistent with the core of the Fifth Circuit's holdings.

## VI.    ANY RELIEF SHOULD BE LIMITED TO PLAINTIFFS.

Even if the Court were to rule against the Department on the merits, Plaintiffs overreach in seeking a nationwide permanent injunction. While the Fifth Circuit has held that a court may "in appropriate circumstances, [] issue a nationwide injunction," *Texas v. United States*, 809 F.3d 134,

188 (5th Cir. 2015), *aff'd by equally divided court*, 579 U.S. 547 (2016), it has also more recently emphasized that "nationwide injunctions are [not] required or even the norm." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). Plaintiffs fail to explain why a nationwide injunction is necessary to give an effective remedy to the parties before the Court—all of whom are insurance agents, businesses, and a trade association based in Texas. *See* Compl. ¶¶ 4-10, ECF No. 1. Unlike the immigration laws at issue in *Texas*, the statutory scheme at issue here is not subject to a constitutional uniformity requirement. *See Louisiana*, 20 F.4th at 263 (distinguishing the injunction in *Texas*). Nothing about this case requires that a single district court attempt to control all applications of a U.S. Department of Labor interpretation of its own regulation nationwide. *See id.* (quoting Justice Gorsuch's concurrence critiquing nationwide injunctions in *DHS v. New York*, 140 S. Ct. 599, 600 (2020)); *see also* Defs.' Br. at 61-62 (collecting cases).

Far more consequentially, Plaintiffs also argue that setting aside an agency action under the APA has the same effect as a nationwide injunction: "once it has been vacated under the APA it can no longer be enforced by the [agency] against anyone." FACC Reply at 46. It cannot be that the first district court decision about any agency regulation or action inherently has universal effect. Indeed, the Office of the Solicitor General has recently addressed this argument at length, showing from text and history that "Congress . . . did not intend to create a novel remedy of universal vacatur in Section 706." *see* Br. for Pet'rs, *United States v. Texas*, No. 22-58, 2022 WL 4278395, at *39-*42 (Sept. 12, 2022); *see also* Reply Br. for Pet'rs, *United States v. Texas*, No. 22-58, 2022 WL 17170668, at *16-*20 (Nov. 17, 2022); John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Reg. Bull. 37 (2020).

For these reasons, any relief granted should be limited to the parties before the Court.

**CONCLUSION**

For the foregoing reasons, Defendants are entitled to dismissal or summary judgment on all claims, and the Court should deny Plaintiffs' motion for summary judgment.

Dated: December 22, 2022                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            BRAD P. ROSENBERG
                                            Assistant Branch Director

                                            */s/ Galen N. Thorp*
                                            GALEN N. THORP
                                            Senior Trial Counsel
                                            ALEXANDER N. ELY
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW, Washington, DC 20005
                                            Tel: (202) 993-5177; Fax: (202) 616-8470
                                            alexander.n.ely@usdoj.gov

                                            *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on December 22, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

                                            /s/ Galen N. Thorp

                                            *Counsel for Defendants*

26