IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FEDERATION OF AMERICANS §
FOR CONSUMER CHOICE, INC.; §
JOHN LOWN d/b/a LOWN §
RETIREMENT PLANNING; §
DAVID MESSING; MILES §
FINANCIAL SERVICES, INC.; JON §
BELLMAN d/b/a BELLMAN §
FINANCIAL; GOLDEN AGE §
INSURANCE GROUP, LLC; §
PROVISION BROKERAGE, LLC; §
and V. ERIC COUCH, §
§
    Plaintiffs, §
§
v. §    Case No. 3:22-cv-00243-K-BT
§
UNITED STATES DEPARTMENT §
OF LABOR and MARTIN J. §
WALSH, in his official capacity as §
SECRETARY OF LABOR, §
§
    Defendants. §

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiffs the Federation of Americans for Consumer Choice, Inc. (the "FACC") and several of its members bring this challenge under § 706 of the Administrative Procedures Act (APA) asking the Court to vacate and set aside Defendants the United States Department of Labor (the "DOL") and Secretary of Labor Martin J. Walsh's new interpretation of the agency's five-part test to determine whether financial professionals are acting as "investment advice fiduciaries" under the Employee Retirement Income Security Act of 1974 (ERISA)

and the Internal Revenue Code (the "Code") in the context of recommendations to roll over assets from an employee benefit plan to an individual retirement account (IRA).

The DOL promulgated the five-part test in a 1975 regulation which outlines when financial professionals are considered investment advice fiduciaries under ERISA. The DOL currently takes the position that if a financial professional advises a participant to roll assets out of an employee benefit plan, then such advice is related to the sale, withdrawal, or transfer of plan assets; therefore, the financial professional is an ERISA fiduciary—if other conditions of the five-part test are satisfied. Consistent with this position, the DOL adopted a prohibited transaction exemption (PTE) under ERISA and the Code, PTE 2020-02, that requires, in addition to other compliance conditions, investment advice fiduciaries to render advice that is in the employee benefit plan participants' best interest in order to receive compensation that would otherwise be prohibited in the absence of an exemption. PTE 2020-02 expressly covers prohibited transactions resulting from rollover advice, as well as advice on how to invest assets within a plan or IRA. The DOL is especially concerned with rollover recommendations as it believes the decision to roll over assets from a plan to an IRA is often the single most important financial decision an employee benefit plan participant makes. According to the DOL, rollovers involve a lifetime of retirement savings, and financial services providers often have a strong economic incentive to recommend that retirement

investors roll assets out of employee benefit plans into one of the financial professional's institution's IRAs.

While the Court may view the DOL's new interpretation as part of the agency's well-intentioned efforts to update its regulations to ensure that fiduciary advice providers adhere to stringent standards designed to ensure that investment recommendations by financial institutions and professionals reflect the best interests of plan and IRA investors, the Court must also recognize that other similar agency efforts have not held up well under judicial scrutiny. Five years ago, the United States Court of Appeals for the Fifth Circuit vacated the DOL's revised definition of an investment advice fiduciary to include all financial professionals who give advice to roll assets out of a plan to an IRA. *Chamber of Com. v. U.S. Dep't of Lab.* (*Chamber II*), 885 F.3d 360 (5th Cir. 2018).[1] And earlier this year, the United States District Court for the Middle District of Florida, Tampa Division, issued an opinion in which the court vacated the policy referenced in Frequently Asked Question (FAQ) 7 in the New Fiduciary Rule Advice Exemption FAQs which extended the five-part test to a recommendation to roll plan assets to an IRA, in the context of an ongoing advice relationship. *Am. Sec. Ass'n v. U.S. Dep't of Lab.*, 2023 WL 1967573 (M.D. Fla. Feb. 13, 2023).

---

[1] The Fifth Circuit's decision is referred to throughout these findings, conclusions, and recommendations in text as "*Chamber of Commerce*," but in citations as "*Chamber II*."

3

As explained below, Plaintiffs have standing to bring their challenge, and therefore the Court should DENY Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 39).

Further, based on ERISA's text and purpose, coupled with the common law understandings of fiduciary relationships, the Court should find the DOL's new interpretation of the five-part test narrowly conflicts with ERISA and the DOL's own regulations. In view of this conflict, the Court should conclude that the DOL exceeded its statutory authority in promulgating the new interpretation and that the new interpretation is an arbitrary and capricious interpretation of the five-part test. Accordingly, the Court should GRANT in part and DENY in part Plaintiffs' Motion for Summary Judgment (ECF No. 19) and the DOL's Cross-Motion for Summary Judgment (ECF No. 39). As explained below, the Court should VACATE the portions of PTE 2020-02 that permit consideration of actual or expected Title II investment advice relationships when determining Title I fiduciary status.

## Background

### I.   Statutory Framework & Regulatory History

Congress passed ERISA in 1974 after finding that the "growth in size, scope, and numbers of employee benefit plans in recent years ha[d] been rapid and substantial" and there was an inherent "national public interest" to ensure the "continued well-being and security of millions of employees and their dependents [who] are directly affected by these plans." ERISA § 2(a), 29 U.S.C. § 1001(a). In enacting the statute, Congress comprehensively defined fiduciary standards for

creating, maintaining, and advising various retirement savings vehicles and delegated authority to enforce these standards to different agencies. The provisions of ERISA are grouped into four sections, or Titles. This case requires an analysis of Title I and Title II.

### A.  Title I and Title II Fiduciary Definitions

Title I regulates employer- or union-sponsored welfare and pension plans. ERISA §§ 3(1), 4(a), 29 U.S.C. §§ 1002(1), 1003(a). It covers "employee welfare benefit plan[s]," "welfare plan[s]," "employee pension benefit plan[s]," and "pension plan[s]" which provide, among other things, medical benefits or retirement income to employees. ERISA § 3(1)-(2), 29 U.S.C. § 1002(1)-(2). When dealing with these plans, a person becomes an "investment advice fiduciary"— subject to Title I fiduciary rules—when that person:

> renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so[.]

ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii).

Title II amended the Code and imposed separate restrictions on those who engage with certain other retirement savings vehicles, such as IRAs. In the relevant section, the Code defines a "plan" as "an [IRA] described in section 408(a)." 26 U.S.C. § 4975(e)(1)(B). An IRA is "a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries" that meets specific requirements. 26 U.S.C. § 408(a). Title II also delineates who is a fiduciary with respect to these plans, noting that an "investment advice fiduciary" is one who:

renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so[.]

26 U.S.C. § 4975(e)(3).

So, the definition for an investment advice fiduciary under either Title is the same; however, the definitions of a covered "plan" are notably different.

### B. Title I and Title II Prohibited Transactions

Whether (or not) an individual is a fiduciary with respect to a covered plan has significant implications related to the transactions an individual may engage in with the plan. Congress expressly found that some transactions with retirement plans are inherently conflicted and constitute impermissible self-dealing between fiduciaries and retirement plans. To address these conflicted transactions, Congress inserted provisions in ERISA, noting that, under Title I, fiduciaries may not participate in any of these prohibited transactions, stating that:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

ERISA § 406(b), 29 U.S.C. § 1106(b). If a Title I fiduciary engages in a prohibited transaction regarding a Title I plan, the DOL or plan participants or beneficiaries

may bring a civil lawsuit, and the DOL may assess civil penalties. ERISA § 502(a), (i), 29 U.S.C. § 1132(a), (i).

ERISA also provides similar restrictions on Title II plans. Title II prohibits certain transactions between fiduciaries and plans, first defining a "disqualified person" as "a fiduciary." 26 U.S.C. § 4975(e)(2)(A). A prohibited transaction under Title II occurs if a disqualified person receives any "direct or indirect . . . consideration for his own personal account . . . [when] dealing with the plan in connection with a transaction involving the income or assets of the plan." 26 U.S.C. § 4975(c)(1)(F). If a Title II disqualified person engages in a prohibited transaction, the IRS may impose an excise tax—but, unlike Title I, no private right of action is available. 26 U.S.C. § 4975(a)-(b).

### C. Title I and Title II Fiduciary Duties

Additionally, Title I fiduciaries are subject to several distinct duties owed to a covered plan. For instance, a Title I fiduciary is subject to duties of loyalty and prudence. That is, the fiduciary must:

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>> (A)  for the exclusive purpose of:
>>
>>> (i) providing benefits to participants and their beneficiaries; and
>>>
>>> (ii) defraying reasonable expenses of administering the plan;
>>
>> (B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use

> in the conduct of an enterprise of a like character and with
> like aims[.]

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed" is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." ERISA § 409(a), 29 U.S.C. § 1109(a). However, a Title II fiduciary is not subject to statutory duties of loyalty and prudence, and Title II does not give rise to claims for breach of fiduciary duties like Title I permits.

D. <u>Regulatory History</u>

Various federal agencies regulate and enforce different Titles of ERISA. The DOL enforces Title I, and the Secretary of Labor may "prescribe such regulations as he finds necessary or appropriate to carry out the provisions" of Title I, including, "[a]mong other things," "defin[ing] accounting, technical and trade terms used in such provisions." ERISA § 505, 29 U.S.C. § 1135. Under Title I, the Secretary of Labor may "grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by section[] 1106." ERISA § 408(a), 29 U.S.C. § 1108(a). Thus, the Secretary of Labor may grant PTEs when the Secretary deems it appropriate and may impose certain compliance requirements on fiduciaries who seek to avail themselves of the PTE. In contrast, the IRS primarily enforces Title II

8

through its excise tax mechanism. 26 U.S.C. § 4975(a)-(b). But the Secretary of Labor may also issue PTEs that cover Title II plans. *See infra* Part I.D.ii.

In short, the Secretary of Labor may exempt Title I fiduciaries or Title II disqualified persons from ERISA's bar on prohibited transactions either through a conditional or unconditional PTE.

### i.   *The 1975 Five-Part Test for an Investment Advice Fiduciary*

Shortly after the passage of ERISA in 1974, the DOL promulgated a functional, conjunctive five-part test to clarify which individuals are subjected to fiduciary status (and their corresponding duties) under ERISA's investment advice fiduciary provision for either Title I or Title II plans. 29 C.F.R. § 2510.3–21(c) (Title I); 26 C.F.R. § 54.4975–9(c) (Title II). The five-part test provides that:

(1)   A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of [ERISA] and this paragraph, only if:

    (i)   Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

    (ii)   Such person either directly or indirectly (e.g., through or together with any affiliate)—

       . . . .

       (B)   Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized

> investment advice to the plan based on the
> particular needs of the plan regarding such matters
> as, among other things, investment policies or
> strategy, overall portfolio composition, or
> diversification of plan investments.

29 C.F.R. § 2510.3–21(c) (Title I); *see* 26 C.F.R. § 54.4975–9(c) (slight modifications for Title II definition). Thus, under the DOL's five-part test, an "investment advice fiduciary" is one who (1) renders advice or makes recommendations as to the investing in, purchasing, or selling securities or other property, (2) on a regular basis, (3) pursuant to a written or other mutual agreement, arrangement, or understanding, (4) which will serve as a primary basis for investment decisions with respect to plan assets, and (5) that such person will render individualized investment advice to the plan. 29 C.F.R. § 2510.3–21(c).

According to the Fifth Circuit, this five-part test "captured the essence of a fiduciary relationship known to the common law as a special relationship of trust and confidence between the fiduciary and his client." *Chamber II*, 885 F.3d at 365. The test further echoed the historic distinction between an "'investment adviser,' who is a fiduciary regulated under the Investment Advisers Act, and a 'broker or dealer' whose advice is 'solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor.'" *Id.* (quoting 15 U.S.C. § 80b-2(11)). Under this test, "a fiduciary relationship would exist only if . . . the adviser's services were furnished 'regularly' and were the 'primary basis' for the client's investment decisions." *Id.* (quoting 29 C.F.R. § 2510.3–21(c)(1)).

The DOL's "five-part test" remained unchanged until 2016.

*ii.   Prohibited Transaction Exemptions*

As discussed above, the Secretary of Labor has the authority to issue exemptions from prohibited transactions penalties for both Title I and Title II plans.[2] ERISA § 408(a), 29 U.S.C. § 1108(a). The Secretary of Labor may grant a PTE if the exemption is "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan." ERISA § 408(a)(1)-(3), 29 U.S.C. § 1108(a)(1)-(3).

For example, in 1984, the DOL issued PTE 84-24. *See* 49 Fed. Reg. 13208 (April 3, 1984). PTE 84-24 exempted certain transactions between Title I or Title II plans and insurance companies/agents/brokers or 1940 Act[3] investment companies, where the seller of the financial product would receive commissions in connection with a plan's purchase of insurance or annuity contracts. *Id.* at 13211. The exemption required covered entities to comply with certain conditions, including that the seller must only act in the ordinary course of business with the plan and give terms that were at least as favorable to the plan as an arm's-length transaction with an unrelated party would be. *Id.*

---

[2] After President Carter's reorganization plan in 1978 and ratification by Congress in 1984, the Secretary of Labor gained the ability to authorize and grant PTEs for both Title I and Title II plans. Act of Oct. 19, 1984, Pub. L. No. 98-532, § 1, 98 Stat. 2705, 2705.

[3] The "1940 Act" refers to the Investment Company Act of 1940.

###### iii.   *The 2005 Deseret Letter Regarding Rollovers*

In 2005, the DOL issued Advisory Opinion 2005-23A in response to an inquiry about whether "a recommendation that a [Title I plan] participant roll over his or her account balance to an [IRA] to take advantage of investment options not available under the plan constitute[s] investment advice with respect to plan assets." Advisory Opinion 2005-23A (December 7, 2005) [hereinafter *Deseret Letter*].[4] This opinion, termed the "Deseret Letter," stated that it was the DOL's view that "merely advising a plan participant to take an otherwise permissible plan distribution, even when that advice is combined with a recommendation as to how the distribution should be invested, <u>does not</u> constitute 'investment advice'" under ERISA because the DOL did "not view a recommendation to take a distribution as advice or a recommendation concerning a particular investment." *Id.* (emphasis added). The Deseret Letter further viewed "recommendations by someone who is not connected with the plan" as insufficient to confer fiduciary status and thus "a person making such recommendations . . . <u>would not</u> engage in an act of self-dealing if he or she advises the participant to roll over" Title I plan assets into a Title II IRA, even if that IRA "will pay management or other investment fees to such person." *Id.* (emphasis added).

This advisory letter remained in effect until June 29, 2020.

---

[4] The full text of the Deseret Letter is also available online at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/2005-23a.

E.  The 2016 Fiduciary Rule and the Fifth Circuit's *Chamber of Commerce* Decision

In 2016, the DOL recognized that the market for retirement savings had "undergone a dramatic shift both in the degree to which retirement investors are responsible for investing their retirement savings and the role played by IRAs and rollovers from ERISA-covered [Title I] Plans." Defs.' Br. 20 (ECF No. 40). The DOL therefore promulgated a package of seven rules—collectively known as the "2016 Fiduciary Rule"—that, among other things, (i) abandoned the five-part test and revised the definition of a fiduciary, (ii) issued two new exemptions, including the Best Interest Contract Exemption (BICE) which required a written contract between the fiduciary and the retirement plan investors with several conditions to receive conflicted income, and (iii) amended existing exemptions to only allow for a PTE for the sale of fixed rate annuity contracts.[5] Defs.' Br. 22.

The Fifth Circuit observed that "[t]he stated purpose of the new rules [was] to regulate in an entirely new way hundreds of thousands of financial service providers and insurance companies in the trillion-dollar markets for ERISA plans and [IRAs]." *Chamber II*, 885 F.3d at 363. However, the Fifth Circuit found that the 2016 Fiduciary Rule was inconsistent with the "touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence" that

---

[5] Fixed rate annuities "guarantee the purchaser will earn a minimum rate of interest during the accumulation phase." *Chamber of Com. v. Hugler* (*Chamber I*), 231 F. Supp. 3d 152, 160 (N.D. Tex. 2017), *rev'd sub nom.* Chamber II, 885 F.3d 360 (5th Cir. 2018).

is incorporated into ERISA's text. *Id.* at 369. Thus, the rule conflicted with ERISA's statutory authorization, and the Fifth Circuit vacated the rule in its entirety.

      F.  The New Interpretation

Notwithstanding the Fifth Circuit's decision, the DOL again sought to regulate the ever-growing rollover market. On July 7, 2020, the DOL issued a proposed new PTE, PTE 2020-02. Proposal PTE 2020-02, 85 Fed. Reg. 40834 (July 7, 2020); *see also* Admin R. 70-101. That same day, the DOL issued technical amendments which implemented the vacatur of the 2016 Fiduciary Rule and re-implemented the five-part test. Proposal PTE 2020-02, 85 Fed. Reg. at 40589. The DOL then considered comments to the proposed exemption and issued its final PTE with a New Interpretation of the now-reinstated five-part test (the "New Interpretation") on December 18, 2020, which took effect on February 16, 2021. PTE 2020-02, 85 Fed. Reg. 82798 (Dec. 18, 2020); *see also* Admin. R. 1-69.

The New Interpretation in PTE 2020-02 made several changes to existing standards by way of its preamble and exemption. First, it withdrew the Deseret Letter and reversed the DOL's position that rollovers do not constitute fiduciary investment advice. PTE 2020-02, 85 Fed. Reg. at 82803-05. The DOL's new position is that "a recommendation to roll assets out of a Title I Plan is advice with respect to moneys or other property of the plan" and that "[a]n investment advice fiduciary making a rollover recommendation would be required to avoid prohibited transactions under Title I and the Code unless an exemption, including this one, applies." *Id.* at 82803.

Second, PTE 2020-02 instituted a "facts and circumstances analysis" where the DOL considers the entirety of the facts and circumstances surrounding rollover recommendations to determine whether a financial professional is acting as an investment advice fiduciary. *Id.* at 82805. This includes an analysis of written statements, marketing materials, and contractual disclaimers in finding if individuals satisfy the five-part test for an investment advice fiduciary. *Id.* at 82805-06.

Third, PTE 2020-02 requires financial institutions to provide written disclosures that acknowledges their fiduciary status, outlines a description of the services to be provided, and discusses any material conflicts of interest. *Id.* at 82820, 82863-64.

Fourth, PTE 2020-02 mandates that financial institutions must conduct an annual review to achieve compliance with the Impartial Conduct Standards (ICS), to implement policies and procedures to comply with the exemption's requirements, and to create an annual report discussing the methodology and results of the review. *Id.* at 82863-64.

And fifth, PTE 2020-02's preamble modifies the interpretation of the 1975 five-part test's prongs. *Id.* at 82805-07. In particular, the DOL now takes the position that while "a single instance of advice to take a distribution from a Title I Plan and roll over assets would fail to meet the regular basis prong," "advice to roll over plan assets can also occur as part of an ongoing relationship or an intended ongoing relationship that an individual enjoys with his or her investment advice

15

provider." *Id.* at 82805. Additionally, the DOL "intends to consider the *reasonable* understanding of each of the parties" to determine whether there was a mutual agreement, arrangement, or understanding that the investment advice will serve as a primary basis for investment decisions. *Id.* at 82805-06.

## II.   Procedural Background

The FACC and several individual "financial professionals"—persons or entities who represent or regularly engage in sales of insurance and other annuity contracts to retirement plans and retirement investors (collectively, the "Individual Plaintiffs" and together with the FACC, "Plaintiffs")—filed their Complaint against the DOL and Secretary of Labor Martin J. Walsh, alleging that the New Interpretation exceeds the DOL's authority under ERISA, and violates the APA as an arbitrary and capricious rule.[6] Compl. 18-20 (ECF No. 1). Plaintiffs state that they are now covered as "investment advice fiduciaries" under the DOL's New Interpretation and are required to comply with a PTE or face penalties and other potential lawsuits for breaches of fiduciary duties. Pls.' App. 4-5, 7, 9, 11-12, 14 (ECF No. 21).

Plaintiffs filed their Motion for Summary Judgment asking the Court to (1) declare the New Interpretation was promulgated by the DOL in excess of its statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. §

---

[6] The Court refers generally to anyone engaging in a rollover transaction as a "retirement investor," unless expressly noted. And the Court refers generally to any party, such as a retirement adviser or insurance broker, engaging with a retirement investor (fiduciary or not) as a "financial professional."

706(2)(C) and is arbitrary, capricious, or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A); (2) vacate and set aside the New Interpretation in its entirety; and (3) permanently enjoin the DOL and all of its officers, employees, and agents from implementing, applying, or taking any action of any type under the New Interpretation anywhere within the DOL's jurisdiction. Pls.' Mot. Summ. J. (ECF No. 19). In response, the DOL filed a Motion to Dismiss due to lack of subject matter jurisdiction, or in the alternative, a Cross-Motion for Summary Judgment. Defs.' Mot. Summ. J. (ECF No. 39). The DOL contends that Plaintiffs lack standing, and the New Interpretation is a reasonable interpretation of ERISA's text and its prior regulations. Defs.' Mot. Summ. J. Plaintiffs then filed a combined Reply in support of their Motion for Summary Judgment and in opposition to the DOL's Motion for Summary Judgment, Resp. (ECF No. 48), and the DOL filed its Reply in support of their Motion to Dismiss and Cross-Motion for Summary Judgment, Reply (ECF No. 55). The Court held oral argument on January 24, 2023. Entry (ECF No. 59).

The next month, Plaintiffs filed a notice of supplemental authority, calling attention to the recent opinion in *American Securities Ass'n v. United States Department of Labor* (*ASA*)*, 2023 WL 1967573 (M.D. Fla. Feb. 13, 2023), where the District Judge vacated a portion of the DOL's response to PTE 2020-02's FAQs as unreasonable under ERISA and the five-part test. Notice Suppl. Auth. 2 (ECF No. 61). The DOL responded that this holding was based on a "mistaken premise" and "should be rejected." Defs.' Resp. Suppl. Auth. 2-3 (ECF No. 63). The DOL

initially appealed the decision in the *ASA* case, but later filed a Joint Stipulation of Voluntary Dismissal of Appeal. Am. Notice Suppl. Auth. (ECF No. 64). In a submission filed in this Court on June 9, 2023, the DOL asserts that—even though it abandoned its appeal—it still contends the *ASA* decision was clearly erroneous in some respects, but that the limited vacatur of the policy under the FAQ at issue "does not undermine the [DOL's] interpretation of the other prongs of the [five-part test]." Defs.' Second Resp. Suppl. Auth. 3-4 (ECF No. 68).

The Motions are now ripe and ready for determination.

## Legal Standards

### I.   Rule 12(b)(1) Motion to Dismiss

"Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The United States Supreme Court has interpreted "cases" and "controversies" to mean those types of disputes traditionally resolved by the judicial process. *Muskrat v. United States*, 219 U.S. 346, 357 (1911). "Standing to sue is part of the common understanding of what it takes to make a justiciable case." *Steel Co.*, 523 U.S. at 102 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The "irreducible constitutional minimum of standing" includes three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). Second, the injury must be causally

connected to the complained-of conduct; in other words, it must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 41-42 (1976)). And third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

"If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). The Court "must presume that a suit lies outside [its] limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001) (citations omitted). The party asserting jurisdiction must allege the jurisdictional basis "affirmatively and distinctly"; it cannot be "established argumentatively or by mere inference." *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988) (citing *Ill. Cent. Gulf R.R. Co. v. Pargas, Inc.*, 706 F.2d 633, 636 & n.2 (5th Cir. 1983)). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that

jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citation omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but in "response to a summary judgment motion, . . . the plaintiff . . . must 'set forth' by affidavit or other evidence 'specific facts,' . . . , which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)).

"If, in a suit 'challenging the legality of government action,' 'the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Texas v. EEOC*, 933 F.3d 433, at 446 (5th Cir. 2019) (quoting *Lujan*, 504 U.S. at 561-62). When a party is the object of a regulation, "[a]n increased regulatory burden [on that party] typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (citing *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 38 F.3d 582 (D.C. Cir. 1994)).

## II.     Motion for Summary Judgment

In a challenge to an agency action under the APA, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "[S]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.*, 2021 WL 1209188, at *2 (N.D. Tex. Mar. 31, 2021) (Kinkeade, J.) (quoting *Delta Talent, LLC v. Wolf*, 448 F. Supp. 3d 644, 650 (W.D. Tex. 2020)). "Thus, in evaluating a case on summary judgment, the court applies the standard of review from the APA." *Id.* (quoting *Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019)).

The APA provides that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions" that the court determines are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

"An agency acts in an arbitrary and capricious manner if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Permian*

*Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 706-07 (W.D. Tex. 2015) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 707 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

In addition, an agency's actions are in excess of its authority, jurisdiction, or limitations if it acts outside of "its statutory mandate." *Elec. Indus. Ass'n Consumer Elecs. Grp. v. FCC*, 636 F.2d 689, 696 (D.C. Cir. 1980). If an agency seeks to regulate areas outside of its jurisdiction, it may be deemed as either in excess of jurisdiction or as an arbitrary and capricious decision. *See Sackett v. EPA*, 143 S. Ct. 1322, 1332, 1341 (2023) (affirming a § 706(2)(A) claim).

## Analysis

### I.   Standing

#### A.  The Individual Plaintiffs have standing to sue.

The DOL challenges the Individual Plaintiffs' standing to sue and asserts that they fail to allege an injury in fact. Defs.' Br. 29-36. Plaintiffs maintain that these individuals have standing because "the New Interpretation has a clear and direct effect on their business decisions, as each of them has confirmed in their declarations." Resp. 9-10.

The Individual Plaintiffs submitted declarations describing the effects that the New Interpretation has on them and their businesses. Pls.' App. 3-17. Each declaration describes that the individual, or principal of a business entity, is a "licensed life insurance and annuity agent in Texas," who engages in the sales of annuities or other investment products. Pls.' App. 3, 6, 8, 10, 13, 15. As a result of the New Interpretation, the Individual Plaintiffs aver, they are subjected to a "new regulatory regime" and have had to either decline offering business services or adopt new and burdensome procedures to comply with the new exemption requirements. Pls.' App. 3, 6, 8, 10, 13, 15. No Individual Plaintiffs would have been considered a fiduciary when recommending annuities or other investment options offered in conjunction with a rollover prior to the DOL's promulgation of the New Interpretation.

First, the DOL posits that the Individual Plaintiffs fail to allege any injury in fact. The DOL does not dispute any of the facts recited in the Individual Plaintiffs' declarations. Rather, the DOL argues that the declarations are "repeated verbatim with no variation" and that they are wholly conclusory, complaining that "Plaintiffs do not explain how the [DOL]'s action will increase the compliance costs already imposed by state action." Defs.' Br. 32. The affidavit evidence, the DOL states, is also not "particularized" to any Individual Plaintiffs and consists of mere speculation. Defs.' Br. 32-33.

But simply because the Individual Plaintiffs face similar—or even identical—harms does not negate each plaintiff's injury. The Individual Plaintiffs are financial

professionals who engage in sales or recommendations of annuity and investment vehicles, which the New Interpretation now targets in the rollover context. PTE 2020-02, 85 Fed. Reg. at 82862-63 (describing coverage of financial institutions and professionals). The DOL itself noted that newly covered firms and professionals would be subject to millions of dollars in new compliance costs. PTE 2020-02, 85 Fed. Reg. at 82851-61. A decline in revenues—particularly here, where the injury represents past forgone business opportunities and higher costs—tied to the challenged agency action can be sufficient to confer standing. *Cf. Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (noting that even a "sufficient likelihood of economic injury" can establish standing). The Individual Plaintiffs are surely the "object[s]" of the New Interpretation, as the New Interpretation "directly influences the business decisions" of each. *See Am. Sec. Ass'n*, 2023 WL 1967573, at *8. Thus, the Individual Plaintiffs have set forth a concrete, particularized injury in fact.

Second, the Individual Plaintiffs' injuries of additional economic and procedural burdens are fairly traceable to the actions of the DOL. The New Interpretation imposes fiduciary status and compliance duties on financial professionals who would not have otherwise met the five-part test under the DOL's 1975 regulation and were excluded under the Deseret Letter. The expanded coverage stems directly from the New Interpretation's different factors in determining when individuals are considered an "investment advice fiduciary" and

24

withdrawal of the Deseret Letter. Thus, the Individual Plaintiffs have set forth an injury that is fairly traceable to the DOL's promulgation of the New Interpretation.

The DOL argues that the Individual Plaintiffs are engaged in self-harm to artificially manufacture standing. Defs.' Br. 34-36. In the DOL's view, the existence of PTE 84-24 gives insurance companies and agents an "alternative" to PTE 2020-02. Defs.' Br. 34-35. Thus, every Individual Plaintiff would lack standing because they do not have to abide solely by PTE 2020-02. Defs.' Br. 36. Stated differently, any Individual Plaintiff who elects to abide by PTE 2020-02, rather than PTE 84-24, is choosing to incur the new compliance costs and resultant alleged decline in revenues.

Self-inflicted injury is generally insufficient to confer standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). "'But-for' causation will not suffice if a plaintiff's injury is self-inflicted, because such an injury is not 'fairly traceable' to the challenged action." *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 668 (S.D. Tex. 2020) (collecting cases). A self-inflicted injury will defeat standing "if 'the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *Id.* (quoting *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) (quoting 13 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 3531.5, at 457 (2d ed. 1984))).

As Plaintiffs point out, they are not challenging PTE 2020-02 itself; rather, they challenge the New Interpretation of the five-part test, as discussed in the preamble and text of PTE 2020-02, and its definition of what relationships will be

considered in determining fiduciary status. Resp. 14 ("Plaintiffs are challenging the New Interpretation, *not* the [PTE 2020-02] itself, under the APA."). As accurately characterized, Plaintiffs complain about the DOL's new promulgated methodology in PTE 2020-02 for evaluating fiduciary status and applying this rule to rollovers generally. If the financial professional is not a fiduciary, it would not need to comply with either PTE 2020-02 or PTE 84-24; such a financial professional would be engaged in only sales conduct outside of ERISA's purview. The Individual Plaintiffs are not "manufacturing" standing by having to comply with PTE 2020-02, instead they are forced to choose between *any* PTE and the corresponding compliance requirements. Accordingly, the Individual Plaintiffs have shown they would be subjected to a new regulatory scheme under the DOL's New Interpretation necessary to show traceability to the DOL's actions.

The DOL's reliance on *Renal Physicians Ass'n v. Department of Health and Human Services* mischaracterizes the extent of that holding. 422 F. Supp. 2d 75 (D.D.C. Mar. 7, 2006). In *Renal Physicians Ass'n*, the plaintiff challenged certain regulatory safe harbor provisions to the Stark Law.[7] *Id.* at 80. The Court found that the plaintiff failed to allege an injury in fact because the "ultimate injury arises not from the safe harbor provision itself, but from regulated third parties." *Id.* at 83. The voluntary nature of safe harbor meant that any ruling from the courts would

---

[7] The Stark Law prohibits physicians from referring Medicare patients to healthcare service providers with which the referring physician has a financial relationship. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901-02 (5th Cir. 1997).

not result in relief to the plaintiff. *Id.* at 82-84 & n.5. Here, under the New Interpretation, the Individual Plaintiffs are subjected to fiduciary duties or they are not—there is no voluntary choice. Further, there is no question that there are no third parties causing harm simply because retirement investors are involved; the financial professionals themselves are subjected to the DOL's interpretive rules.

Third, court action could fairly redress the Individual Plaintiffs' injuries. The APA allows courts to "set aside agency action" that is arbitrary or capricious or in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C). The New Interpretation broadens the range of financial professionals who may be subjected to new fiduciary duties. Vacatur of the New Interpretation would remove any additional compliance burdens or threat of potential litigation. Therefore, the Individual Plaintiffs have set forth that a favorable ruling would redress any injuries.

Accordingly, the Court should determine that the Individual Plaintiffs have standing.

### B. The FACC has associational standing.

The DOL also maintains that the FACC itself failed to sufficiently demonstrate associational standing because the FACC "failed to show that 'its members would otherwise have standing to sue in their own right[,]'" and that the FACC's members have only a "statistical probability that some of those members are threatened with concrete injury." Defs.' Br. 33-34.

An organization may establish "associational standing" by demonstrating the classic elements of standing and "that the interest the association seeks to

27

protect be germane to its purpose." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citing *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). Courts consider three factors to determine whether an organization has associational standing: "(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[8] *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (alteration in original) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977))). "[T]he germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 550 n.2 (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2d Cir. 2006)).

The FACC submitted its CEO's affidavit which states that the association is "dedicated to advancing the interest of independent distribution of guaranteed insurance products through insurance-licensed professionals," the association's members "have had to consider their business practices to be subject to ERISA requirements for the first time and have had to meet the requirements of a [PTE],"

---

[8] The third prong of the associational standing test is prudential. *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 551.

and "many of FACC's members [] have had to adopt new and burdensome procedures and documentation for tax-qualified annuity sales . . . [which] have led to a diminution in tax-qualified annuity sales by FACC's members." Pls.' App. 18-19.

First, the FACC has adequately set forth that their members will suffer a harm due to the increased regulatory burden; a harm that is concrete and particularized to its members that, as discussed, would allow them to sue in their own right. *See Contender Farms, L.L.P.*, 779 F.3d at 266. Second, the FACC meets the "undemanding" germaneness requirement as the association seeks to advance the interests of insurance-licensed professionals, all of whom are directly impacted by the DOL's New Interpretation. And third, nothing in this lawsuit requires the presence of individual members of the FACC to adjudicate the member's interests because the FACC does not seek damages; rather, it seeks declaratory and injunctive relief. *See Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, 2023 WL 2043149, at *6 (D.D.C. Feb. 16, 2023) (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 544, 554 (1996) (explaining that, generally, association standing is inappropriate "when an organization seeks damages on behalf of its members," but not when it seeks injunctive or declaratory relief)).

Therefore, the Court should determine that the FACC satisfies the associational standing requirements.

## II.  Judicial Review

A court considering a challenge to agency action must ensure that the agency action at issue is reviewable under the APA. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022). As a jurisdictional question, "the Court must consider whether [a regulation] is reviewable under the APA to ensure that it does 'not exceed the scope of [the Court's] jurisdiction.'" *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). To be reviewable, a court must inquire about whether (1) the action is not a final agency action, (2) there are any statutory bars to judicial review, (3) the agency action is committed to agency discretion by law, and (4) the injury alleged is outside the "zones of interests" for which the statutes exist to protect. *See Texas v. United States*, 606 F. Supp. 3d 437, 468-86 (S.D. Tex. June 10, 2022). If the answer to any of these inquiries is in the affirmative, the action is not reviewable under the APA.

The DOL does not appear to challenge the judicial reviewability of Plaintiffs' claims on any particular ground. And a single, cursory assertion that rulemaking on *other* amendments to PTE 84-24 is not a "final agency action" should not alter the Court's analysis regarding PTE 2020-02, its preamble, or the New Interpretation. Defs.' Br. 36. The Fifth Circuit reviewed a similar agency action in *Chamber II*, *see* 885 F.3d at 368, and the Court discerns no reason why the New Interpretation is unreviewable here. Indeed, this Court cannot ignore the Fifth Circuit's *Chamber of Commerce* opinion, as it is controlling precedent with respect to the analysis required here.

### III.    APA Review

According to Plaintiffs, the New Interpretation must be vacated because it "perpetuates the original sin of the 2016 Fiduciary Rule by completely ignoring the historically recognized distinction between fiduciary investment advisers and financial salespeople" and neglects incorporating the "special relationship of trust and confidence" into the determination of whether financial professionals are acting as investment advice fiduciaries. Pls.' Br. 17 (ECF No. 20). This failure, Plaintiffs argue, is evident because the New Interpretation renders different requirements of the five-part test "meaningless" and "stray[s] from Congress' intent in a fundamental way." Pls.' Br. 18, 19. Further, Plaintiffs contend, the blurring of the distinction between trusted adviser and ordinary salespeople leads to an expanded definition of fiduciary that exceeds the statutory grant of authority under ERISA. The DOL disputes Plaintiffs' characterization of its action and asserts that the New Interpretation aligns with the plain meaning of ERISA because it carefully crafted the New Interpretation to only encompass those relationships built on trust and confidence; that is, those relationships that are fiduciary in nature. Defs.' Br. 45 (ECF No. 40).

The New Interpretation is only valid "if it is authorized by ERISA Titles I and II." *Chamber II*, 885 F.3d at 369. "A regulator's authority is constrained by the authority that Congress delegated it by statute." *Id.* The APA provides that "[t]o the extent necessary to a decision and when presented, . . . [t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to

be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Also, under current Fifth Circuit precedent, the *Chevron* Doctrine applies when reviewing agency action under the APA.[9] *See Chamber II*, 885 F.3d at 369; *Texas v. Becerra*, 575 F. Supp. 3d 701, 714 (N.D. Tex. Dec. 15, 2021).

Courts reviewing an agency action under *Chevron* engage in a two-step process. First, the Court must begin by reviewing "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously express intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1994). If Congress has not "directly addressed the precise question at issue . . . [and] if the statute is silent or ambiguous," then the Court must review "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

### A. The Major Questions Doctrine does not preclude review.

In *Chamber of Commerce*, the Fifth Circuit suggested that the 2016 Fiduciary Rule's departure from the common law's definition of fiduciary was a "novel interpretation" that may be subject to the Major Questions Doctrine.

---

[9] While *Chevron* review is apparently out of favor, the Supreme Court has not expressly overruled the deferential standard, and the Court should consider *Chevron* here. Furthermore, although the precise contours of a challenge under either 5 U.S.C. § 706(2)(A) or § 706(2)(C) are unclear, the Supreme Court has found that an agency acts arbitrarily and capriciously when it acts outside its jurisdiction. *Cf. Sackett*, 143 S. Ct. 1322 (2023) (analyzing jurisdiction on a 5 U.S.C. § 706(2)(A) claim).

*Chamber II*, 885 F.3d at 380-81. And here, Plaintiffs argue that the Major Questions Doctrine should preclude any meaningful analysis of the New Interpretation. Pls.' Br. 40-47. They argue they are entitled to relief because the DOL is using the New Interpretation "to arrogate to itself significant regulatory power over the IRA marketplace that Congress has not granted it." Pls.' Br. 43. The DOL contends that the Major Questions Doctrine has no application to this case. Defs.' Br. 51.

"Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J. dissenting from denial of rehearing en banc)). The Major Questions Doctrine provides that "in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent" cautions courts from "'read[ing] into ambiguous statutory text' the delegation claimed to be lurking there." *Id.* (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). When determining whether the Major Questions Doctrine applies, the Fifth Circuit generally considers factors such as: (1) whether the authority is from an "old statute employed in a novel manner," (2) the economic impact of the regulation, (3) whether the regulation lies outside of the agency's "core competencies," and (4) whether the regulation involves a matter of political significance. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 617-18 (5th Cir. 2021). When analyzing these factors here, they weigh against application of the

Major Questions Doctrine. The Middle District of Florida did not invoke the Doctrine in the *ASA* case to avoid analyzing the policy referenced in FAQ 7. And the New Interpretation does not rise to the level of the expansive power the DOL sought to exert through the 2016 Fiduciary Rule.

First, the authority that the DOL seeks to exert here is not novel or based in any "ancillary" provision in ERISA. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Congress granted the DOL broad authority to issue technical terms relating to fiduciary status. ERISA § 505, 29 U.S.C. § 1135; ERISA § 2(a), 29 U.S.C. § 1001(a). Here, the challenged agency action includes the DOL's restoration of the previous five-part test, withdrawal of the Deseret Letter, and modification of the factors that the DOL will review in determining fiduciary status. The DOL's actions fall within the broad grant of Congressional authorization, and it is similar to previous actions such as the DOL's initial 1975 regulation and clarifying opinion in the Deseret Letter.

Second, the economic impact of the New Interpretation is unclear. While the parties note that the rollover market cumulatively approached $2.4 trillion in 2020, Pls.' Br. 40, Defs.' Br. 23, the economic *impact* looks primarily to the costs imposed on individuals covered by the statute—not simply the total amount of assets affected. *See BST Holdings, L.L.C.*, 17 F.4th at 617 (holding that the Major Questions Doctrine applies when compliance costs exceed $3 billion); *Brown v.*

34

*U.S. Dep't of Educ.*, 2022 WL 16858525, at *11 (N.D. Tex. Nov. 10, 2022) (holding major questions doctrine applies when compliance costs exceed $400 billion); *Biden v. Nebraska*, 600 U.S. ___ (2023) (suggesting the major questions doctrine applies in a case "to release 43 million borrowers from their obligations to repay $430 billion in student loans"), 2023 WL 4277210. ERISA necessarily involves substantial assets, as Americans save billions of dollars annually in ERISA plans. If absolute asset values that are regulated were the dispositive factor for the application of the Major Questions Doctrine, the doctrine would likely apply to *any* DOL regulation under ERISA solely due to the nature of the retirement industry. Reviewing the compliance costs as the appropriate metric, the DOL projects that costs for compliance with the New Interpretation would reach approximately $80 million annually, PTE 2020-02, 85 Fed. Reg. at 82856, which is far short of the "vast economic . . . significance" to support application of the Major Questions Doctrine. *BST Holdings, L.L.C.*, 17 F.4th at 617. Thus, this factor weighs against application of the Major Questions Doctrine.

Third, the New Interpretation is directly within the core competencies of the DOL. Since ERISA's enactment, the DOL has been expressly granted the authority to issue PTEs for Title I plans; and, in 1984, the President and Congress granted the DOL the ability to issue PTEs for Title II plans. 29 U.S.C. § 1135; Act of Oct. 19, 1984, Pub. L. No. 98-532, § 1, 98 Stat. 2705, 2705. The DOL also has express authority to publish exemptions for Titles I and II and to define "accounting, technical and trade terms" used in ERISA. 29 U.S.C. § 1135. With its expertise in

defining those terms and standards outlining fiduciary status regarding ERISA plans, the DOL is well-suited to address issues relating to defining certain characteristics of fiduciary status.

Fourth, the issue is not one of vast political significance. The New Interpretation neither endeavors to transform constitutional rights nor does it involve an entirely new statutory scheme. The New Interpretation is instead an attempt to modify an existing regulation—the five-part test—that has been in place since 1975. *Cf. ASA*, 2023 WL 1967573, at *12-13, 19-20 (holding that the policy behind an FAQ related to the New Interpretation is an "interpretive rule"). Neither party points to any major political question that may arise in the context of the New Interpretation, and the Court should decline to find one that the parties have not identified.

### B.  The withdrawal of the Deseret Letter is not procedurally improper.

Plaintiffs also seek vacatur of the New Interpretation's withdrawal of the Deseret Letter. Compl. 16; Pls.' Br. 39. They contend that the withdrawal "disavow[s]" the five-part test of any connection to the common law meaning of a fiduciary. Pls.' Br. 36. The effects of the withdrawal are analyzed below, but the procedural nature of the withdrawal is not impermissible.

The fact that an agency's interpretation of terms "does not . . . lead [courts] to conclude that no deference should be accorded the agency's interpretation of the statute." *Chevron, U.S.A., Inc.*, 467 U.S. at 863. "An initial agency interpretation is not instantly carved in stone." *Id.* "When an agency adopts a materially changed

interpretation of a statute, it must in addition provide a 'reasoned analysis' supporting its decision to revise its interpretation." *Ala. Educ. Ass'n v. Chao*, 455 F.3d 386, 392 (D.C. Cir. 2006). But "the Supreme Court has long recognized that an agency interpretation that 'conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.'" *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023) (quoting *Immigr. & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987)), *appeal docketed*, No. 22-976.

PTE 2020-02 fully explained the DOL's reasoning for the withdrawal of the Deseret Letter, 85 Fed. Reg. at 82803-04. The exemption notes that "[a] recommendation to roll assets out of a Title I Plan is necessarily a recommendation to liquidate or transfer the plan's property interest in the affected assets and the participant's associated property interest in plan investments." *Id.* While the New Interpretation is a complete reversal from the position represented by the Deseret Letter, the withdrawal of the Desert Letter itself does not modify or change the five-part test; rather, it reinterprets the contexts where the five-part test will apply. The DOL may adopt or withdraw advisory opinions in order to effectuate ERISA's mandate to the Secretary of Labor to promulgate exemptions—and, here, the DOL has provided a lengthy and reasoned opinion for doing so. *See Tex. Off. of Pub. Util. Couns. v. FCC.*, 265 F.3d 313, 322 (5th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 56) ("While the agency is entitled to change its views on

the acceptability of [a prior policy], it is obligated to explain its reasons for doing so.").

C.  The New Interpretation generally comports with ERISA and the common law meaning of a fiduciary.

Plaintiffs argue that the DOL exceeded its authorization under ERISA in promulgating the New Interpretation. Pls.' Br. 15-31. It argues that the New Interpretation "still operates to sweep within its reach financial salespeople, such as insurance agents and stockbrokers, who inarguably are ***not*** fiduciaries at common law." Pls.' Br. 17. The DOL counters that the New Interpretation is "in line with the Fifth Circuit's interpretation of ERISA's text" and consistent with the *sine qua non* of a fiduciary relationship—that of trust and confidence between parties. Defs.' Br. 46-51.

ERISA grants the DOL authority to regulate a fiduciary's conduct when that fiduciary engages with assets of various retirement plans. As stated previously, ERISA provides that, under both Title I and Title II, an individual is a fiduciary who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) (Title I); 26 U.S.C. § 4975(e)(3)(B) (Title II). In *Chamber of Commerce*, the Fifth Circuit held that when Congress enacted ERISA, "'Congress intend[ed] to incorporate the well-settled meaning' of fiduciary" that encompasses the "relationship of trust and confidence." *Chamber II*, 885 F.3d at 371 (citing *United States v. Castleman*, 572

U.S. 157, 162 (2014)). ERISA's fiduciary definitions are "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Through this lens, the Fifth Circuit held in the *Chamber of Commerce* decision that the term "fiduciary" necessarily encompasses the common law definition which "turns on the existence of a relationship of trust and confidence between the fiduciary and the client." *Chamber II*, 885 F.3d at 370. Thus, the New Interpretation is only valid if it properly distinguishes between fiduciaries, who engage in relationships where a retirement investor places their faith in the financial professional to make prudent decisions, and mere "stockbrokers and insurance agents," who do not. *Id.* at 372.

Plaintiffs fault the DOL for "fail[ing] to even mention . . . the existence of a special relationship of trust and confidence between adviser and client." Pls.' Br. 17. Plaintiffs contend the New Interpretation treats salespeople and fiduciaries alike. They suggest that because the DOL *might* find some salespeople to be fiduciaries, the New Interpretation exceeds the authority of the DOL. Pls.' Br. 17. Therefore, in Plaintiffs' view, the DOL's attempt at regulating financial professionals engaging in rollover transactions is in excess of the DOL's authority and an arbitrary and capricious interpretation of the five-part test.

But ERISA does not expressly mention "trust and confidence" either. Rather, those words are implicit when referring to a fiduciary in the context of ERISA. *See Chamber II*, 885 F.3d at 369-71. Even so, "the question of who is a fiduciary can be a vexatious one." Ronald J. Cooke, 2 ERISA Practice & Procedure § 6:2 (Dec.

2022). However, simply because a question of fiduciary status is "vexatious" does not mean that the term is ambiguous, and no deference to the agency is necessary when common law can inform the meaning of a fiduciary as used by Congress in enacting ERISA. In reviewing the common law of trusts, "fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries." *In re Luna*, 406 F.3d 1192, 1204 (10th Cir. 2005) (citing *Pegram v. Herdrich*, 530 U.S. 211, 231 (citing G. Bogert & G. Bogert, Law of Trusts and Trustees §§ 551, 741-747, 751-775, 781-799 (2d ed. 1980))). "Trustees buy, sell, and lease investment property, lend and borrow, and do other things to conserve and nurture assets." *Pegram*, 530 U.S. at 231. "[T]he common law trustee's most defining concern historically has been the payment of money in the interest of the beneficiary." *Id.*

Further, ERISA expressly has limitations included, as individuals are fiduciaries only "to the extent" they "render[] investment advice." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). "ERISA . . . require[s] . . . that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225 (2000) (first citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-44 (1999); and then citing *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)). If a financial professional, through the lens of the facts and circumstances surrounding the rollover recommendation, crosses the line from mere selling of investment products to offering investment advice, the DOL (or, potentially, private individuals) will hold the professional accountable for

their recommendations but only to the extent the professional acts in a manner of trust and confidence. ERISA's text combined with common law understandings unambiguously demonstrates what Congress intended to cover as an investment advice fiduciary.

A financial professional who works regularly with a specific plan and cultivates a relationship of trust and confidence with retirement investors may be acting as a fiduciary in light of the common law of trust's defining traits. Indeed, the DOL now focuses on the relationship between the two parties—the key inquiry into fiduciary status—irrespective of whether that transaction involves a rollover or not. Utilizing facts and circumstances to determine fiduciary status is not a novel concept. Courts routinely review the underlying record to determine whether a fiduciary relationship is established, regardless of whether one party attempts to contract out their fiduciary status. *See, e.g.*, *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 299 (3d Cir. 2014); *Hamilton v. Carell*, 243 F.3d 992, 1000 (6th Cir. 2001). A categorical exclusion for all financial professionals who engage in rollover transactions is not warranted through ERISA's statutory text—if a financial professional functions as a fiduciary, it must conduct themselves in compliance with ERISA.

Unlike its position in the *Chamber of Commerce* case, the DOL here rejects the notion that the New Interpretation includes financial professionals and transactions that the DOL does not believe Congress intended to cover as a fiduciary. Defs.' Br. 50-51. Rather, the facts and circumstances surrounding a

rollover will cover "persons whose actions affect the amount of benefits retirement plan participants will receive." Defs.' Br. 51 (first quoting *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993); and then citing *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 969 (5th Cir. 1981)).

As to the regular basis requirement and the New Interpretation's consistency with ERISA, the Fifth Circuit held that investment advice procured "*on a fee basis*" generally encompasses "a substantial, ongoing relationship between adviser and client." *Chamber II*, 885 F.3d at 375 (emphasis added). But that opinion did not foreclose that Title I duties may reach those fiduciaries who, as aligned with Title I's text, render advice, even for the first time, "*for* a fee or other compensation." ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). And, as another court has noted, "[n]othing in the phrase 'renders investment advice' suggests that the statute applies only to advice provided 'on a regular basis.'" *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 23 (D.D.C. 2016). Indeed, ERISA expressly authorizes the DOL to impose fiduciary duties on those who provide recommendations concerning Title I assets, if that investment advice is given "for a fee or other compensation." While a regular, ongoing relationship may be indicative of one based in confidence and trust, the length of the relationship itself is not dispositive of whether the recommendation is investment advice.[10]

---

[10] The Court emphasizes that the five-part test requires a "regular basis" but that ERISA itself does not.

First-time advice may be sufficient to confer fiduciary status and is consistent with ERISA.[11] Indeed, courts analyzing the "regular basis" aspect of fiduciary status do so by referencing the DOL's regulation, not solely ERISA, when determining a fiduciary relationship did not exist because advice was given on a irregular basis. *See, e.g.*, *Schlogel v. Boswell*, 994 F.2d 266, 272 (5th Cir. 1993); *Useden v. Acker*, 947 F.2d 1563, 1578 (11th Cir. 1991); *Am. Fed. of Unions Loc. 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988). ERISA does not include a regular basis requirement. The New Interpretation keeps the regular basis requirement of the five-part test, but it now also covers rollover transactions if there is a reasonable expectation of ongoing advice from financial professionals to retirement investors, and other portions of the five-part test are met. Accordingly, the New Interpretation appears consistent with ERISA insofar as it covers rollover relationships of trust and confidence.

> i. *The New Interpretation impermissibly considers Title II plan advice when determining Title I fiduciary status and conflates the distinction of fiduciary <u>status</u> outlined in ERISA between Title I and Title II plans.*

Plaintiffs argue that "[m]erely advising an employee to withdraw funds from a 401k plan is not, in the usual meaning of such words, advice regarding the investment of plan assets." Pls.' Br. 36. Thus, "investment advice with respect to funds in an IRA that have been rolled over from an ERISA Title I plan are obviously

---

[11] The Court emphasizes that the analysis for consistency with ERISA and consistency with the DOL's regulations is distinct.

no longer assets of the plan." Pls.' Br. 36. The DOL argues that it has authority to consider actions taken over any ERISA plan, because the definitions of fiduciaries are identical between Title I and Title II. Defs.' Br. 57.

ERISA's text defines Title I and Title II "plans" distinctly. *See supra* Part I.A. By utilizing these separate definitions, Congress indicated how each Title's plans should be treated differently due to the nature of the relationship between financial professionals and retirement investors in Title I and Title II plans. As the New Interpretation purports to consider recommendations as to Title II plans when determining Title I fiduciary status, it conflicts with ERISA. Therefore, it is an arbitrary and capricious agency action in violation of the APA.

This Title I–Title II distinction is supported by the statute's text defining an investment advice fiduciary, which provides that a person is a fiduciary if they render advice with regard to "any moneys or other property *of such plan*." ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). As the Fifth Circuit did in the *Chamber of Commerce* decision, this provision is read in conjunction with § 3(21)(A)(i) and § 3(21)(A)(iii) which also focus on management authority or discretionary authority "of such plan." This is significant because allowing Title II advice to be considered for determining Title I relationships would dilute these provisions and encompass financial professionals who may only have fiduciary status for one ERISA-protected plan, but not a separate one. Congress carefully distinguished between the penalties fiduciaries faced for engaging in prohibited transactions for Title I and Title II plans. Allowing the New Interpretation to stand

as a whole would give the DOL an ability to impose Title I fiduciary status on unsuspecting financial professionals who do not cultivate relationships of trust and confidence with that same Title I plan. Once Title I assets are severed from the Title I plan, any consideration of future relationships or advice given is an impermissible application that blurs this Title I–Title II delineation set out in ERISA.

Courts have carefully scrutinized differences in Title I and Title II provisions and the usage of language within each Title's authorizations. *See, e.g.*, *Chamber II*, 885 F.3d at 381; *Musmeci v. Schwegmann Giant Super Mkts., Inc.*, 332 F.3d 339, 345 (5th Cir. 2003); *cf. Flahertys Arden Bowl, Inc. v. Comm'r*, 115 T.C. 269, 272-73 (2000). For instance, in *Musmeci*, the Fifth Circuit noted that Title I was drafted "in concert" with Title II and that "overlapping terms should be consistently defined in both." *Musmeci*, 332 F.3d at 345. Here, "plan" is defined differently in Title I and Title II and cannot be said to be an ambiguous "overlapping term." In the same vein, "fiduciary" may be defined identically across each Title, but the DOL does not suggest that "plan" should be interpreted the same across each Title in light of the clear statutory directive.

Plaintiffs point out another district court that drew a clear line between Title I and Title II fiduciary status requirements, holding that "the threshold question is . . . whether that [defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Carfora v. Teachers Ins. Annuity Ass'n of Am.*, 2022 WL 4538213, at *5 (S.D.N.Y.

Sept. 27, 2022) (alteration in original). The *Carfora* court noted that a recordkeeper/investment manager was not a fiduciary because the "investment advice provision of ERISA states that 'a person is a fiduciary *with respect to a plan* to the extent . . . he renders investment advice for a fee.'" *Id.* at *13 (quoting ERISA, § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii)). This inquiry was properly understood "in the context of the *plan's* investment decisions." *Id.* This argument is persuasive in that it emphasizes the textual restrictions ERISA places on the DOL to address competing interests in the marketplace. *See Donovan v. Cunningham*, 716 F.2d 1455, 1467 (noting that, by enacting ERISA, "Congress was aware of, and has struck a balance between" competing policy interests of employees and employers).

The DOL focuses on the Supreme Court's holding in *LaRue v. DeWolff, Boberg & Associates, Inc.* as support for its position. 552 U.S. 248 (2008). In *LaRue*, the Supreme Court authorized a suit by an individual participant in a defined contribution plan under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), whose individual account was depleted due to the employer's failure to direct investments according to the participant's choices. *LaRue*, 552 U.S. at 250-51. The Supreme Court found that individual accounts in Title I plans were still considered assets of the plan, such that participants could bring claims for breaches of fiduciary duties to recover losses caused by the fiduciary's failures. *Id.* at 252-56. This case is inapposite. *LaRue* dealt with claims reaching assets of individual accounts that are wholly encompassed in Title I plans, while the New Interpretation now reviews relationships that span Title I and Title II plan assets to determine fiduciary status.

46

The New Interpretation allows for the consideration of fiduciary relationships with both Title I and Title II plans, which is contrary to the text and ERISA's legal precedents. Accordingly, the New Interpretation conflicts with ERISA, and the portions of the New Interpretation that allow for consideration of relationships that span more than one ERISA plan should be vacated.

> ii.   *Aside from the problems with fiduciary* <u>*status*</u>*, the New Interpretation does not conflate the ERISA* <u>*duties*</u> *imposed on fiduciaries regarding Title I and Title II plans.*

Plaintiffs also argue that the New Interpretation "significantly erodes" the demarcation of duties that apply to Title I and Title II assets. Pls.' Br. 35. The assets that are rolled over from Title I to Title II plans, Plaintiffs state, are "no longer assets of the plan," and that the withdrawal of the Deseret Letter is a "radical[] new position that is inconsistent with the five-part test and ERISA." Pls.' Br. 36-37. The DOL maintains that the recommendation to roll assets out of a plan is a recommendation "to liquidate or transfer the plan's property interest" and that "the Deseret Letter arbitrarily drew a line between fiduciary advice provided to an ERISA plan and advice to rollover assets that comprise part of that plan." Defs.' Br. 63-64.

As discussed, ERISA provides that a person is an investment advice fiduciary who "renders investment advice for a fee . . . with respect to any moneys or other property of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Indeed, the preamble to PTE 2020-02 outlines the demarcation between duties of Title I and Title II fiduciaries:

> a broker-dealer who satisfies the five-part test with respect to a
> Retirement Investor in advising on assets in a Title I Plan, advises
> the Retirement Investor to move his or her assets from the plan to an IRA,
> and receives any fees or compensation incident to distributing those
> assets, will be a fiduciary subject to Title I, including section 404, with
> respect to the advice regarding the rollover. Following the rollover, the
> broker-dealer will be a fiduciary under the Code subject to the
> prohibited transaction provisions in Code section 4975.

PTE 2020-02, 85 Fed. Reg. at 82805. Once assets are removed from the plan through a rollover, they will no longer be subjected to breaches of Title I fiduciary duties, only Title II excise tax penalties. The DOL recognized the contours of Title I and Title II and drafted its regulation in an attempt to carefully delineate between the two.

Other courts have noted that Title I fiduciary duties may extend to the time a party withdraws assets from the Title I Plan. *See Beeson v. Fireman's Fund Ins. Co.*, 2009 WL 2761469, at *5 (N.D. Cal. Aug. 31, 2009) (holding breach of fiduciary duty claims regarding assets withdrawn from a Title I plan are not cognizable because the assets were no longer part of the Title I plan). The New Interpretation follows this distinction as it only imposes Title I duties on Title I assets up until the point they are withdrawn from the Title I plan, at which point the DOL recognizes that the assets are only subject to Title II duties and penalties.

The parties each analyze this perceived conflation of duties in terms of what the DOL may consider in the "regular basis" prong or other portions of the five-part test, and the Court analyzes that in comparison to the DOL's five-part test, *see infra* Part III.D. But these arguments are irrelevant for determining whether the

48

New Interpretation is consistent with ERISA, instead relating to whether the New Interpretation is consistent with the DOL's own regulations. Indeed, Plaintiffs and the DOL spend a majority of their briefing discussing whether the New Interpretation aligns with the five-part test, arguing that if the New Interpretation oversteps the bounds of the five-part test, such action violates ERISA. But this approach would ossify the DOL's enforcement into the five-part test's requirements and the Deseret Letter's position, essentially foreclosing any coverage of fiduciary conduct regarding rollovers.

Accordingly, because PTE 2020-02 and its preamble do not impose fiduciary duties beyond that authorized by each Title under ERISA, the New Interpretation does not conflate the duties imposed on the specific relationships in an unlawful manner.

### iii.   The New Interpretation does not impermissibly equate sales commissions with advice for a fee.

Plaintiffs also argue that the New Interpretation "obliterate[s] [] the historical divide between commissioned salespeople and fee-based advisers." Pls.' Br. 34. Due to the "watered-down version" of the 1975 five-part test stemming from the New Interpretation, Plaintiffs contend that the consideration of commissions as investment advice for a fee essentially covers all sales conduct. Resp. 23. The DOL posits that Plaintiffs are seeking "categorical exclusions" for brokers and insurance agents who receive commission-based compensation, Defs.' Reply 9,

and that commissions have consistently been deemed as a "fee" within the scope of ERISA. Defs.' Br. 61-62.

The Fifth Circuit in its *Chamber of Commerce* decision cited approvingly of the DOL's understanding in 1975 of what compensation structures constitute advice for a fee. *Chamber II*, 885 F.3d at 373-74. It noted that, under the 1975 definition of an "investment advice fiduciary," the DOL found that fees in conjunction with investment advice "'may include' brokerage commissions, but only if the broker-dealer who earned the commission otherwise satisfied the [1975] regulation's requirements" of the five-part test. *Id.* at 373 (quoting Definition of the Term "Fiduciary," 40 Fed Reg. at 50842-43 (Oct. 31, 1975)).

The DOL's New Interpretation does not stray from previous, approved iterations of the five-part test. The 1975 regulation expressly stated that fees for advice "may include, for example, brokerage commissions, mutual fund sales commissions, and insurance sales commissions"—if investment advice is rendered. 40 Fed. Reg. at 50842; *see* 29 C.F.R. § 2510.3–21. This reasoning aligns with the full text of ERISA, which holds that a party is a fiduciary if it "renders investment advice for a fee *or other compensation, direct or indirect*." ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). The expansive choice of investment advice "for other compensation" indicates an intent to cover any transaction where the financial professional may receive conflicted income if they are acting as a trusted adviser.

Plaintiffs challenge the DOL's position with scattered citations to the Fifth Circuit's *Chamber of Commerce* decision and argue that the New Interpretation "carries forward the same misguided approach" where salespeople and insurance brokers have the "responsibility to 'render investment advice.'" Pls.' Br. 31-34; *see* Resp. 23-24. Other courts hold that commissions may be fees or other compensation if they are both given for investment advice and come from the plan assets to the purported fiduciary. *See, e.g.*, *Am. Fed. of Unions Loc. 102 Health & Welfare Fund*, 841 F.2d at 664; *Consol. Beef Indus., Inc. v. N.Y. Life Ins. Co.*, 949 F.2d 960, 965 (8th Cir. 1991). *But see Reich v. McManus*, 883 F. Supp. 1144, 1150-51 (N.D. Ill. 1995) (holding that defendants "were not paid any sort of fee or compensation by the Plans for their services; rather, they were paid commissions on the sales made to their clients"). While the *Reich* court seemingly excludes any commissions from "investment advice for a fee or other compensation," it expressly noted that the commissions were paid on "sales," not for investment advice. *Reich*, 883 F. Supp. at 1150 (noting that defendants were "paid commissions on the *sales* made to their clients" (emphasis added)).

This outcome aligns with ERISA's text and this Circuit's precedent which holds that the key inquiry is whether some form of compensation was given for *advice*, not mere *sales*. Consistent with this position, the DOL does not categorically cover nor exclude specific financial professionals based on their fee structure, instead looking to the relationship and parties' understandings of the reasons for the compensation to determine fiduciary status to determine if a fee

was given for advice. The DOL's New Interpretation does not overstep in considering various types of fee structures in determining fiduciary status of investment advice providers.

### D. The New Interpretation's consistency with DOL regulations

Even assuming that the New Interpretation is consistent with ERISA's authorization to the DOL, the DOL—likely in an attempt to meet the Fifth Circuit's holding in *Chamber II*—reinstated the five-part test but modified the interpretation of the test's prongs and expressly made the test applicable to rollover transactions. In view of these modifications, the New Interpretation conflicts with the DOL's reinstated regulation.

Strictly speaking, "an agency is bound by its own regulations." *Panhandle E. Pipe Line Co. v. Fed. Energy Regul. Comm'n*, 613 F.2d 1120, 1135 (D.C. Cir. 1979). But if an agency regulation is ambiguous, "[c]ourts sometimes extend *Auer* deference to 'agencies' reasonable readings of genuinely ambiguous regulations." *All. for Hippocratic Med. v. FDA*, 2023 WL 2825871, at *20 (N.D. Tex. Apr. 7, 2023) (subsequent history omitted). An agency's interpretation of an ambiguous regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997). "[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction" to analyze whether a regulation is, in fact, ambiguous. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Courts are directed to "'carefully consider[]' the text, structure, history, and purpose of a regulation, in all the ways it would if

it had no agency to fall back on." *Id. Auer* deference presumes that "the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 362 (5th Cir. 2021).

The DOL argues that "regular basis" and "mutual agreement" requirements of the five-part test in its own regulation are ambiguous, and thus the New Interpretation is entitled to *Auer* deference and can be read as reasonable under this deferential standard. Defs.' Br. 70-71; Reply 28-30. Plaintiffs state that the 1975 five-part test is not ambiguous and "appropriately and accurately 'captured the essence of a fiduciary relationship' as it was understood at common law and incorporated into ERISA." Resp. 48.

> i.   *The New Interpretation is not entitled to deference in the DOL's interpretation of the "regular basis" prong and conflicts with the agency's own interpretation of the "regular basis" prong of the 1975 Five-Part Regulation.*

Plaintiffs assert that the New Interpretation "virtually eliminate[s] the regular basis prong" of the five-part test. Pls.' Br. 19. They argue that failing to recognize a regular basis for investment advice would encompass mere sales conduct within a fiduciary relationship, contrary to Congressional intent. Pls.' Br. 22-24. The DOL maintains that it can review whether there is an expectation of an ongoing relationship, even after the assets have been severed from the Title I plan. Defs.' Br. 53-58.

As to the "regular basis" prong of the five-part test, the 1975 regulation requires that a person "renders any advice . . . on a regular basis to the plan." 29 C.F.R. § 2510.3–21(c)(ii)(B). The unambiguous text provides that advice must be provided on a regular basis *to the plan*, with "plan" being defined by the respective Titles. A Title I plan is a "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both[,]" ERISA § 3(3), 29 U.S.C. § 1002(3), whereas a Title II plan is "an [IRA] described in section 408(a)." 26 U.S.C. § 4975(e)(1)(B). The five-part test requires that—as aligned with the essence of a fiduciary relationship of trust and confidence—the financial professional must have a substantial, ongoing relationship regarding the specific plan. As reflected in Title I, the additional duties imposed on fiduciaries reflect Congressional intent to protect against conflicted transactions regarding employer-provided benefit plans, *see* ERISA § 404(a), 29 U.S.C. § 1104(a), as compared to the different circumstances of relationships between financial professionals and investors in Title II plans. The precise contours of what constitutes a "regular basis to the plan" need not be defined here, but the text and structure of the five-part test must mean advice given more than once to a specific Title I or Title II plan. *See Schloegel v. Boswell*, 994 F.2d 266, 273 (5th Cir. 1993) (noting that "only a few instances" of "investment-type advice" to a plan is insufficient to meet the regular basis requirement). The DOL's interpretation of its own regulation is in conflict with its own regulation.

The New Interpretation provides that fiduciary "advice to roll over Plan assets can occur as part of . . . an anticipated ongoing relationship that an individual enjoys with his or her advice provider." PTE 2020-02, 85 Fed. Reg. at 82805. This by itself may be permissible as the DOL posits that first time advice may be the beginning of a relationship, but the DOL's regulation provides that advice must be given "on a regular basis *to the plan*." 29 C.F.R. § 2510.3–21(c)(ii)(B) (emphasis added). As noted above, the text and structure of ERISA supports a reading where the advice relationship must be determined by only looking to whether a fiduciary relationship exists in regard to a specific plan. *See Carfora*, 2022 WL 4538213, at *13 ("'[R]egular basis' is meant to be understood in the context of the *plan's* investment decisions."); *Am. Sec. Ass'n*, 2023 WL 1967573, at *16 (citing *Carfora*, 2022 WL 4538213, at *13) (same).

Included in the New Interpretation is the proposition that:

> advice to roll assets out of a Title I Plan into an IRA where the investment advice provider has not previously provided advice but will be regularly giving advice regarding the IRA in the course of a more lengthy financial relationship would be the start of an advice relationship that satisfies the regular basis prong.

PTE 2020-02, 85 Fed. Reg. at 82805. Indeed, the DOL attempts to salvage a broad reading by stating that it has "considered and rejected" Plaintiffs' argument that all stockbrokers or insurance agents want to cultivate a relationship which would meet the DOL's regular basis prong. Defs.' Br. 54. But the DOL cannot justify its position when its own regulation (and ERISA) requires advice to be given on a

regular basis to "the" plan and may not consider IRA relationships in determining Title I fiduciary status, as it contravenes ERISA and the five-part test.

While the New Interpretation provides that "a single instance of advice to take a distribution from a Title I Plan" and "sporadic interactions" would not meet the regular basis prong, PTE 2020-02, 85 Fed. Reg. at 82805, it would be a strained reading to permit the DOL to consider advice relationships outside such advice for even first-time advice given to a specific plan, when the regulation requires advice to be given "on a regular basis." The DOL relies on 1 U.S.C. § 1 to support that "[i]t is by no means uncommon to interpret regulatory or statutory terms phrased in the present to incorporate the future tense." PTE 2020-02, 85 Fed. Reg. at 82805 n.44. However, 1 U.S.C. § 1 states that this interpretative method applies "unless the context indicates otherwise." Given the context of the five-part test's clear textual limitation to *specific* plans and the Fifth Circuit precedent, the DOL cannot read a prospective consideration of future advice spanning different plans when the text of the 1975 five-part test requires a relationship of trust and confidence between financial professionals and an ERISA plan. "[T]reating IRA financial services providers in tandem with ERISA employer-sponsored plan fiduciaries" conflates the distinctions outlined by Congress. *Chamber II*, 885 F.3d at 381. This may be limited if, say, the financial professional gives advice specifically to a plan, but that is not what the regulation says; the Court must review the text of the regulation before it.

The New Interpretation's construction of advice given "on a regular basis to the plan" conflicts directly with the five-part test's mandate and is unambiguously foreclosed by the DOL's own regulation. Given this conflict, this portion of the New Interpretation is unreasonable under any standard for reviewing agency action.

ii.   *The New Interpretation does not conflict with the mutual agreement or primary basis requirements of the 1975 Five-Part Regulation.*

Plaintiffs next complain that the "mutual agreement" and "primary basis" prongs of the five-part test are now meaningless, holding that the New Interpretation "simply assumes that *any* type of ongoing relationship with an Investment Professional must be fiduciary in nature, without any meaningful consideration of whether the marketplace or the parties themselves would expect" a mutual agreement that the recommendation will serve as the primary basis for the plan's investment decisions. Pls.' Br. 26-31.

As stated previously, the five-part test requires that, in order to be an investment advice fiduciary, advice must be given "pursuant to a mutual agreement, arrangement, or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan." 29 C.F.R. § 2510.3–21(c)(ii)(B). "That *mutual* agreement, arrangement, or understanding must indicate that such advice will serve as the primary basis for the plan's investment decisions and that the advisor will render individualized investment advice based on the plan's particular investment needs." *Schloegel*, 994 F.2d at 273 (quoting 29 C.F.R. § 2510.3–21(c)(1)(ii)(B)).

Beginning the analysis with the text, as courts must, the text of the regulation indicates broad coverage over a multitude of relationships. Black's Law Dictionary describes an "agreement" as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Agreement*, Black's Law Dictionary (11th ed. 2019). An arrangement can be a "nonbinding settlement of a dispute or issue of mutual concern; a nonobligatory compromise reached," "an agreement between a debtor and his or her creditors to modify the obligations to them." *Arrangement*, Black's Law Dictionary (11th ed. 2019). And an understanding is merely "[a]n agreement, esp. of an implied or tacit nature." *Understanding*, Black's Law Dictionary (11th ed. 2019). While these dictionary definitions are certainly not the sole basis for the meaning of words within regulations, *see Chamber II*, 885 F.3d at 370 (quoting *Varity Corp.*, 516 U.S. at 502), these definitions bolster ERISA's liberally construed "fiduciary" definition and common law roots to support a broad reading of what types of mutual conduct are covered under this prong of the five-part test. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 544 (S.D. Tex. Sept. 30, 2003) (quoting *Ariz. State Carpenters Pension Tr. Fund v. Citibank (Arizona)*, 125 F.3d 715, 720 (9th Cir. 1997)) ("Fiduciary status under ERISA is to be construed liberally, consistent with ERISA's policies and objectives.").

Moreover, the New Interpretation provides that "the regulation's reference to the advice [is on] 'a' primary basis rather than 'the' primary basis." PTE 2020-

02, 85 Fed. Reg. at 82808. Thus, if "the parties reasonably understand that the advice is important to the Retirement Investor and could determine the outcome of the investor's decision, that is enough to satisfy the 'primary basis' requirement." *Id.* These provisions highlight that the parties must mutually agree, in some form of a relationship, that the rollover recommendation is a key part of the retirement investor's decision to divest their Title I plan assets.

ERISA's fiduciary definition encompasses any party who has "control and authority over the plan." *Chamber II*, 885 F.3d at 377 (quoting *Mertens*, 508 U.S. at 262). The New Interpretation purports to do just that—cover financial professionals' behaviors if it is determined that there is mutual agreement to have authority or control that the advice will serve as the foundation for investment decisions regarding Title I or Title II plans, provided that all other parts of the five-part test are also satisfied. "[U]nilateral views or unilateral impressions of one party or another are not dispositive" of a mutual agreement between parties. Oral Tr. 50 (ECF No. 60); PTE 2020-02, 85 Fed. Reg. at 82808 ("The [DOL] also declines in this exemption to set forth evidentiary burdens applied to establish a mutual understanding, including any presumptions . . . . That question is better left to development by the courts or, if necessary, future guidance or rulemaking."). The fiduciary relationship is a fact intensive inquiry on the functional effect of the financial professional's relationship with the retirement investor, and the New Interpretation as written is not defective for promulgating a facts-and-

circumstances analysis of any mutual agreement of the parties or primary basis of the recommendation.

The DOL notes that it "intends to consider the reasonable understanding of each of the parties" and "consider[s] marketing materials in which Financial Institutions and Investment Professionals hold themselves out as trusted advisers, in evaluating the parties' reasonable understandings with respect to the relationship." PTE 2020-02, 85 Fed. Reg. at 82806. The New Interpretation focuses expressly on factual matter that demonstrates "whether those facts and circumstances give rise to a mutual agreement, arrangement, or understanding." *Id.* at 82808. While the DOL rejects the contention that "written statements disclaiming a mutual understanding . . . will not be determinative" in whether a mutual arrangement is made, *id.* at 82808, the DOL also correctly points out that the five-part test is commonly understood to be a functional analysis of fiduciary status. *Id.* at 82809; *Mertens*, 508 U.S. at 262 (1993) ("ERISA, however, defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan. . . . Professional service providers . . . become liable for damages when they cross the line from advisor to fiduciary."). Functional outcomes require a factual inquiry into not just the title or fee structure of the transaction, but how the financial professional is interacting with the retirement investor. The New Interpretation takes this functional analysis and looks to whether the parties are de facto agreeing to partake in an advice relationship. Defs.'

Br. 60 (noting that the PTE 2020-02's mutual agreement prong now looks to "consisten[cy] with the financial professional's other behavior").

The DOL does not provide that a disclaimer is dispositive for good reason. It would serve little purpose. Another section of ERISA states that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). Thus, while a disclaimer may ultimately shape the understandings of the parties, it cannot be dispositive— public policy demands that when a financial professional acts in a relationship of trust and confidence with retirement investors, the financial professional is a fiduciary.

Plaintiffs argue that this facts-and-circumstances analysis in the New Interpretation "attempt[s] to rewrite the five-part test *sub silentio*." Defs.' Br. 29; *see* Resp. 35. But this improperly focuses on an assumption that "if the rollover recommendation is accepted, the DOL will assert the advice was obviously relied on." Resp. 35. Plaintiffs again retreat to their primary complaint that the test is "circular" because "any broker or agent who recommends a rollover transaction will be a fiduciary if there is an ongoing or expected relationship with the client." Resp. 35. Plaintiffs argue that the DOL will start with the presumption that a relationship is fiduciary in nature. Pls.' Br. 26-27. This position is speculative at best. Plaintiffs' posited presumption is nowhere in PTE 2020-02, and the DOL represented at oral argument that it is unaware of whether there has been any

enforcement action under PTE 2020-02. Oral Tr. 69. Plaintiffs do not cite any unlawful enforcement either. There is no evidence that these prongs have been used to presume financial professionals who act as mere salespeople are engaged in fiduciary relationships.

Further, the mutual agreement and primary basis prongs may be easy to satisfy under the DOL's present application, but they are constrained by the other three prongs of the five-part test, regardless of the New Interpretation's facts-and-circumstances analysis's applicability to initial rollover recommendations. The mutual agreement prong ensures that an advice relationship exists, and the primary basis prong, coupled with the remaining three prongs, ensures that such a relationship is one of trust and confidence.

The New Interpretation, as a whole, attempts to embody the Fifth Circuit's *Chamber of Commerce* mandate, and while errors persist, the New Interpretation of the mutual agreement or primary basis prongs are not one of them. Complaining that one beam is insufficient to support a house while disregarding that four others are in place to support it overlooks the holistic review that the DOL has implemented to review fiduciary status in the context of rollovers. Accordingly, the New Interpretation's mutual agreement or primary basis analysis is not an arbitrary and capricious interpretation of those prongs of the DOL's five-part test.

      *iii.*   *The New Interpretation does not conflict with the any other*
              *elements of the 1975 Five-Part Test.*

Plaintiffs also attack the New Interpretation's final prongs of the five-part test, stating that "the New Interpretation addresses these elements . . . in a way that fails to recognize the foregoing distinctions between salespeople and fiduciary investment advisers." Pls.' Br. 30. The DOL emphasizes that "all elements of the five-part test must be satisfied for a particular recommendation to be considered fiduciary investment advice," Defs.' Br. 61, and that the New Interpretation of these final prongs "further distinguish ERISA fiduciary advice from mere sales activity," Reply 23.

The remaining prongs of the five-part test require that advice be given regarding advice or recommendations as to the investing in, purchasing, or selling securities or other property and that the adviser will render individualized investment advice to the plan. 29 C.F.R. § 2510.3–21(c) (Title I); *see* 26 C.F.R. § 54.4975–9(c) (Title II). Moreover, the New Interpretation provides that:

> The Department also recognizes that the requirement for "individualized" advice is separate from the "primary basis" requirement, but this does not mean that the individualized nature of a particular advice recommendation is irrelevant to whether the parties understood that the advice could serve as a "primary basis" for investment decisions.

*Id.* Individualized advice must be "based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments." 29 C.F.R. § 2510.3–21(c)(1). Further clarifying its position, the preamble includes that "Hire

63

Me" communications[12] would only be fiduciary advice if it is "accompanied by an investment recommendation, such as a recommendation to invest in a particular fund or security, [and] . . . all five parts of the [five-part] test were satisfied." *Id.* at 82809.

Notably, neither side cites any case law regarding how courts have previously interpreted these two prongs of the five-part test. Plaintiffs baldly assert that this new interpretive methodology of reviewing the facts and circumstances surrounding the rollover recommendation is outside "the normal function of stockbrokers and insurance agents engaged in sales to individual customers." Pls.' Br. 30. In their view, the five-part test should be construed not to "advice incidental to a sale but advice regarding the investor's portfolio." Resp. 36 & n.10. This argument mischaracterizes the New Interpretation's targeted conduct. Nothing in the five-part test or ERISA expressly excludes rollovers from the DOL's purview under Title I or Title II (viewed separately), and mere sales conduct regarding rollovers would be excluded as it would not be on a regular basis or individualized advice to the plan regarding the retirement investor's portfolio. Indeed, the crux of

---

[12] A "Hire Me" communication is one where a financial professional "engage[s] in introductory conversations to promote their advisory services to Retirement Investors." PTE 2020-02, 85 Fed. Reg. at 82809. For example, the DOL provides that the following, standing alone, would not be considered investment advice: "I have been working with our mutual friend, Bob, for fifteen years, helping him to invest for his kids' college tuition and for retirement. I would love to talk with you about the types of services my firm offers, and how I could help you meet your goals. Here is my business card. Please give me a call on Monday so that we can discuss." *Id.*

Plaintiffs' complaint seems to be simply the fact that rollovers are now reviewable as potential fiduciary relationships. But this inclusion is proper in certain circumstances where a salesperson establishes a relationship of trust and confidence as to Title I plan investors through trusted advice to financial professionals. The DOL expressly states that the New Interpretation only covers those that "giv[e] and receiv[e] individualized advice—especially advice pursuant to the SEC and NAIC best interest standards—can reasonably expect that the advice may be a basis for decision." Reply 24.

The New Interpretation applied to the final two prongs properly bolsters the five-part test of whether there is a degree of authority, control, trust, and confidence given to the financial professional. Giving a recommendation to an investor to sell their life savings is surely an investment recommendation, and it relates directly to individualized decisions. These recommendations may not all be under the fiduciary label, unless the financial professional satisfies each element of the unambiguous five-part test. Accordingly, the New Interpretation's facts-and-circumstances analysis of the final two prongs is consistent with the five-part test and is not arbitrary and capricious.

## IV.    Remedies

After finding that the DOL exceeded its statutory authority in promulgating the New Interpretation to the extent it impermissibly conflates the distinction of fiduciary status outlined in ERISA between Title I and Title II plans and that the New Interpretation is an arbitrary and capricious interpretation of the DOL's own

policies to the extent it conflicts with the agency's own interpretation of the "regular basis" prong of the 1975 Five-Part Regulation, the Court must determine the appropriate remedy.

    A.  <u>The Court should only vacate the portions of PTE 2020-02's text and preamble that allow consideration of Title II investment advice relationships when determining Title I fiduciary status.</u>

Plaintiffs request vacatur of the rule *in toto*. Pls.' Br. 47. The DOL insists that any relief "should be appropriately tailored and limited to the Plaintiffs before the court."[13] Defs.' Br. 73.

The scope of judicial review under the APA is limited "[t]o the extent necessary to the decision and when presented," and the APA directs that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While "vacatur of an agency action is the default rule" in the Fifth Circuit, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Cargill*, 57 F.4th at 472 (citations omitted); *see Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). Courts should set aside only those parts of final rules that are found to be in excess

---

[13] The DOL argues that the APA does not create a novel remedy of universal vacatur in Section 706. Reply 31. Although Plaintiffs contend this argument "clearly [has] been waived," Oral Tr. 38, the DOL has repeatedly argued that "any relief" should be limited to the Plaintiffs, including at oral argument. Oral Tr. 37-38, 68-69.

of statutory authority or arbitrary and capricious. *See Sw. Elec. Power Co. v. U.S. Env't Prot. Agency*, 920 F.3d 999, 1022 (5th Cir. 2010); *Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1127-28 (D.C. Cir. 1994) ("The APA definition of 'agency action' obliges reviewing courts to carefully limit their review . . . ."). When a rule "may sensibly be given independent life" because only a part of a rule is invalid, the court should only set aside the invalid portion. *Catholic Soc. Serv.*, 12 F.3d at 1128; *cf. United States v. Patel*, 2022 WL 17246941, at *1 n.1 (5th Cir. 2022) (noting that "the doctrine of judicial restraint dictates that [courts] decide cases on the best and narrowest grounds available").

When a party prevails on an APA challenge, a court may either remand with vacatur or remand without vacatur. The Fifth Circuit directs courts to consider two factors to determine whether remand without vacatur is warranted: "(1) the seriousness of the deficiencies of the action, that is how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022); *see Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Remand without vacatur is only appropriate when there is "at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas*, 50 F.4th at 529.

The DOL begins its argument by stating that even if vacatur is warranted, relief should be that the action is "set aside" only as to the Plaintiffs before the Court and that "[i]t cannot be that the first district court decision about any agency

regulation or action inherently has universal effect." Reply 31; Defs.' Br. 72. In the DOL's view, this would require standing to be "extrapolate[d]" to other parties not before the court, even those "who are subject to other legal regimes" and who face different state compliance burdens which may affect standing. Oral Tr. 68-69. Plaintiffs respond that "Fifth Circuit authority is clear," bluntly stating that "if the Court vacates[,] . . . the rule is gone." Oral Tr. 39.

While Fifth Circuit authority may be clear, the Court acknowledges that questions exist regarding the limits of federal jurisdiction in granting universal vacatur of agency rules. In his concurrence in *United States v. Texas*, Justice Gorsuch suggested that "[t]here are many reasons to think § 706(2) uses 'set aside' to mean 'disregard' rather than 'vacate.'" 599 U.S. ___ (2023), 2023 WL 4139000, at *14. By a single plaintiff's request for vacatur having universal effect, "[o]rdinary joinder and class-action procedures would become essentially irrelevant in administrative litigation." *Id*. This echoes the DOL's assertions that "many jurists have questioned the wisdom and even constitutionality of nationwide injunctions," Defs.' Br. 72, and that "Congress . . . did not intend to create a novel remedy of universal vacatur in Section 706," Reply 31. In sum, the DOL agrees with the proposal that allowance for universal relief, "whether by way of injunction or vacatur, strains [respect for] separation of powers." *Texas*, 599 U.S. at ___.

Whether this will be the prevailing viewpoint on the breadth of § 706(2) is not the prerogative of this Court to decide. This Court is not free to ignore Fifth Circuit precedent. As another court in this District recently observed, "[p]recedent

undermines the defendants' position that vacatur should be limited to the plaintiffs." *Texas v. Becerra*, 2023 WL 2754350, at *30 (N.D. Tex. Mar. 31, 2023). The Fifth Circuit has affirmed a holding or held that vacatur of a rule on a nationwide basis is the proper effect for vacatur of an unlawful agency action. *See id.* (discussing precedent); *Data Mktg. P'ship*, 45 F.4th 846, 859-60 (holding that § 706 nullifies and revokes unlawful agency action). While the DOL is correct that potential plaintiffs' standing may be affected by their state's compliance burdens, this does not change the analysis that the DOL has exceeded its statutory authority with respect to the New Interpretation. Furthermore, the United States District Court for the Middle District of Florida recently vacated the policy referenced in FAQ 7 in the New Fiduciary Rule Advice Exemption FAQs. *See generally ASA,* 2023 WL 1967573. This "first district court decision" has nationwide effect and was not limited only to the plaintiffs who brought that case. Accordingly, the Court should not stray from this Circuit's precedent regarding universal vacatur.

The New Interpretation is inconsistent with ERISA and the DOL's own regulations but only to a narrow extent related to the relationships that may be considered when determining fiduciary status. As discussed, the New Interpretation focuses directly on whether a relationship of trust and confidence has been established between a financial professional and a retirement investor when the investor is engaging in a rollover transaction. The New Interpretation's allowance of review that a single rollover "can be the beginning of an ongoing advice relationship" to Title II plans, PTE 2020-02, 85 Fed. Reg. at 82806,

inclusion of potential "future, ongoing relationships" to Title II plans, *id.* at 82805, and conclusion that "an ongoing advisory relationship spanning both the Title I Plan and the IRA satisfies the regular basis prong," *id.* at 82807, exceed the DOL's authority under ERISA and constitute arbitrary and capricious interpretations of the five-part test. There is no realistic possibility that the DOL would be able to substantiate this unlawful action if the Court remanded without vacatur. As noted, Congress carefully delineated between the two types of "plans," and the DOL may not use both Title I and Title II relationships to determine Title I fiduciary status. Further, any decision to remand with vacatur would not be disruptive as there is nothing in the record to show that the New Interpretation's provisions have been enforced against any individual. Oral Tr. 69; *see Allina Health Servs.*, 746 F.3d at 1110-10 ("This is not a case in which the 'egg has been scrambled,' and it is too late to reverse course."). Further, there are no "settled transactions" that may be in jeopardy due to vacatur. *See Am. Sec. Ass'n*, 2023 WL 1967573, at *22.

As to scope, it appears that the New Interpretation can stand alone without these provisions—covering those financial professionals who work regularly with a specific Title I plan and also give rollover recommendations to that same Title I plan in a fiduciary manner (or working regularly with a Title II plan and giving advice to that same Title II plan). The New Interpretation's facts-and-circumstances analysis is consistent with ERISA's text and the five-part test when applied to a specific financial professional's relationship with a specific plan. Only removing the unlawful portion of the New Interpretation does not change its

character or judicially rewrite the action. While this might limit the New Interpretation's impact, courts must decide the cases on the best and narrowest grounds possible. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 414 (D.C. Cir. 2020) ("[T]he 'arbitrary and capricious' standard is narrow and does not permit [the court] to substitute [its] policy judgment for that of [the agency.]" (quoting *Maryland v. EPA*, 958 F.3d 1185, 1210 (D.C. Cir. 2020) (per curiam)).

This crafted relief is reinforced by the Middle District of Florida in the *ASA* case. For similar reasons, the Florida court found that policies included in an FAQ that allowed for the regular basis prong to be satisfied through a review of combined Title I and Title II plan relationships were arbitrary and capricious. *ASA*, 2023 WL 1967573, at *13-19. Yet, the *ASA* decision tailored the remand with vacatur of the policy only to the specific terms in one FAQ, while upholding other portions of the rule because these latter portions were within the scope of ERISA and the five-part test. *Id.* at *20-21. While the Florida court did not conduct a full review of PTE 2020-02, this demonstrates a likelihood that the New Interpretation is able to have a meaningful effect without vacatur of the entire rule. Indeed, the DOL rejects Plaintiffs' suggestion that the *ASA* decision—and the DOL's choice not to appeal that ruling—renders the New Interpretation unworkable. *See* Suppl. Resp. (ECF No. 68). Thus, the Court should vacate only those portions of the preamble of PTE 2020-02 and PTE 2020-02 that expand the view of a Title I fiduciary's status based on Title II plan relationships for the purposes of determining whether a financial professional is an investment advice fiduciary.

### B. A permanent injunction is not warranted.

Plaintiffs also seek a permanent injunction that would enjoin the DOL from implementing, applying, or taking any action of any type under the New Interpretation "anywhere within the DOL's jurisdiction." Pls.' Br. 47. The DOL asks this Court to limit any injunctive relief, if granted, to only the Plaintiffs before the Court. Defs.' Br. 72-73.

An injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "A party seeking a permanent injunction must show: (1) that is has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021) (citing *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006)). Further, "[a] permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions." *Id.* (quoting *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017)). The mere possibility of injury is insufficient, "[p]laintiffs must 'demonstrate that irreparable injury is *likely* in the absence of an injunction." *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 376 (N.D. Tex. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "If a less drastic remedy (such as partial . . . vacatur of [an agency's] decision) [is] sufficient to

redress [a party's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co.*, 561 U.S. at 165-66 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)).

Plaintiffs point out that an injunction versus a vacatur of agency action is "sort of an academic point because the issue of vacating the rule, obviously, has effect beyond just these Plaintiffs." Oral Tr. 37 (ECF No. 60). The effects may indeed be similar, but vacatur is "a less drastic remedy" than an injunction. *Texas*, 40 F.4th at 219. "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action" and it "neither compels nor restrains further agency decision-making." *Id.* at 220. "Vacatur operates on the legal status of a rule, causing the rule to lose binding force. Injunctions, including universal injunctions against enforcement, operate on the defendant by imposing a new duty." John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Y.J. Reg. Bull. 119, 119-20 (2023). These differences show that determining whether vacatur and/or an injunction is appropriate meaningfully changes the analysis of remedies and the potential considerations for each type.

The Court does not find that imposing any new duties or restraining the DOL's authority further is necessary after vacatur of the unlawful provisions. While Plaintiffs have demonstrated success on the merits, the failure to grant an injunction will not result in irreparable injury. Vacatur of the unlawful portions of the New Interpretation is a sufficient, tailored remedy for Plaintiffs as the vacatur will negate any threat of injurious actions by the DOL. Even Plaintiffs themselves

tacitly concede that an injunction is redundant, stating that "once [the New Interpretation] has been vacated under the APA it can no longer be enforced by the DOL against anyone." Resp. 51. Accordingly, the Court should find that an injunction is not warranted.

## Recommendation

For the reasons stated, the Court should DENY Defendants' Motion to Dismiss, and GRANT in part and DENY in part Plaintiffs' and Defendants' Motions for Summary Judgment. The Court should vacate the portions of PTE 2020-02's text and preamble that allow consideration of Title II investment advice relationships when determining Title I fiduciary status, including the New Interpretation's (i) allowance of review that a single rollover "can be the beginning of an ongoing advice relationship" to Title II plans, PTE 2020-02, 85 Fed. Reg. at 82806; (ii) inclusion of potential "future, ongoing relationships" to Title II plans, *id.* at 82805; and (iii) conclusion that "an ongoing advisory relationship spanning both the Title I Plan and the IRA satisfies the regular basis prong," *id.* at 82807; these provisions exceed the DOL's authority under ERISA and constitute arbitrary and capricious interpretations of the five-part test to determine whether financial professionals are acting as "investment advice fiduciaries."

**SO RECOMMENDED.**

June 30, 2023.

_____
REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## <u>INSTRUCTIONS FOR SERVICE AND</u>
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).